## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **Robert PANTON,** | ) |
| *Plaintiff-Petitioner,* | ) Case No. |
| v. | ) **VERIFIED PETITION FOR A** |
| | ) **WRIT OF HABEAS CORPUS AND** |
| **William Joyce**, Acting New York Field Office | ) **COMPLAINT** |
| Director for U.S. Immigration and Customs | ) |
| Enforcement; **Sirce E. OWEN** acting Director of | ) ***Oral Argument Requested*** |
| the Executive Office for Immigration Review | ) |
| (EOIR); **Pamela Jo Bondi**, Attorney General of the | ) |
| United States; **Kristi NOEM**, in her official | ) |
| capacity as Secretary, **U.S. Department of** | ) |
| **Homeland Security** and **U.S. Immigration and** | ) |
| **Customs Enforcement**, | ) |
| *Defendants-Respondents.* | ) |

## PRELIMINARY STATEMENT

1. Petitioner, Robert Panton ("Petitioner" or "Mr. Panton"), is a fifty-nine (59) year old man who

has lived in the United States since he first came as a lawful permanent resident ("LPR") at

four years old in 1970. On this date, March 25, 2025, Mr. Panton was detained by Defendants-

Respondents ("Respondents") Immigration and Customs Enforcement ("ICE") when he

appeared, as instructed, for a regularly scheduled check-in and despite his full and complete

compliance with the terms of the Order of Supervision ("OSUP") that was granted to him by

the government on April 30, 2021. A new copy of the OSUP was issued on December 21, 2022

by the New York ICE Field Office.  *See* Exh. 2, Order of Supervision ("OSUP").  Since his

release from detention on an OSUP on April 30, 2021, he has complied with all requirements

of his release. He was granted stays of removal in 2021 and 2022 and most recently, deferred action status on January 10, 2024, which was renewed until March 25, 2025. Exh. 5.

2. As is discussed *infra,* to grant an OSUP, the government *must* determine that the individual is neither a flight risk nor a danger to the community. Similarly, deferred action is granted where the government makes a case-by-case determination that a noncitizen is not a priority for removal and merits a favorable exercise of discretion.

3. The notice for the March 25, 2025 OSUP check-in scheduled by ICE did not state that Petitioner's OSUP would be revoked, or that he would be detained and processed for, upon information and belief, a rushed and unnoticed deportation to Jamaica, a country where his health will be endangered and to which he has been as yet unable to obtain a passport.

4. Further, ICE is aware that Mr. Panton has three separate pending immigration matters: a motion to reopen removal proceedings with the Board of Immigration Appeals ("Board"), a petition for U nonimmigrant status as a victim of qualifying criminal activity, and a request to extend his previous grant of deferred action.

5. First, ICE knew that Mr. Panton is awaiting adjudication of a motion to reopen removal proceedings, which was filed on April 11, 2024, with the Board. Exh. 3, Board Receipt Notice. His motion seeks reopening to permit adjudication of a waiver of inadmissibility by an Immigration Judge for purposes of a petition for U nonimmigrant status. Exh. 7, Board Motion to Reopen and Supporting Documents. During his original removal proceedings, Mr. Panton was ineligible to apply because the New York Police Department ("NYPD") had not yet provided him with the requisite certification for such a petition. *Id.* Through no fault of his own, Mr. Panton was only able to obtain certification in November 2023, after his removal proceedings had concluded. *Id.*

6. ICE knew that Mr. Panton had filed his application for U nonimmigrant status in December 2023 after receiving the requisite certification from the NYPD. He is prima facie eligible for a U Visa as he was the victim of a shooting in 1991 and nearly died, spending three weeks in the hospital and requiring multiple surgeries. *See* Exh. 7, Board Motion to Reopen Supporting Documents (including Mr. Panton's full petition for U nonimmigrant status).  His application remains pending with USCIS. Exh. 4, USCIS Receipt Notice. He has not yet obtained an initial bona fide determination from the agency.

7. Finally, ICE knew that Mr. Panton had requested an extension of his deferred action status on January 7, 2025, in anticipation of his upcoming check-in. Exh 8, Deferred Action Request; Exh. 9, Email Correspondence with ICE. ICE originally granted Mr. Panton deferred action on January 10, 2024 after Mr. Panton had filed his application for U nonimmigrant status. His deferred action status was set to expire on September 26, 2024, but was renewed on September 25, 2024. Exh. 5. As he has routinely done since his release on an OSUP in April 2021, Mr. Panton filed a request to extend his deferred action status on January 7, 2025. Exh. 8; Exh. 9. His request was based on his pending motion to reopen, his pending petition for U nonimmigrant status, and based on medical necessity due to upcoming surgeries to address severe chronic pain. *Id.* ICE knew that Mr. Panton is currently receiving treatment from a team of medical specialists in New York, New York, for severe, chronic pain and nerve damage. *Id.* Deportation to Jamaica at this time would severely jeopardize his health and prevent necessary surgeries. *Id.*

8. Finally, ICE also knew that Mr. Panton has been unable to obtain a Jamaican passport because his birth certificate cannot be located, and he was making good faith efforts to obtain new copies of his identifying documents prior to his detention. Exh. 9. He is waiting on the

Jamaican Registry Department to respond to a records search as the next step in this process. Exh 9, Email Correspondence with ICE dated March 11, 2025, with attachments. Absent a passport or any other travel documents or records necessary for obtaining such documents, there is no reasonable likelihood of deportation in the immediate future. As such, Mr. Panton is at risk of prolonged detention.

9. As directed by ICE, Mr. Panton, arrived at ICE's New York Field Office located at 26 Federal Plaza, New York, NY 10278 at 9:00 am and proceeded to wait in a line to get into the building. Once in the building, Mr. Panton and his legal counsel continued to wait until his name was called. Mr. Panton and his legal counsel were then called into a room and an ICE officer said that Petitioner would be detained.  Ms. Panton's legal counsel was not, despite attempts to do so, permitted to defend against his re-detention. Rather, ICE ignored legal counsel and immediately detained Ms. Panton.

10. Prior to his unnoticed detention by ICE, Mr. Panton had been residing in Harlem, his home of fifty-five years, since he was four years old. He lived at 135 West 123rd St, Apt. 1A, New York, NY 10027, a short walk from his son, New York Police Department ("NYPD") Officer Dajon Panton; his son's wife; and his one year old grandchild, Olivia.

11. The power of the government to detain and deport immigrants is not without limitations. To the contrary, the power of government to act is delineated by a specific set of statutes and federal regulations, and subject to the limitations of the United States Constitution.

12. To the extent that Respondents revoked Ms. Panton's OSUP without prior notice or opportunity to be heard, Respondents have acted in violation of statute, regulations, and the U.S. Constitution. At the time of his unnoticed detention by ICE, Mr.  Panton was in full and complete compliance with his OSUP and Respondents did not and could not allege any change

in circumstances altering the original assessment of his danger to the community and risk of flight.

13. To comport with due process, immigration detention must bear a reasonable relationship to its two regulatory purposes: ensuring the appearance of noncitizens at future hearings and preventing danger to the community pending the completion of removal. *See Zadvydas v. Davis*, 533 U.S. 690, 691 (2001). Here, despite no changed circumstances regarding either flight risk or public safety, ICE nevertheless detained Mr. Panton without notice, a hearing, or even an interview. *See Rombot v. Souza*, 296 F. Supp. 3d 383, 388–89 (D. Mass. 2017) (finding a due process violation and explaining that ICE "never asserted that Rombot is a danger to the community or a flight risk, or that he violated the conditions of his [OSUP]. . . . The Supreme Court has recognized that a 'alien may no doubt be returned to custody upon a violation of [supervision] conditions,' but it has never given ICE a carte blanche to re-incarcerate someone without basic due process protection.") (quoting *Zadvydas*, 533 U.S. at 700).

14. Moreover, motions to reopen are an "important safeguard," intended "to ensure a proper and lawful disposition" of removal proceedings, *Dada v. Mukasey*, 554 U.S. 1, 18 (2008). Respondents now seek to deport Mr. Panton before the Board adjudicates his pending motion to reopen removal proceedings.   If the Board grants Ms. Panton's motion, he will be able to pursue a waiver of inadmissibility before the Immigration Judge for purposes of his petition for U nonimmigrant status. Ex. 6, Board Motion.  If the Board denies the motion, Mr. Panton could file a petition for review of that decision with the United States Court of Appeals with the Seventh Circuit. Nonetheless, Respondents detained Mr. Panton without any notice or

warning on this date and, upon information and belief, is moving to deport him from the United States.[1]

15. Ms. Panton also has a due process interest in having his petition for U nonimmigrant status adjudicated and that interest should not be cut short by Respondents' unlawful conduct. *See Mathews v. Eldridge*, 424 U.S. 319, 333-34 (1976) (finding that the fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner") (citing *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *S.N.C. v. Sessions,* 2018 WL 6175902, at *6 (S.D.N.Y. Nov. 26, 2018) (granting habeas relief because, in part, "[p]etitioner has a right to make the [visa] applications and have them fully adjudicated without undue interference.")(citing *S.N.C. v. Sessions*, 325 F. Supp. 3d 401, 411-12 (S.D.N.Y. 2018)).

16. During the pendency of this Petition, the Court should order the Respondents to immediately release Mr. Panton.  The Court's authority to release habeas corpus petitioners during the pendency of their petitions is governed by *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001); *see also Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 153 (2d Cir. 2007) (explaining the REAL ID Act of 2005 "did not qualify our inherent authority to admit to bail petitioners in immigrations cases").

17. Where a petitioner seeks injunctive relief, he must demonstrate 1) that he is likely to succeed on the merits; 2) that he is likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tip in his favor; and 4) that an injunction is in the public

---

[1] Because Mr. Panton's motion with the Board was filed at a time when he was not detained and facing imminent removal, he did not file a motion for a stay of removal with the Board. As is set forth herein, Mr. Panton did not have any notice or warning that he would be detained by Respondents on March 25, 2025, he did not, prior to this date file a motion for a stay of removal with the Board.  Mr. Panton is now simultaneously filing a motion for a stay with the Board.

interest.  *See Winter v. National Resources Defense Council*, 555 U.S. 7 (2008).  Mr. Panton meets that burden.

18. Each day that Mr. Panton remains in detention, he suffers irreparable harm. "[I]rreparable harm is presumed where there is an alleged deprivation of constitutional rights." *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015) (citing *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999)). Even absent that presumption, Mr. Panton's continued detention will cause irreparable harm to his physical and mental health.  *See Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (The fact that the plaintiff had "suffered physical effects of his confinement...serve[s] as an independent basis for the district court's conclusion that the plaintiff would suffer irreparable harm in the absence of preliminary injunctive relief"); *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 511 (2d Cir. 2005) ("claims of emotional and physical harm may in some circumstances justify preliminary injunctive relief"); *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332-33 (2d Cir. 1995) (upholding finding of irreparable harm based on "physical and emotional harm" that included the "risk of injury, infection, and humiliation").

19. Mr. Panton's  release is both in the public interest, and supported in consideration of the balance of equities.  The "status quo" in preliminary-injunction parlance is really a "status quo ante."  *See Holt v. Cont'l Grp., Inc.*, 708 F.2d 87, 90 (2d Cir. 1983) (referring to reinstatement of benefits as "restoration of the status quo ante"); accord *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (en banc) (per curiam) ("requir[ing] a party who has disturbed the status quo to reverse its actions ... restores, rather than disturbs, the status quo ante, and is thus not an exception" to the ordinary standard for preliminary injunctions).  This "ante" formulation of the status quo in the realm

of equities is required to prevent Respondent seeking shelter under a current "status quo" precipitated by its wrongdoing.

20. Therefore, Mr. Panton petitions this Court for declaratory, injunctive, and mandamus relief. Mr. Panton seeks this Court's intervention on an emergency basis to provide a limited, protective stay of removal in the form of a temporary restraining order ("TRO") and/or preliminary injunction ("PI") to ensure that Petitioner is not removed from this District and the United States. If a limited protective stay is not granted, Ms. Panton will be deported to Jamaica, where he will be subject to irreparable harm and lose the ability to continue to seek immigration relief through his pending motion to reopen. Further, his deportation would add an additional ground of inadmissibility for which he requires a waiver for purposes of his petition for U nonimmigrant status.

21. In the alternative, because Mr. Panton does not have a passport and Jamaica has been unable to locate his birth certificate or Birth Entry ID Number, he cannot be deported in the reasonably foreseeable future to Jamaica. Mr. Panton fears that Respondent ICE could seek to send him to a third country such as El Salvador, Mexico or Panama, where he fears he would be subject to persecution and torture. *See, e.g.*, Genevieve Glatsky, *Migrants Deported to Panama Ask: 'Where Am I Going to Go?'*, NY TIMES, March 23, 2025, https://www.nytimes.com/2025/03/23/world/americas/migrants-panama-trump-stranded.html (discussing removal of noncitizens to third countries including Panama, Costa Rica, and El Salvador without reasonable fear interviews.).    In the alternative, Mr. Panton therefore seeks a TRO preventing his deportation to any third country of removal.

## **PARTIES**

22. Mr. Panton is a 59-year-old grandfather and community leader who has lived in the United States since he was four years old. He entered as a lawful permanent resident ("LPR") in October 28, 1970, and has three U.S.-citizen adult children in the United States and nine grandchildren.  Prior to his unnoticed detention by ICE on March 25, 2025, that took place at 26 Federal Plaza, New York, NY 10278, Mr. Panton resided at 135 West 123rd St. Apt. 1A, New York, NY 10027.

23. Respondent William Joyce is named in his official capacity as the acting New York Field Officer Director for U.S. Immigration and Customs Enforcement within the United States Department of Homeland Security ("DHS").   In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations and is legal custodian of Petitioner.  Respondent Joyce's address is 26 Federal Plaza, 9th Floor, New York, New York 10278.

24. Respondent, Sirce E. Owen, is named in her official capacity as the acting Director of EOIR. In this capacity,  among other duties, she has the authority to "[d]irect the conduct of all EOIR employees to ensure the efficient disposition of all pending cases, including the power, in her discretion, to set priorities or time frames for the resolution of cases; to direct that the adjudication of certain cases be deferred; to regulate the assignment of adjudicators to cases; and otherwise to manage the docket of matters to be decided by the BIA, the immigration judges, the Chief Administrative Hearing Officer, or the administrative law judges." 8 C.F.R. § 1003.0(b)(1)(ii). Sirce E. Owen is empowered to instruct immigration judges and the BIA to adjudicate an immigration motion.

25. Respondent, Pamela Jo Bondi, is named in her official capacity as Attorney General of the United States.

26. Respondent, Kristi Noem, is named in her official capacity as the Secretary, U.S. Department of Homeland Security. In this capacity, she is responsible for overseeing ICE's day-to-day operations, leading approximately 20,000 ICE employees, including Respondent Joyce.

27. Respondent DHS is an executive department of the United States Government headquartered in Washington, D.C. DHS is the parent agency of ICE.

28. Respondent ICE is a component agency of DHS and is responsible for enforcing federal immigration law, including the detention and removal of immigrants.

## JURISDICTION AND VENUE

29. This Court has jurisdiction under the U.S. Constitution. U.S. Const. art. I § 9, cl. 2 ("The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require."). This Court also has jurisdiction under 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1651 (All Writs Act), the Immigration and Nationality Act ("INA") and regulations thereunder; the Fifth Amendment of the United States Constitution; and the Administrative Procedure Act ("APA"), 5 U.S.C § 701.

30. Petitioner's current arrest and detention — constitutes a "severe restraint" on his individual liberty such that Petitioner is "in custody" of the Respondent in violation of the . . . laws of the United States. *Hensley v. Municipal Court*, 411 U.S. 345, 351 (1973); 28 U.S.C. § 2241.

31. This Court also has jurisdiction under 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1361(mandamus).

32. The Court may grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202, 5 U.S.C. § 702, and 28 U.S.C. § 1361. The government has waived its sovereign immunity pursuant to 5 U.S.C. § 702.

33. Venue is proper in the U.S. District Court for the Southern District of New York because Mr. Panton was detained within this District on March 25, 2025, and upon information and belief, remains in this District. *See* 28 U.S.C. § 1391(e).

34. Venue is also proper because, upon information and belief, Respondent William Joyce is in this District.

## RELEVANT STATEMENT OF FACTS AND PROCEDURAL HISTORY

35. Mr. Robert Savio Panton was born in Kingston, Jamaica, in 1965. He came to the United States at only four years old as an LPR on October 28, 1970. Exh. 1 at ¶18. He is now a father to three U.S. Citizen children: NYPD Officer Dajon Panton, Shamecca Panton, and Aaron Jenkins, who each rely on him for support in caring for Mr. Panton's numerous grandchildren. *Id* at ¶¶66-68 Mr. Panton is also a beloved youth mentor and community leader in Harlem. Exh. 7 at 143-214. His 1992 conviction for a non-violent drug offense, changed Robert's life forever and ignited in him a passion to help youth avoid the mistakes he made when he was a young man. His work and general rehabilitation led to a resentencing by the original judge in his case, and garnered support from numerous elected officials, the original prosecutor in his case, former AUSA Henry DePippo, and the attention of the media. *See* Exh. 7 at 185.

36. In his early twenties , he began working as a boxing trainer at a local gym and, in 1988, he met a man named George Rivera. Exh. 1 at ¶25-26. Mr. Rivera hired Mr. Panton to train him and also offered Mr. Panton a second job–holding money for Rivera's street-level drug distribution location. *Id.* Although Mr. Panton did not sell the drugs and did not know how large of an

enterprise George was operating, he now deeply regrets his decision to become involved in any capacity. *Id.*

37. In 1989, Mr. Rivera was arrested and indicted alongside 32 other individuals on federal charges of conspiracy to distribute heroin. *Id at* ¶30 . Mr. Panton was *not* among those arrested at the time. *Id.* Mr. Panton moved on with his life, focusing on his responsibilities as a young father and attending classes at a community college. *Id* ¶31.

38. On January 10, 1991, Mr. Panton was shot twice while walking near 123rd Street and 2nd Avenue in New York City. *Id.* at 35. He believes the man who shot him targeted him out of a mistaken belief that he had cooperated with police to avoid arrest. *Id.* He was taken to Metropolitan Hospital. The NYPD has certified that Mr. Panton is the victim of the qualifying crimes of Attempt to Commit Murder and Felonious Assault and that he was helpful to the officials in the investigation. Exh. 7 at 52-56 (U Visa App, Form I-918B, dated Dec. 11, 2023).

39. Mr. Panton was arrested while recovering at the hospital for his past role in Mr. River's drug business. *Id.* In 1992, Mr. Panton was convicted in the Southern District of New York of one count of conspiring to distribute and possess with intent to distribute more than a kilogram of heroin between April 1988 and May 1989 in violation of 21 U.S.C. §§ 821, 841(a)(1), and 841(b)(1)(A). Exh. 7 at 111(U Visa App. Ex. D, Original Disposition).

**Mr. Panton's Incarceration Ignited in Him a Lifelong Quest for Personal Development and Community Involvement, Which Ultimately Resulted in his Early Release from his Sentence.**

40. After spending 30 years in prison, in August 2020, sentencing reforms led Judge Preska of the Southern District of New York to release Robert, reducing his sentence to time served plus one week. See *United States v. Panton*, No. 89 Cr. 346 (S.D.N.Y. Aug. 4, 2020); *see also* Exh. 7

at 117-142. She found that releasing Mr. Panton would "avoid sentencing disparity" and that Robert had demonstrated "exceptional and compelling circumstances" warranting his release from prison. *Id.* at 139. Importantly, she found that there was "no doubt" he had fully rehabilitated himself and "no need for further incarceration to protect the public." *Id.* She observed that while incarcerated, Mr. Panton had taken advantage of "every opportunity to improve himself and to prepare for a law-abiding, productive life." *Id.*

41. Mr. Panton's commitment to self-improvement began even before his sentencing. In 1993, he started taking educational courses, including a 500-hour drug education course. He eventually completed more than 20 courses—learning subjects ranging from creative writing to emotional intelligence. *Id.* at 234-261. He obtained diplomas in Civil Litigation Studies and The Professional Paralegal Program from The School of Paralegal Studies. *Id.* Over the years, Mr. Panton increasingly took on leadership positions within the prison, serving as a law library clerk, creative writing teacher, mentor, and Imam to other incarcerated individuals. *Id.* at 164, 230. While at United States Penitentiary Atlanta, Mr. Panton helped launch the "Slow Down Program", which provided mentoring to youth at risk of imprisonment in coordination with the juvenile courts. *Id.* During his incarceration, Mr. Panton also maintained strong relationships with his sisters and his children. *Id.* at 216-228. In particular, his son, NYPD Officer Dajon Panton credits Mr. Panton with "guid[ing] me to a beautiful career in law enforcement" and considers his dad to be a role model. *Id.* at 217. Upon Mr. Panton's release from prison, instead of returning to his family, he was detained by Immigration and Customs Enforcement, held at Boone County Jail, in Kentucky, and placed in removal proceedings in August 2020.

**Mr. Panton has diligently pursued relief from deportation and currently has a pending petition for U nonimmigrant status and a pending motion to reopen proceedings before the Board of Immigration Appeals.**

13

42. Mr. Panton's removal proceedings were venued with the Chicago Immigration Court. On January 27, 2021, Mr. Panton received a final order of removal from Immigration Judge Samuel B. Cole based on a single aggravated felony conviction from 1994. Robert Savio Panton, A 031 257 320 (Jan. 27, 2021) (copy of Removal Order at Exh. 7, sub-exhibit Exh. A). Immigration Judge Cole denied Mr. Panton's application for deferral of removal under the Convention Against Torture. *Id.* Mr. Panton unsuccessfully appealed his case to the Board of Immigration Appeals and to the U.S. Court of Appeals for the Seventh Circuit. Robert Savio Panton, A031-257-320 (BIA, Mar. 30, 2021); *Panton v. Garland*, No. 21-2346, 2023 WL 4027534 (7th Cir. June 15, 2023).

43. On January 20, 2021, Mr. Panton, while detained in ICE Custody in Kentucky, filed an Emergency Petition for Habeas Corpus with the United States District Court for the Eastern District of Kentucky at Covington. Mr. Panton sought release given his health conditions, which include a history of multiple bouts of pneumonia, chronic high blood pressure, and exposure to tuberculosis and the facility's failure to provide basic protections during the COVID-19 pandemic. Complaint, *Panton v. Maydak*, Case No. 2:21-cv-00009 (E.D Ky. 2021). He was subsequently released by ICE on an Order of Supervision ("OSUP") on April 30, 2021 and thereafter granted a stay of removal. Exh. 7, sub-exhibit C at 153; Exh. 2 (OSUP). He was granted a second stay in 2022. *Id.*

44. During his removal proceedings, Mr. Panton requested certification from NYPD for a petition for U nonimmigrant status on December 18, 2020 in the midst of the COVID-19 pandemic. Exh. 7. Three years later, NYPD finally certified Mr. Panton on December 11, 2023, after removal proceedings had concluded. Exh. 7 at 53-57. Mr. Panton promptly filed a petition for U nonimmigrant status ("U visa" and waiver of inadmissibility with USCIS on December 21,

2023. Exh. 4. Thereafter, on January 10, 2024, he was granted deferred action by ICE ERO. Exh. 7, sub-exhibit D. His deferred action status was most recently renewed on September 24, 2025. It expires today, on March 25, 2025, the date of Mr. Panton's check-in with ICE. Exh. 5.

45. On April 11, 2024, Mr. Panton filed a motion to reopen proceedings with the Board of Immigration Appeals so that an immigration judge may adjudicate a waiver of inadmissibility under *L-D-G v. Holder*, 744 F.3d 1022 (7th Cir. 2014). Exh. 3; Exh. 7.

**Today, Mr. Panton Works Tirelessly to Make Amends in Harlem and Is a Respected Community Leader.**

46. Since returning to Harlem, Mr. Panton has dedicated himself to youth mentorship. In 2021, Mr. Panton launched a campaign called "Too Young to Die" alongside Poet Laureat Mahdi Salam. His dream is "that [young people] do not have to go to jail to realize how they are hurting themselves and the people around them like I did." *Id.* at X. As part of his work, Mr. Panton operates a suicide prevention hotline, volunteers at SCAN-Harbor's after school programming, and is a guest speaker at community events. *Id.*; *see generally* Exh. 7 at 185-223 (Letters of Support from Family, Mentees, and Community Leaders). In the summer of 2022, Mr. Panton, designed and ran a summer program for teenage youth in collaboration with Lead by Example Reverse the Trend, a community organization in Harlem. *Id.* at 209. The following summer, he ran a summer internship program at Urban Homeownership Corporation to provide youth in Harlem with job readiness skills. *Id.* at 211-212. Two of those young men were later hired by Urban Homeownership Corporation to permanent positions. *Id.* For his work in the community he was awarded the Community Warrior Award in 2023. Exh. 7 at 263. Finally, Mr. Panton's work has garnered him the support of dozens of local and national

nongovernmental organizations and civil society organizations as well as elected officials, namely U.S. Reps. Adriano Espaillat (NY-13) and Jerrold Nadler (NY-14). Exh. 7 at 188-202.

47. Mr. Panton has also been an outspoken advocate for immigrants. On March 29, 2023, he appeared with U.S. Representatives Jesús "Chuy" García (IL-04), Ayanna Pressley (MA-07) and Greg Casar (TX-35) for the reintroduction of the New Way Forward Act, a crucial piece of legislation that takes major policy steps toward removing racism entrenched in U.S. immigration laws. Mr. Panton spoke at a press conference, providing personal testimony in support of the bill.[2]

48. In addition to his work in his community, Mr. Panton is committed to making up for lost time with his children and grandchildren. Exh. 1. His son NYPD Officer Dajon Panton lives near Mr. Panton and has a one-year-old child, who Mr. Panton provides critical child care for. Mr. Panton's daughter Shamecca Panton lives in Atlanta, Georgia, with her young daughter, but visits her father in New York often. *Id.* Shamecca has struggled with mental illness throughout her life. *Id.* If Mr. Panton were able to stay in the United States long term, she would move to New York to benefit from his assistance. *Id.* Mr. Panton's oldest son Aaron is planning to move to New York to live with Mr. Panton. Exh. 1. Mr. Panton also maintains close relationships with his oldest son Aaron, who lives in North Carolina, and his three sisters, Greta, Grace, and Kandi. Mr. Panton's sister Grace writes in a declaration, "I pray that my brother is allowed to stay in the only country he has ever known. Not only for Robert's sake, but for the sake of our entire family who has lost almost 3 decades of time with our loving brother, father…". *Id.* at 174.

**Mr. Panton Requires Surgery to Address Severe Chronic Pain and Is Working with a Team of Surgeons in New York.**

---

[2] Live video of the press conference is available here:
https://www.facebook.com/ImmJusticeNetwork/videos/884379482791997.

49. Mr. Panton has suffered from chronic pain for the last two years due to a series of accidents, and he now requires additional surgeries.

50. In January 2022, Mr. Panton was a passenger in a car that was T-boned, and he severely injured his neck, back, and right knee to such a degree that he was certified as disabled by Dr. Joyce Goldenberg of the Central Park Physical Medicine and Rehabilitation, P.C. Exh. 8. Mr. Panton underwent an initial knee surgery in 2022, but a recent MRI revealed that he requires a second surgery, which his orthopedic surgeon, Dr. Steven Struhl is in the process of scheduling. Mr. Panton hopes that once he has recovered from his knee surgery, he will be healthy enough for back surgery that has been recommended by doctors in New York. Exh. 1; Exh. 8.  Mr. Panton's  medical team includes: Dr. Haider, his primary care physician, Dr. Steven Struhl, his orthopedic surgeon, Dr. Thomas Youm, an orthopedic hip surgeon, Dr. Joyce Goldenberg, a physiatrist, and Dr. Dr. Peter Kwan, a neurologist. *Id*.

51. If deported to Jamaica, he would lose his health insurance, his long-standing medical team, and access to appropriate treatment as Jamaica's dangerously underdeveloped health care system would jeopardize Mr. Panton's health. Exh 8. Not only would he be unable to receive proper surgeries in Jamaica, but he would be unable to access appropriate care for recovery including but not limited to physical therapy and rehabilitation, ongoing pain management medication, and accessible transportation for his ongoing disabilities. *Id.*

**Mr. Panton was detained without notice on March 25, 2025 at a scheduled ICE Check-in**

52. Mr. Panton has repeatedly checked in with ICE since his release on an OSUP in April 2021 and has never been re-detained. In anticipation of his scheduled March 25, 2025 check-in, Mr. Panton, through counsel at the National Immigrant Justice Center, filed a request to extend his deferred action based on medical necessity – namely his upcoming surgeries – as well as his

pending U visa application and motion to reopen with the Board. ICE confirmed receipt of his request on January 7, 2025. Exh. 9, Email Correspondence with ICE.

53. On March 11, 2025, Ms. Olivia Abrecht, counsel at the National Immigrant Justice Center wrote to ICE to supplement the original request and seek a decision. *Id.* She provided ICE with documentation of an upcoming medical procedure on March 27 and informed ICE that Mr. Panton had been working to obtain a Jamaican passport, but that he was now waiting on the results of a Jamaican Registry Department search for his birth entry ID number. *Id.* Per the Jamaican Registry Department, a Birth Entry ID Number is required to obtain a new birth certificate, which is necessary to apply for a Jamaican passport.

54. ICE Deportation Officer, Jaime Rodriguez replied, stating he was no longer Mr. Panton's Deportation Officer ("DO"), but had forwarded the email to the new DO, Officer William Lee. Ms. Abrecht requested contact information for Officer Lee and received no response. *Id.*

55. On March 25, 2025, Mr. Panton timely appeared at ICE's Office located at 26 Federal Plaza, New York, NY 10278 pursuant to his OSUP and was, without any notice or warning, detained by ICE.

56. Mr. Panton's motion to reopen with the Board remains pending and his application for a U visa remains pending with USCIS.

## **LEGAL FRAMEWORK**

**Ms. Panton's Due Process, Statutory, and Regulatory Rights to Release from Detention and Unlawful Re-Detention.**

57. Respondents purported basis for re-detaining Mr. Panton is 8 U.S.C. §1231. ICE's authority to release people from detention is governed by 8 U.S.C. § 1231(a)(3), which grants ICE authority to release an individual "subject to supervision."

58. Federal regulations specify that ICE may only release such individuals if they "demonstrate[] to the satisfaction of the Attorney General . . . that his or her release will not pose a danger to the community or to the safety of other persons or to property or a significant risk of flight pending such alien's removal." 8 C.F.R. § 241.4(d); *see also id*. § 241.4(e)(6). These requirements—flight risk and danger—reflect constitutional constraints, since only individuals who pose a flight risk or danger may be civilly detained. *See Zadvydas v. Davis*, 533 U.S. 690 (2001).

59. Mr. Panton having been released on an OSUP pursuant to this process, was therefore deemed by Respondents to lack flight risk or dangerousness – a determination that was repeatedly re-affirmed through grants of stays of removal and deferred action status.

60. To comport with due process, detention must bear a reasonable relationship to its two regulatory purposes—to ensure the appearance of noncitizens at future hearings and to prevent danger to the community pending the completion of removal. *Zadvydas*, 533 U.S. at 690-691 (2001).

61. ICE determined that Mr. Panton is neither a flight risk nor a danger when they granted him an OSUP on April 30, 2021. Since that date, Respondent's circumstances have not changed, and he has remained in full and complete compliance with the OSUP. ICE has further granted him two consecutive stays of removal and two consecutive grants of deferred action—confirming that ICE has repeatedly re-determined he does not pose a danger to public safety or a flight risk.

62. Procedural due process constrains governmental decisions that deprive individuals of property or liberty interests within the meaning of the Due Process Clause of the Fifth Amendment. Because Mr. Panton's detention on March 25, 2025, lacked the procedural protections that

such a significant deprivation of liberty requires under the Due Process Clause of the Fifth Amendment to the U.S. Constitution, his continued detention is unlawful. *See Mathews,* 424 U.S. at  332 (1976); *see also Perry v. Sindermann*, 408 U.S. 593, 601-03 (1972) (reliance on informal policies and practices may establish a legitimate claim of entitlement to a constitutionally protected interest). Infringing upon a protected interest triggers a right to a hearing before that right is deprived. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569-70 (1972).

63. The revocation of Mr. Panton's release does not satisfy the minimum requirements of due process, because that revocation is not the product of any individualized review and alleges no relevant change in circumstances altering the original assessment of his risk of flight. *See Rombot,* 296 F. Supp. 3d at 388. *See also, Torres-Jurado v. Biden,* 2023 U.S. Dist. LEXIS 193725 at *12 (S.D.N.Y. Oct. 29, 2023) (stating that "due process, at a minimum" requires the government to afford meaningful notice and an opportunity to be heard and that the opportunity must be meaningful) (citing to *Ying Fong v. Ashcroft*, 317 F. Supp. 2d 398, 403 (S.D.N.Y. 2004)).

64. The government's putative basis for detention of Mr. Panton is 8 U.S.C. § 1231, the statute governing detention following a final order of removal ("post-order detention"). Under the terms of this statute and the governing regulations, Mr. Patnton's detention is unlawful.

65. The INA specifies circumstances upon which a person may be released from custody, and it does not provide for re-detention except impliedly for a violation of those terms. The relevant regulatory framework (8 C.F.R. §§ 241.4(l) and 241.13(i)) authorizes revocation of an individual's release on an OSUP only in certain contexts. Section 241.4(l) specifies revocation may occur upon violation of the conditions of release or when, in the district director's opinion,

revocation is in the public interest because one of four conditions is met: "(1) the purposes of release have been served; (2) the alien violates any condition of release; (3) it is appropriate to enforce a removal order or to commence removal proceedings against an alien; or (4) the conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate." 8 C.F.R. § 241.4(l)(2). Section 241.13(i) provides further conditions where release decisions may be revoked, only for the purpose of removal. Notably, several of these provisions are found only in the regulations and not the statute and are ultra-vires, but even to the extent they apply, Respondents have failed to comply with the process.

66. 8 U.S.C. § 1231 authorizes the detention of individuals following a final order of removal only under specifically delineated circumstances. The third subclause of 8 U.S.C. § 1231(a)(3) provides that an individual who is not removed within a 90-day statutory removal period "*shall* be subject to supervision*" (emphasis added) under specific terms, including requirements that he or she appear periodically before an immigration officer and obey any written restrictions. *See also* 8 C.F.R. § 241.5 (specific conditions for release—involving but not limited to reporting requirements and travel document acquisition requirements—should an order of supervision be issued).

67. Mr. Panton has, at minimum, a regulatory right to an explanation for the reasons of revocation as well as an interview to contest the basis for the revocation. At a minimum, ICE "has the duty to follow its own federal regulations." *Haoud v. Ashcroft*, 350 F.3d 201, 205 (1st Cir. 2003) (quoting *Nelson v. I.N.S.*, 232 F.3d 258, 262 (1st Cir. 2000)). It has failed to do so here. Mr. Panton's attorney was not even allowed in the room during his check-in.

68. When the government fails to comply with its own federal regulations, as it did when it revoked Mr. Panton's release in violation of its own procedures, the action should be found invalid. *See Rombot*, 296 F. Supp. 3d at 388.

69. Moreover, under the APA, "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. The reviewing Court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (E).

70. The decision to detain Mr. Panton, who had previously been released on an OSUP, and neither violated nor failed to comply with the OSUP, and has a pending motion before the Board and a pending petition for U nonimmigrant status as a victim of a crime, must be reviewed by this Court and found to be "arbitrary, capricious, an abuse of discretion and not in accordance with the law." 5 U.S.C. §§ 706(2)(A), (E). Absent this Court's intervention, Mr. Panton does not have any "remedy" to challenge the decision of Respondents. *See Torres-Jurado,* 2023 U.S. Dist. LEXIS 193725 at *14 (finding that "[a]lthough procedural requirements can seem like a mere formality, they promote 'agency accountability' and ensure that the parties—and where relevant, the public—can respond fully and in a timely manner to an agency's exercise of authority.") (citing *Bd. of Regents of State Colleges,* 140 S. Ct. 1891).

**Mr. Panton Has the Right to Have his Motion to Reopen (Now on Appeal with the Board) Adjudicated.**

71. The Supreme Court has called the right to move to reopen proceedings as "an 'important safeguard' intended 'to ensure a proper and lawful disposition' of immigration proceedings." *Kucana v. Holder*, 558 U.S. 233, 242 (2010) (quoting *Dada v. Mukasey*, 554 U.S. 1, 18

(2008). The Second Circuit has likewise called its review of motions to reopen through the Petition for Review process "meaningful" and no less thorough than habeas review. *Luna v. Holder*, 637 F.3d 85, 98 (2d Cir. 2011).

72. The filing of a motion to reopen and/or an appeal of an Immigration Judge's denial of a motion to reopen does not necessarily stay the execution of a removal order. Yet a stay of removal—and with it the opportunity to remain safely in the United States—is often crucial to the motion reopen process.

73. First, it is much more difficult to pursue the motion to reopen process from outside the United States, because it can be difficult to communicate with one's attorney and obtain and provide evidence. *See Compere v. Nielsen,* 358 F. Supp. 3d 170, 181-182 (D.N.H. 2019).

74. Third, no reliable system is in place to ensure that deported immigrants, if they are able to survive, can return to the U.S. if their motion to reopen is later granted. For instance, the government will not necessarily pay for travel or assist with arrangements which, as a practical matter, may make returning impossible. *See Nat'l Immigration Project of Nat'l Lawyers Guild v. U.S. DHS*, No. 11-cv-3235, 2014 WL 6850977, at *5 (S.D.N.Y. Dec. 3, 2014) (finding "the government's refusal to fund the return of indigent aliens" "troubling" because "the financial burden of removal may, as a practical matter, preclude effective relief.").

75. Absent a TRO, Mr. Panton could very likely be stranded in Jamaica because travel outside the United States could subject him to grounds of inadmissibility as a returning lawful permanent resident pursuant to INA § 101(a)(13)(C), 8 U.S.C. § 1101(a)(13)(C). As such, his premature removal would substantively change the procedural posture of his case. His removal would trigger additional grounds of inadmissibility, namely INA § 212(a)(9)(A) and

INA § 212(a)(9)(B)(i)(II), 8 U.S.C. §§ 1182(a)(9)(A) & (a)(9)(B)(i)(II), and he would therefore need to seek a waiver for these additional grounds.

**Mr. Panton Has a Due Process Interest in Having His Petition for U Nonimmigrant Status Adjudicated.**

76. Individuals who pursue lawful immigrant status in the United States have rights under the Due Process Clause of the Fifth Amendment. The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews,* 424 U.S. at 333 (1976) (internal citations omitted). Procedural due process "imposes constraints on government decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Id*. At 332.

77. Once a party has identified a protected liberty or property interest, the Court must determine whether constitutionally sufficient process has been provided. *See id.* In making this determination, the Court balances: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural requirement would entail;" (3) "the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* At 335.

78. Due process cases recognize a broad liberty interest rooted in both the *fact* of deportation and the *process* of removal proceedings. *See Bridges v. Wixon*, 326 U.S. 135, 154 (1945) (deportation "visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom."); *see also Chhoeun v. Marin*, 306 F. Supp. 3d 1147, 1160 (C.D. Cal. 2018) (finding a noncitizen possesses a "strong liberty interest" where being deported means being separated from home and family). While this liberty interest typically

arises in removal proceedings, courts have found procedural due process violations for persons not in removal proceedings. *See, e.g., Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998) (forms issued to noncitizens charged with civil document fraud violated due process clause); *Rojas v. Johnson*, 305 F. Supp. 3d 1176, 1187 (W.D. Wash. 2018) (concluding that "Agency Defendants do not provide sufficient notice of the one-year deadline to satisfy the Due Process clause" to asylum-seeker subclasses both in and out of removal proceedings).

79. Mr. Panton has a protected due process interest in having his petition for U nonimmigrant status adjudicated and to remain in the United States and ultimately receive lawful permanent residence status.

80. U Visa status is a form of immigration relief for noncitizen victims of certain crimes in the United States, who have suffered "substantial physical and mental abuse", and who have been or are likely to be helpful to authorities in investigating or prosecuting that crime, and provides a pathway to lawful permanent residency. *See* 8 U.S.C. §§ 1101(a)(15)(U), 1184(p). Congress created the U Visa as part of the Victims of Trafficking and Violence Protection Act of 2000 ("TVPA"). See Pub.L. No. 106–386, 114 Stat. 1464 (2000). The provision is intended to encourage noncitizen crime victims to help law enforcement without fear of deportation. See New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status, 72 Fed.Reg. 53014, 53014–15 (Sept. 17, 2007).

81. Pursuant to 8 C.F.R. § 214.14(d)(2), an individual applying for a U Visa can be granted "deferred action" which was a status designed specifically to prevent deportation. "Deferred action" was intended by Congress to ensure that victims of crime are able to access the process created to seek a U Visa. Pursuant to 8 U.S.C. § 1184(p)(2), only 10,000 U Visas are issued to crime victims per fiscal year. *See* 8 C.F.R. § 214.14(d)(1). Crime victims who are eligible

for a U Visa, but are not granted the status because of the cap, are placed on a waiting list. 8 C.F.R. § 214.14(d)(2). Those on the waiting list and their qualifying family members are granted deferred action—a decision to stay their deportation as an act of prosecutorial discretion—while their petitions are pending. *Id.* USCIS may also grant these individuals and their qualifying family members work authorization. *Id.*

82. The legal framework enacted by Congress recognizes that individuals who are able to successfully obtain the requisite certification from law enforcement in support of a U Visa application, should not be denied the right to seek relief regardless of the yearly caps on the numbers of U Visas that can be granted each year. Thus, "deferred action" together with the right to seek employment authorization makes clear that the intent of Congress was that all applicants with a pending U Visa would be able to remain in the United States and not be simply subject to deportation when an agency decides otherwise. This framework is given that USCIS's website provides that 80 percent of U visa applications are completed within 39.5 months.[3]

83. Crucially, USCIS' Policy Manual states that it does not grant bona fide determinations or deferred action to individuals applying from abroad who have been removed. USCIS Policy Manual Chap. 5(C)(7)("USCIS only issues BFD EADs and deferred action to petitioners living in the United States as it cannot provide deferred action or employment authorization to petitioners outside the United States.").

84. Further confirming Congress's desire to enable non-citizens in removal proceedings from accessing relief via a U visa application, Congress also created two expansive pathways to obtaining waivers of inadmissibility for U visa applicants under 8 U.S.C. § 1182(d)(14) and 8

---

[3] Available at: https://egov.uscis.gov/processing-times/.

U.S.C. § 1182(d)(3)(A). Most crucially, the U.S. Court of Appeals for the Seventh Circuit ("Seventh Circuit"), the circuit in which Mr. Panton's removal proceedings are venued, has affirmed that non-citizens have the right to seek a waiver of inadmissibility from an Immigration Judge for purposes of a U visa application. *L.D.G. v. Holder*, 744 F.3d 1022 (7th Cir. 2014). In so holding, the Seventh Circuit recognized the importance of an Immigration Judge's ability to adjudicate a waiver in the interest of efficiency given that non-citizens are operating in "an administrative system as backlogged as the U.S. immigration bureaucracy has been." *L.D.G. v. Holder*, 744 F.3d at 1031.

85. Should Mr. Panton be removed prior to the adjudication of his U visa application, his removal would trigger additional grounds of inadmissibility, namely INA § 212(a)(9)(A) and INA § 212(a)(9)(B)(i)(II), 8 U.S.C. §§ 1182(a)(9)(A) & (a)(9)(B)(i)(II),  and he would therefore need to seek a waiver for these additional grounds. Thus, Mr. Panton faces a risk of erroneous, premature deportation, which would substantively change the procedural posture of his case and add additional hurdles, which could prove insurmountable.

86. Interpreted in light of the Constitution, the INA, its applicable regulations, and Board caselaw, the TVPA does not support deportation while an individual is engaged in the process of attempting to regularize his immigration status through a U Visa application with a waiver of inadmissibility from an Immigration Judge. Rather, the INA seeks to protect individuals who are victims of qualifying crimes, even if they live in the United States under final orders of removal. INA § 237(d)(1).

87. Mr. Panton has a liberty interest and property at stake under the TVPA.  Although deportation does not prevent an applicant from ultimately receiving a U Visa, it does prevent an applicant from receiving "deferred action" status pending their U Visa—a status designed specifically

to prevent deportation. 8 C.F.R. § 214.14(d)(2). Further, removal would interfere with an Immigration Judge's ability to adjudicate the waiver of inadmissibility for purposes of the petition for U nonimmigrant status.

88. ICE's effort to prematurely deport Mr. Panton, by improperly revoking his OSUP before USCIS can adjudicate his U Visa application or make a bona fide determination and before an Immigration Judge can rule on his application for a waiver, constitutes an unlawful attempt to shortchange this process.

## CLAIMS FOR RELIEF

## COUNT I:

## MR. PANTON'S DETENTION VIOLATES THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE BECAUSE IT BEARS NO REASONABLE RELATIONSHIP TO ANY LEGITIMATE PURPOSE

89. Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

90. To comport with due process, detention must bear a reasonable relationship to its two regulatory purposes—to ensure the appearance of noncitizens at future hearings and to prevent danger to the community pending the completion of removal. *Zadvydas*, 533 U.S. at 690-691.

91. Petitioner is neither a danger nor a flight risk. The detention of Petitioner is arbitrary on its face.

92. Mr. Panton has dutifully complied with every condition of his OSUP and no change in circumstances exists to warrant the revocation of his OSUP.

93. Because Petitioner's detention has been unaccompanied by the procedural protections that such a significant deprivation of liberty requires under the Due Process Clause of the Fifth Amendment to the U.S. Constitution, his continued detention is unlawful.

## COUNT II:

## MR. PANTON'S DETENTION VIOLATES THE INA, REGULATIONS THEREUNDER, AND THE FIFTH AMENDMENT DUE PROCESS CLAUSE BECAUSE HE HAS BEEN RELEASED ON A VALID ORDER OF SUPERVISION AND THE ORDER HAS NOT BEEN VALIDLY RESCINDED

94. Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

95. Respondents' presumed basis for re-detaining Petitioner is 8 U.S.C. § 1231, the statute governing detention following a final order of removal ("post-order detention").

96. Under the terms of this statute and the governing regulations, Petitioner's release order has not been validly rescinded or terminated.  His re-detention is therefore unlawful.

## COUNT III:

## MR. PANTON'S RE-DETENTION BY RESPONDENTS VIOLATES THE APA AND THE *ACCARDI* DOCTRINE

97. Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

98. The APA provides that a court "shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When the government has promulgated "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes, such that the agencies are bound to follow their own "existing valid regulations."  *United States ex rel. Accardi Shaugnessy*, 347 U.S. 260, 266, 268 (1954).  The *Accardi* doctrine also obligates agencies to comply with procedures it outlines in its internal manuals. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (finding that an agency is obligated to comply with procedural rules outlined in its internal manual).

99.  To the extent that Respondents have revoked Mr. Panton's OSUP without notice or an opportunity to be heard, they violated the statute and the applicable regulations–8 C.F.R. §§ 241.4(l) and 241.13(i)–by failing to provide her with a particularized notice of the reason(s) of the revocation of her release or an opportunity to respond to the allegations contained therein.

100.  Mr. Panton has no adequate remedy at law.

**COUNT IV:**

**MR. PANTON'S RE-DETENTION BY RESPONDENTS VIOLATES THE APA, 5 U.S.C. § 706(2)**

101.  Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

102.  The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

103.  The pertinent regulations require ICE to provide notification "of the reasons for the revocation" of the order of supervision.  8 C.F.R. § 241.1(l)(1).  No such notification has been made by DHS.

104.  The pertinent regulations permit redetention only if a determination is made by specified agency actors revocation is in the public interest.  8 C.F.R. § 241.1(l)(2).  No such determination has been made, nor communicated to Mr. Panton.

105.  Furthermore, Respondents' re-detention of Mr. Panton who was in full and complete compliance with his OSUP was arbitrary and capricious. Respondents failed to articulate a reasoned explanation for their decision in light of all available evidence.

106.  A court reviewing agency action "must assess … whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment; it

must "examine[e] the reasons for agency decisions- or, as the case may be, the absence of such reasons." *Judulang v. Holder*, 565 U.S. 42, 53 (2011) (quotations omitted).

107.    Ms. Panton has no adequate remedy at law.

## COUNT V:

## MR. PANTON HAS THE RIGHT TO HAVE EOIR ADJUDICATE HIS MOTION TO REOPEN

108.    Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

109.    Mandamus is available to a party to compel a federal official or agency to perform a duty if: (1) she has a clear right to the relief requested; (2) defendant has a clear, non- discretionary duty to act; and (3) there is no other adequate remedy available. See 28 U.S.C. § 1361.

110.    Here, Mr. Panton cannot seek review by the circuit court of appeals in connection with a petition for review until such time that there has been a denial of his pending motion to reopen by the Board EOIR.

111.    Immigration agencies, including the Board, cannot functionally eliminate statutory rights. *See*, *e.g.*, *Kucana*, 558 U.S. at  252-53 (2010) (holding that the agency cannot cut off right to judicial review of motions to reopen by regulation)

112.    Without a protective stay of removal from a District Court, ICE can summarily remove people like Mr. Panton and thereby obviate any meaningful opportunity for them to continue pursuing a pending motion to reopen removal proceedings.  Mr. Panton's right to a fair proceeding guaranteed by the INA and Due Process Clause will be violated. *See Mathews,* 424 at 335 (1976); *Reno v. Flores*, 507 U.S. 292, 306 (1993).

113.    Here, the private interests at stake are weighty: deportation can result in serious and irreparable injuries. *See, e.g., Delgadillo v. Carmichael*, 332 U.S. 388, 391 (1947); *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010).

114.    This is especially true in the case of Mr. Panton where his removal will effectively preclude him from pursuing a waiver of inadmissibility before the Immigration Court, add additional grounds of inadmissibility for which he would need a waiver, and endanger his health. The risk of erroneous deprivation absent improved procedures is great. Further, his motion to reopen is evidently non-frivolous as it has remained pending for over 11 months, long before the current threat of removal.

115.    Finally, any government interest in minimizing burdens cannot outweigh the other factors or the government's interest in proper adjudications. *See, e.g., Oshodi v. Holder*, 729 F.3d 883, 896 (9th Cir. 2013) (noting that government's burden is "minimal" where procedural protection "require[s] no process that the government has not already imposed on itself").

116.    Pursuing any additional administrative remedy would prejudice Mr. Panton.

117.    Given that Mr. Panton has "no other adequate means to attain the relief he desires," his right to mandamus relief is therefore "clear and indisputable." *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 35 (1980).

118.    Mr. Panton therefore seeks an order in mandamus mandating that Sirce Owens ensure that a decision be made on the motion to reopen before Mr. Panton is removed.

### COUNT VI:

**MR. PANTON'S REMOVAL PRIOR TO THE ADJUDICATION OF HIS PETITION FOR U NONIMMIGRANT STATUS VIOLATES THE ADMINISTRATIVE PROCEDURES ACT'S PROHIBITION AGAINST ARBITRARY AGENCY ACTION AND RUNS AFOUL OF THE ACCARDI *DOCTRINE***

119.    Petitioner realleges and incorporates by reference each and every allegation contained in

the preceding paragraphs as if set forth fully herein.

120.    ICE's Directive 11005.4 directs that "ICE officers and agents should consult with the Office of the Principal Legal Advisor (OPLA) through their Field Office Directors or Special Agents in Charge prior to conducting a civil enforcement action against such known beneficiaries, or against primary and derivative applicants or petitioners for such benefits, to ensure any such action is consistent with applicable legal limitations" ICE Directive 11005.4 (emphasis added). By attempting to deport a primary petitioner for U nonimmigrant status without consulting OPLA, the Respondent is acting in an arbitrary and capricious manner. Here, USCIS has not yet had the opportunity to make an initial bona fide determination on Mr. Panton's pending petition for U nonimmigrant status.  Principal and derivative petitioners who receive positive bona fide determinations are granted four years of both work authorization and deferred action. 8 U.S.C. § 1184(p)(6); USCIS Policy Manual, vol. 3, part C, ch. 5, § C.3.

121.    Reviewing courts have the authority to compel agency action unlawfully withheld but shall also "hold unlawful and set aside agency action, findings, and conclusions found to be—(a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; [or] (c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2).

122.    Pursuant to the *Accardi* doctrine, Respondent is bound to apply ICE Directive 11005.4.

123.    The *Accardi* doctrine applies in a broad set of contexts, including where the agency rules in question implicate an individual's due process rights, or in circumstances involving violation of the APA. *Accardi* is the bedrock for the proposition that federal agencies are required to follow their own procedures. *Morton*, 415 U.S. at 233–35; *United States v. Heffner*, 420 F.2d 809, 811 (4th Cir. 1969) (courts must overturn agency actions which do not scrupulously

follow the regulations and procedures promulgated by the agency itself); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 341 (D.D.C. 2018) (finding plaintiffs demonstrated a likelihood of success on the merits of their *Accardi* claim by arguing that DHS was not abiding by their own policies and procedures when adjudicating parole requests submitted by asylum seekers.)

### COUNT VII:

### MR. PANTON'S REMOVAL PRIOR TO ADJUDICATION OF HIS PETITION FOR U NONIMMIGRANT STATUS VIOLATES THE ADMINISTRATIVE PROCEDURE ACT

124.    Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

125.    The APA provides that a court with authority to compel agency action which has been "unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

126.    If Mr. Panton. is removed before his petition for U nonimmigrant status can be preliminarily adjudicated, he will be deprived of access to "deferred action" under pertinent regulations; "deferred action" would permit Mr. Panton to remain and work in the country and await a U Visa (along with other relief). 8 C.F.R. § 214.14(d)(2). Deferred action is designed to prevent removal and is thus unavailable if he is deported.

127.    Given his impending removal, he seeks an order requiring the DHS defendants to promptly decide whether he has made a prima facie case for U visa status, and to decide whether to grant him deferred action.

128.    Assessing reasonableness of agency action frequently involves a balancing test, in which a statutory requirement is a very substantial factor. of agency action , 750 F.2d 70, 77-78 (D.C. Cir. 1984).  Courts often apply a four-factor test asking (1) Whether the time the agency takes to make a decision is governed by a rule of reason, the context for which may be supplied by

an enabling statute that provides a timetable or other indication of the speed with which Congress expects the agency to proceed; (2) whether human health and welfare are at stake (delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake); (3) the effect of expediting delayed action on agency activities of a higher or competing priority; and (4) the nature and extent of the interests prejudiced by the delay. *See Mohamed v. Dorochoff*, No. 11 C 1610, 2011 WL 4496228, at *5 (N.D. Ill. Sept. 22, 2011).

129.    Serious factors exist in this case that make DHS's delays unreasonable as applied to Mr. Panton.  First, this case is not about economic interests. It is about whether ICE will imminently deport Mr. Panton away from his family.  Second, expediting initial consideration of the U visa would not displace others on the waiting list.  At any event, his interests are substantially different, as DHS's impending removal creates an urgent need for preliminary adjudication of his U visa application that is not present in other cases.  Third, irreparable harm will result from Mr. Panton's departure or deportation, because if he is deported he will be precluded from accessing the deferred action mechanism.  Finally, while DHS generally adjudicates U visa petitions in the order they receive them, such an approach is unjustifiable as it pertains to individuals facing imminent deportation. To be clear, while DHS may only grant 10,000 U visas per year, Mr. Panton does not seek one of those 10,000 visas at this point, but merely to compel USCIS to conduct the first phase of adjudication and place him on the U visa waiting list so that he may receive deferred action from removal. 8 C.F.R. 214.14(c)(1)(ii). There is no numerical limit for the waiting list adjudication. See id. ("All eligible petitions who, due solely to the cap, are not granted U-1 nonimmigrant status must be placed on a waiting list . . . .")

**COUNT VIII:**

**MR. PANTON'S REMOVAL PRIOR TO ADJUDICATION OF HIS PETITION FOR U NONIMMIGRANT STATUS VIOLATES PROCEDURAL DUE PROCESS UNDER THE U.S. CONSTITUTION**

130.    Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

131.    Due process protects a noncitizen's liberty and property interest in the adjudication of applications for relief and benefits made available under the immigration laws. *See Arevalo v. Ashcroft*, 344 F.3d 1, 15 (1st Cir. 2003) (recognizing protected interests in the "right to seek relief" even when there is no "right to the relief itself").

132.    Mr. Panton has a protected procedural due process interest in his ability to remain eligible for U visa status and a waiver of inadmissibility under *L.D.G. v. Holder*, 744 F.3d 1022 (7th Cir. 2014), and to reopen his removal proceedings. Mr. Panton is eligible for a waiver of inadmissibility before an Immigration Judge under *L.D.G v. Holder* as his removal proceedings were venued with the Chicago Immigration Court. Due process challenges are evaluated under the *Mathews* balancing test. *Mathews,* 424 U.S. at 335.

133.    Respondent's removal of Petitioner prior to the consideration of "deferred action" through Petitioner's petition for U nonimmigrant status violates due process.

134.    Mr. Panton has a vested liberty interest in preventing his removal. Courts have long recognized that removal implicates substantial liberty interests, such that 'the Due Process Clause protects an alien subject to a final order of deportation." *Zadvydas v. Davis*, 533 U.S. 678, 693-94 (2001); *see also Wong Wing v. United States*, 163 U.S. 228, 238 (1896).

135.    If Mr. Panton. is removed before his petition for U nonimmigrant status is adjudicated or his removal case is reopened, he will be deprived of access to "deferred action." If granted "deferred action," Mr. Panton will be allowed to remain and work in the country and await a

U Visa (along with other relief). 8 C.F.R. § 214.14(d)(2). Deferred action is designed to prevent

removal and is thus unavailable if he is deported.

136.    Mr. Panton's liberty and property interests outweigh any government interest in his

deportation. Any efforts by ICE to remove Petitioner, without allowing him to avail himself of

the procedures created by the INA and its regulations, and without providing any meaningful

process at a meaningful time, violate and would violate procedural due process in the

Constitution.

137.    There is a significant government interest favoring a stay to effectuate the U Visa program

and permit victims of qualifying crimes to assist law enforcement to detect and disrupt criminal

activity. U Nonimmigrant Status was created to "strengthen the ability of law enforcement to

investigate and prosecute" crimes and "[p]rotect victims of crime who have suffered

substantial mental or physical abuse due to the qualifying crime and are willing to help law

enforcement authorities in the investigation or prosecution of the qualifying criminal activity

or the qualifying crime (QCA)". *See* Section 1502 and 1513(a)(2) of the Violence Against

Women Act of 2000, Pub. L. 106-386 (PDF), 114 Stat. 1518, 1533-1534 (October 28, 2000).

Thus, the premature removal of U visa applicants undermines the goals inherent in the statutory

framework.

## COUNT IX

**MR. PANTON'S DETENTION BEARS NO REASONABLE RELATIONSHIP TO ANY LEGITIMATE PURPOSE, AS HIS REMOVAL IS NOT REASONABLY FORESEEABLE**

138.    Petitioner realleges and incorporates by reference each and every allegation contained in

the preceding paragraphs as if set forth fully herein.

139.    To comport with due process, detention must bear a reasonable relationship to its two

regulatory purposes—to ensure the appearance of noncitizens at future hearings and to

37

prevent danger to the community pending the completion of removal. *Zadvydas v. Davis*, 533 U.S. at 690–691 (2001); *Diop v. ICE*, 656 F.3d 221, 233–234 (3d Cir. 2011); *Gordon v. Shanahan*, No. 15-Civ-261, 2015 WL 1176706 at *10 (S.D.N.Y. Mar. 13, 2015).

140.    Due process therefore requires "adequate procedural protections" to ensure that the government's asserted justification for physical confinement "outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Id*. at 690 (internal quotation marks omitted). In the immigration context, the Supreme Court has recognized only two valid purposes for civil detention—to mitigate the risks of danger to the community and to prevent flight. *Id*.; *Demore*, 538 U.S. at 528.

141.    The re-detention of  Mr. Panton and continued detention is arbitrary and violates due process.

142.    An individual such as Mr. Panton, who suffers from severe medical issues and was re-detained after being released due to health concerns, should not be subject to detention. *See* Exh. X.

143.    Moreover, Mr. Panton's medical health has deteriorated in recent years such that detention is now precluding him from receiving two surgeries recommended by doctors and from receiving ongoing care for a serious concussion that has impacted his daily functions and memory.

### PRAYER FOR RELIEF

WHEREFORE, Petitioner requests that this Court:

a.    Exercise jurisdiction over this matter;

b.    Enjoin Respondents from moving Mr. Panton outside the jurisdiction of this Court and the United States pending its adjudication of this petition;

c.     Declare that Mr. Panton's detention violates the INA, regulations and the Due Process Clause of the Fifth Amendment because he has been released on an OSUP;

d.     Declare that any deportation of Mr. Panton prior to the full adjudication of his petition for U nonimmigrant status would violate the Due Process Clause of the Fifth Amendment, the TVPA, INA, APA, and federal regulations;

e.     Order EOIR to instruct the Board to render a decision on Mr. Panton's motion to reopen;

f.     Order DHS to promptly adjudicate the U visa application to the extent of deciding whether he has made out a prima facie claim for relief, and deciding whether to grant him deferred action;

g.     Award Petitioner costs and reasonable attorneys' fees; and

h.     Order such other relief as this Court may deem just and proper.


Dated: March 25, 2025                            Respectfully submitted,
         Washington, D.C.

/s/ Sarah T. Gillman
Sarah T. Gillman (SG 9273)
Gillman@rfkhumanrights.org
**ROBERT F. KENNEDY HUMAN RIGHTS**                    /s/ Ruben Loyo (RL 1254)
88 Pine Street, 8th Floor, Suite 801                          Charles Roth
New York, New York 10005                                    Elizabeth Gibson
Tel.: (646) 289-5593                                               Olivia Abrecht
                                                                          Ruben Loyo
/s/ Sarah E. Decker
Sarah E. Decker (SD 5850763)
**ROBERT F. KENNEDY HUMAN RIGHTS**              **National Immigrant Justice Center**
1300 19th Street NW, Suite 750                            111 W. Jackson Blvd, Suite 800
Washington, DC 20036                                        Chicago, Illinois 60604
Tel.: (646) 289-5593                                             rloyo@immigrantjustice.org
decker@rfkhumanrights.org

## <u>VERIFICATION PURSUANT TO 28 U.S.C. § 2242</u>

I am submitting this verification on behalf of the Petitioner because I am one of the Petitioner's attorneys. I have discussed with the Petitioner's legal team the events described in this Verified Petition for Writ of Habeas Corpus and Complaint and Petition. On the basis of those discussions, on information and belief, I hereby verify that the factual statements made in the attached Verified Petition for Writ of Habeas Corpus and Complaint are true and correct to the best of my knowledge.

Dated: Washington, D.C.
March 25, 2025

<u>/s/ Sarah E. Decker</u>
Sarah E. Decker (SD 5850763)
**ROBERT F. KENNEDY HUMAN RIGHTS**
1300 19th Street NW, Suite 750
Washington, DC 20036
Tel.: (646) 289-5593
decker@rfkhumanrights.org

COUNSEL FOR PETITIONER

40