## Part 2. Information About You (continued)

### *Your U.S. Mailing Address*

**5.a.** In Care Of Name (if any)

**5.b.** Street Number and Name  `135 W123rd St`

**5.c.** ☒ Apt. ☐ Ste. ☐ Flr.  `1A`

**5.d.** City or Town  `Newy York`

**5.e.** State `NY`  **5.f.** ZIP Code `10027`

**6.** Is your current mailing address the same as your physical address?   ☒ Yes ☐ No

**NOTE:** If you answered "No" to **Item Number 6.**, provide your physical address below.

### *U.S. Physical Address*

**7.a.** Street Number and Name

**7.b.** ☐ Apt. ☐ Ste. ☐ Flr.

**7.c.** City or Town

**7.d.** State  **7.e.** ZIP Code

### *Other Information*

**8.** Alien Registration Number (A-Number) (if any)
▶ A- `0` `3` `1` `2` `5` `7` `2` `3` `0`

**9.** USCIS Online Account Number (if any)
▶

**10.** Gender   ☒ Male   ☐ Female

**11.** Marital Status
☒ Single   ☐ Married   ☐ Divorced   ☐ Widowed

**12.** Have you previously filed Form I-765?   ☒ Yes ☐ No

**13.a.** Has the Social Security Administration (SSA) ever officially issued a Social Security card to you?   ☒ Yes ☐ No

**NOTE:** If you answered "No" to **Item Number 13.a.**, skip to **Item Number 14.** If you answered "Yes" to **Item Number 13.a.**, provide the information requested in **Item Number 13.b.**

**13.b.** Provide your Social Security number (SSN) (if known).
▶ ███ ██ ████

**14.** Do you want the SSA to issue you a Social Security card? (You must also answer "Yes" to **Item Number 15.**, **Consent for Disclosure**, to receive a card.)
☐ Yes ☒ No

**NOTE:** If you answered "No" to **Item Number 14.**, skip to **Part 2., Item Number 18.a.** If you answered "Yes" to **Item Number 14.**, you must also answer "Yes" to **Item Number 15.**

**15.** **Consent for Disclosure:** I authorize disclosure of information from this application to the SSA as required for the purpose of assigning me an SSN and issuing me a Social Security card.   ☐ Yes ☐ No

**NOTE:** If you answered "Yes" to **Item Numbers 14. - 15.**, provide the information requested in **Item Numbers 16.a. - 17.b.**

**Father's Name**

Provide your father's birth name.

**16.a.** Family Name (Last Name)

**16.b.** Given Name (First Name)

**Mother's Name**

Provide your mother's birth name.

**17.a.** Family Name (Last Name)

**17.b.** Given Name (First Name)

### *Your Country or Countries of Citizenship or Nationality*

List all countries where you are currently a citizen or national. If you need extra space to complete this item, use the space provided in **Part 6. Additional Information**.

**18.a.** Country  `Jamaica`

**18.b.** Country

## Part 2. Information About You (continued)

### Place of Birth

List the city/town/village, state/province, and country where you were born.

**19.a.** City/Town/Village of Birth

Kingston

**19.b.** State/Province of Birth

Surrey

**19.c.** Country of Birth

Jamaica

**20.** Date of Birth (mm/dd/yyyy)   12/31/1965

### Information About Your Last Arrival in the United States

**21.a.** Form I-94 Arrival-Departure Record Number (if any)

▶ unknown

**21.b.** Passport Number of Your Most Recently Issued Passport

379076

**21.c.** Travel Document Number (if any)

**21.d.** Country That Issued Your Passport or Travel Document

Jamaica

**21.e.** Expiration Date for Passport or Travel Document (mm/dd/yyyy)   unknown

**22.** Date of Your Last Arrival Into the United States, On or About (mm/dd/yyyy)   10/1974

**23.** Place of Your Last Arrival Into the United States

New York

**24.** Immigration Status at Your Last Arrival (for example, B-2 visitor, F-1 student, or no status)

LPR

**25.** Your Current Immigration Status or Category (for example, B-2 visitor, F-1 student, parolee, deferred action, or no status or category)

OSUP ,applicant for U non immigrant status

**26.** Student and Exchange Visitor Information System (SEVIS) Number (if any)

▶ N-

### Information About Your Eligibility Category

**27.** **Eligibility Category.** Refer to the **Who May File Form I-765** section of the Form I-765 Instructions to determine the appropriate eligibility category for this application. Enter the appropriate letter and number for your eligibility category below (for example, (a)(8), (c)(17)(iii)).

( ) ( c ) ( 14 )

**28.** **(c)(3)(C) STEM OPT Eligibility Category.** If you entered the eligibility category **(c)(3)(C)** in **Item Number 27.**, provide the information requested in **Item Numbers 28.a - 28.c.**

**28.a.** Degree

**28.b.** Employer's Name as Listed in E-Verify

**28.c.** Employer's E-Verify Company Identification Number or a Valid E-Verify Client Company Identification Number

**29.** **(c)(26) Eligibility Category.** If you entered the eligibility category (c)(26) in **Item Number 27.**, provide the receipt number of your H-1B spouse's most recent Form I-797 Notice for Form I-129, Petition for a Nonimmigrant Worker.

▶

**30.** **(c)(8) Eligibility Category.** If you entered the eligibility category (c)(8) in **Item Number 27.**, have you **EVER** been arrested for and/or convicted of any crime?   ☐ Yes ☐ No

**NOTE:** If you answered "Yes" to **Item Number 30.**, refer to **Special Filing Instructions for Those With Pending Asylum Applications (c)(8)** in the **Required Documentation** section of the Form I-765 Instructions for information about providing court dispositions.

**31.a.** **(c)(35) and (c)(36) Eligibility Category.** If you entered the eligibility category (c)(35) in **Item Number 27.**, please provide the receipt number of your Form I-797 Notice for Form I-140, Immigrant Petition for Alien Worker. If you entered the eligibility category (c)(36) in **Item Number 27.**, please provide the receipt number of your spouse's or parent's Form I-797 Notice for Form I-140.

▶

**31.b.** If you entered the eligibility category (c)(35) or (c)(36) in **Item Number 27.**, have you **EVER** been arrested for and/or convicted of any crime?   ☐ Yes ☐ No

**NOTE:** If you answered "Yes" to **Item Number 31.b.**, refer to **Employment-Based Nonimmigrant Categories, Items 8. - 9.**, in the **Who May File Form I-765** section of the Form I-765 Instructions for information about providing court dispositions.

## Part 3. Applicant's Statement, Contact Information, Declaration, Certification, and Signature

**NOTE:** Read the **Penalties** section of the Form I-765 Instructions before completing this section. You must file Form I-765 while in the United States.

### Applicant's Statement

**NOTE:** Select the box for either **Item Number 1.a.** or **1.b.** If applicable, select the box for **Item Number 2.**

**1.a.** [x] I can read and understand English, and I have read and understand every question and instruction on this application and my answer to every question.

**1.b.** [ ] The interpreter named in **Part 4.** read to me every question and instruction on this application and my answer to every question in

[                                    ],

a language in which I am fluent, and I understood everything.

**2.** [x] At my request, the preparer named in **Part 5.**,

[ Olivia Abrecht                     ],

prepared this application for me based only upon information I provided or authorized.

### Applicant's Contact Information

**3.** Applicant's Daytime Telephone Number

[ 954-676-9788 ]

**4.** Applicant's Mobile Telephone Number (if any)

[ 954-676-9788 ]

**5.** Applicant's Email Address (if any)

[                                    ]

**6.** [ ] Select this box if you are a Salvadoran or Guatemalan national eligible for benefits under the ABC settlement agreement.

### Applicant's Declaration and Certification

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS may require that I submit original documents to USCIS at a later date. Furthermore, I authorize the release of any information from any and all of my records that USCIS may need to determine my eligibility for the immigration benefit that I seek.

I furthermore authorize release of information contained in this application, in supporting documents, and in my USCIS records, to other entities and persons where necessary for the administration and enforcement of U.S. immigration law.

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

1) I reviewed and understood all of the information contained in, and submitted with, my application; and

2) All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that all of the information in my application and any document submitted with it were provided or authorized by me, that I reviewed and understand all of the information contained in, and submitted with, my application and that all of this information is complete, true, and correct.

### Applicant's Signature

**7.a.** Applicant's Signature

➡ [ *Robert Ponton* ]

**7.b.** Date of Signature (mm/dd/yyyy) [ 12/15/2023 ]

**NOTE TO ALL APPLICANTS:** If you do not completely fill out this application or fail to submit required documents listed in the Instructions, USCIS may deny your application.

## Part 4. Interpreter's Contact Information, Certification, and Signature

Provide the following information about the interpreter.

### Interpreter's Full Name

**1.a.** Interpreter's Family Name (Last Name)

[                                    ]

**1.b.** Interpreter's Given Name (First Name)

[                                    ]

**2.** Interpreter's Business or Organization Name (if any)

[                                    ]

## Part 4. Interpreter's Contact Information, Certification, and Signature

### Interpreter's Mailing Address

**3.a.** Street Number and Name

**3.b.** ☐ Apt. ☐ Ste. ☐ Flr.

**3.c.** City or Town

**3.d.** State ___ **3.e.** ZIP Code ___

**3.f.** Province

**3.g.** Postal Code

**3.h.** Country

### Interpreter's Contact Information

**4.** Interpreter's Daytime Telephone Number

**5.** Interpreter's Mobile Telephone Number (if any)

**6.** Interpreter's Email Address (if any)

### Interpreter's Certification

I certify, under penalty of perjury, that:

I am fluent in English and ___, which is the same language specified in **Part 3.**, **Item Number 1.b.**, and I have read to this applicant in the identified language every question and instruction on this application and his or her answer to every question. The applicant informed me that he or she understands every instruction, question, and answer on the application, including the **Applicant's Declaration and Certification**, and has verified the accuracy of every answer.

### Interpreter's Signature

**7.a.** Interpreter's Signature

**7.b.** Date of Signature (mm/dd/yyyy)

## Part 5. Contact Information, Declaration, and Signature of the Person Preparing this Application, If Other Than the Applicant

Provide the following information about the preparer.

### Preparer's Full Name

**1.a.** Preparer's Family Name (Last Name)

Abrecht

**1.b.** Preparer's Given Name (First Name)

Olivia

**2.** Preparer's Business or Organization Name (if any)

National Immigrant Justice Center

### Preparer's Mailing Address

**3.a.** Street Number and Name    224 S Michigan Ave

**3.b.** ☐ Apt. ☒ Ste. ☐ Flr.    600

**3.c.** City or Town    Chicago

**3.d.** State    IL    **3.e.** ZIP Code    60604

**3.f.** Province

**3.g.** Postal Code

**3.h.** Country    USA

### Preparer's Contact Information

**4.** Preparer's Daytime Telephone Number

3122241348

**5.** Preparer's Mobile Telephone Number (if any)

3122241348

**6.** Preparer's Email Address (if any)

oabrecht@heartlandalliance.org

## Part 5.  Contact Information, Declaration, and Signature of the Person Preparing this Application, If Other Than the Applicant (continued)

### *Preparer's Statement*

**7.a.** ☐ I am not an attorney or accredited representative but have prepared this application on behalf of the applicant and with the applicant's consent.

**7.b.** ☒ I am an attorney or accredited representative and my representation of the applicant in this case
☒ extends ☐ does not extend beyond the preparation of this application.

**NOTE:** If you are an attorney or accredited representative, you may need to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, with this application.

### *Preparer's Certification*

By my signature, I certify, under penalty of perjury, that I prepared this application at the request of the applicant.  The applicant then reviewed this completed application and informed me that he or she understands all of the information contained in, and submitted with, his or her application, including the **Applicant's Declaration and Certification**, and that all of this information is complete, true, and correct.  I completed this application based only on information that the applicant provided to me or authorized me to obtain or use.

### *Preparer's Signature*

**8.a.**  Preparer's Signature

**8.b.**  Date of Signature (mm/dd/yyyy)    12/20/2023

## Part 6. Additional Information

If you need extra space to provide any additional information within this application, use the space below. If you need more space than what is provided, you may make copies of this page to complete and file with this application or attach a separate sheet of paper. Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**1.a.** Family Name (Last Name) `Panton`

**1.b.** Given Name (First Name) `Robert`

**1.c.** Middle Name `Savio`

**2.** A-Number (if any) ▶ A- `0 3 1 2 5 7 2 3 0`

**3.a.** Page Number

**3.b.** Part Number

**3.c.** Item Number

**3.d.**

**4.a.** Page Number

**4.b.** Part Number

**4.c.** Item Number

**4.d.**

**5.a.** Page Number

**5.b.** Part Number

**5.c.** Item Number

**5.d.**

**6.a.** Page Number

**6.b.** Part Number

**6.c.** Item Number

**6.d.**

**7.a.** Page Number

**7.b.** Part Number

**7.c.** Item Number

**7.d.**











4

COUNTRIES FOR WHICH THIS PASSPORT IS VALID
PAYS POUR LESQUELS CE PASSEPORT EST VALABLE
PAISES PARA LOS CUALES ESTE PASAPORTE ES VALIDO

"Valid for all parts of the Commonwealth and for all foreign countries."

The validity of this passport expires :
Ce passeport expire le :
La validez de este pasaporte termina el :

2nd May, 1992

Issued at
Délivré à
Expedido en

Date
Date
Fecha

Jamaican Consulate General

3 - MAY 1982

NEW YORK, U.S.A.











37 90 78

OBSERVATIONS                                            5

Bearer previously travelled on *Jamaican*

_____ Passport No. 404087

dated 14/8/70 Issued at JAM

valid until 13/8/75 which has been



4

COUNTRIES FOR WHICH THIS PASSPORT IS VALID
PAYS POUR LESQUELS CE PASSEPORT EST VALABLE
PAISES PARA LOS CUALES ESTE PASAPORTE ES VALIDO

"Valid for all parts of the Commonwealth and for all foreign countries."

The validity of this passport expires :
Ce passeport expire le :
La validez de este pasaporte termina el :

2nd May, 1992

Issued at
Délivré à
Expedido en

*Jamaican Consulate General*
*3 - MAY 1982*
*NEW YORK, U.S.A.*

Date
Date
Fecha

# B

Certificate #: U-000047138-N



# NEW YORK CRIMINAL COURT

100 Centre St., New York, NY 10013

Phone: (646) 386-4500 Fax: (212) 374-5293

Court ORI: NY030033J

**NO FEE**
Non-Public
Version

The People of the State of New York

vs.

**Bob Panton**

**Certificate of Disposition**
Docket Number:
Legacy Docket Number: **2N050653**

CJTN: 06795139R
NYSID: 04900414Z

Defendant DOB: **12/30/1965**     Arrest Date: **06/09/1982**     Arraignment Date: **09/03/1982**

THIS IS TO CERTIFY that the undersigned has examined the files of the **New York Criminal Court** concerning the above entitled matter and finds the following:

| Count # | Charge | Charge Weight | Disposition | Disposition Date |
|---|---|---|---|---|
| 1 | PL 165.15 03 AM Intent/Fraud Obt Trans W/O Pay | AM | Covered by (Count #2) | 09/03/1982 |

| Count # | Incident Date | Sentence Charge | Charge Description | Charge Weight | Conviction Type | Conviction/ Sentence Date | Sentence Highlight |
|---|---|---|---|---|---|---|---|
| 2 | 06/09/1982 | PL 140.05 | Trespass | V | Pled Guilty | Conv: 09/03/1982 Sent: 09/03/1982 | • Surcharge (MS ($15.00) - due 10/04/1982) • Fine ($25.00/5 d - due 10/04/1982) |

**A balance remains due and owing for fines, fees and/or surcharges imposed at sentence.**

Charge Weight Key: I=Infraction; V=Violation; AM, BM=Class Misdemeanor; UM=Unclassified Misdemeanor; AF, BF, CF, DF, EF=Class Felony

Dated: **December 14, 2023**

Chief Clerk/Clerk of the Court

## CAUTION: THIS DOCUMENT IS NOT OFFICIAL UNLESS EMBOSSED WITH THE COURT SEAL

All marijuana convictions under PL 221.05, PL 221.10, PL 221.15, PL 221.20, PL 221.35 or PL 221.40 —including any appearing on this certificate of disposition—are vacated, dismissed, sealed, and expunged. It is an unlawful discriminatory practice for any entity to make any inquiry about such an expunged conviction or to use such an expunged conviction adversely against an individual in any form of application or otherwise—unless specifically required or permitted to do so by statute. It shall be an unlawful discriminatory practice, unless specifically required or permitted by statute, for any person, agency, bureau, corporation or association, including the state and any political subdivision thereof, to make any inquiry about, whether in any form of application or otherwise, or to act upon adversely to the individual involved, any arrest or criminal accusation of such individual not then pending against that individual which was followed by a termination of that criminal action or proceeding in favor of such individual, as defined in subdivision two of section 160.50 of the criminal procedure law, or by an order adjourning the criminal action in contemplation of dismissal, pursuant to section 170.55, 170.56, 210.46, 210.47, or 215.10 of the criminal procedure law, or by a youthful offender adjudication, as defined in subdivision one of section 720.35 of the criminal procedure law, or by a conviction for a violation sealed pursuant to section 160.55 of the criminal procedure law or by a conviction which is sealed pursuant to section 160.59 or 160.58 of the criminal procedure law, in connection with the licensing, housing, employment, including volunteer positions, or providing of credit or insurance to such individual; provided, further, that no person shall be required to divulge information pertaining to any arrest or criminal accusation of such individual not then pending against that individual which was followed by a termination of that criminal action or proceeding in favor of such individual, as defined in subdivision two of section 160.50 of the criminal procedure law, or by an order adjourning the criminal action in contemplation of dismissal, pursuant to section 170.55 or 170.56, 210.46, 210.47 or 215.10 of the criminal procedure law, or by a youthful offender adjudication, as defined in subdivision one of section 720.35 of the criminal procedure law, or by a conviction for a violation sealed pursuant to section 160.55 of the criminal procedure law, or by a conviction which is sealed pursuant to section 160.58 or 160.59 of the criminal procedure law. An individual required or requested to provide information in violation of this subdivision may respond as if the arrest, criminal accusation, or disposition of such arrest or criminal accusation did not occur. The provisions of this subdivision shall not apply to the licensing activities of governmental bodies in relation to the regulation of guns, firearms and other deadly weapons or in relation to an application for employment as a police officer or peace officer as those terms are defined in subdivisions thirty-three and thirty-four of section 1.20 of the criminal procedure law; provided further that the provisions of this subdivision shall not apply to an application for employment or membership in any law enforcement agency with respect to any arrest or criminal accusation which was followed by a youthful offender adjudication, as defined in subdivision one of section 720.35 of the criminal procedure law, or by a conviction for a violation sealed pursuant to section 160.55 of the criminal procedure law, or by a conviction which is sealed pursuant to section 160.58 or 160.59 of the criminal procedure law. For purposes of this subdivision, an action which has been adjourned in contemplation of dismissal, pursuant to section 170.55 or 170.56, 210.46, 210.47 or 215.10 of the criminal procedure law, shall not be considered a pending action, unless the order to adjourn in contemplation of dismissal is revoked and the case is restored to the calendar for further prosecution. [Executive Law 296(16)]

Conviction charges may not be the same as the original arrest charges.

Charges may not be the same as the original arrest charges.

C



# NEW YORK CRIMINAL COURT

100 Centre St., New York, NY 10013

Phone: (646) 386-4500  Fax: (212) 374-5293

**NO FEE**
Non-Public
Version

Court ORI: NY030033J

| | |
|---|---|
| The People of the State of New York | **Certificate of Disposition** |
| vs. | Docket Number: |
| **Robert S. Panton** | Legacy Docket Number: **5N115065** |
| | CJTN: 09845795N |
| | NYSID: 04900414Z |

Defendant DOB: **12/31/1965**          Arrest Date: **12/26/1985**          Arraignment Date: **12/27/1985**

THIS IS TO CERTIFY that the undersigned has examined the files of the **New York Criminal Court** concerning the above entitled matter and finds the following:

| Count # | Charge | Charge Weight | Disposition | Disposition Date |
|---|---|---|---|---|
| 1 | PL 220.03 AM Crim Poss Contrl Subst-7th | AM | Covered by (Count #2) | 07/09/1986 |
| 3 | PL 220.06 DF Crim Poss Contr Subst-5th | DF | Reduced to (Count #1) | 05/15/1986 |

| Count # | Incident Date | Sentence Charge | Charge Description | Charge Weight | Conviction Type | Conviction/ Sentence Date | Sentence Highlight |
|---|---|---|---|---|---|---|---|
| 2 | 12/26/1985 | PL 110-220.03 | Attempted Crim Poss Contrl Subst-7th | BM | Pled Guilty | Conv: 07/09/1986 Sent: 07/09/1986 | • Surcharge (MS ($60.00) - due 07/09/1986) • Conditional Discharge (1 Years) |

**A balance remains due and owing for fines, fees and/or surcharges imposed at sentence.**
Charge Weight Key: I=Infraction; V=Violation; AM, BM=Class Misdemeanor; UM=Unclassified Misdemeanor; AF, BF, CF, DF, EF=Class Felony

Dated:  **December 14, 2023**

**Chief Clerk/Clerk of the Court**

## CAUTION: THIS DOCUMENT IS NOT OFFICIAL UNLESS EMBOSSED WITH THE COURT SEAL

All marijuana convictions under PL 221.05, PL 221.10, PL 221.15, PL 221.20, PL 221.35 or PL 221.40 —including any appearing on this certificate of disposition— are vacated, dismissed, sealed, and expunged. It is an unlawful discriminatory practice for any entity to make any inquiry about such an expunged conviction or to use such an expunged conviction adversely against an individual in any form of application or otherwise—unless specifically required or permitted to do so by statute. It shall be an unlawful discriminatory practice, unless specifically required or permitted by statute, for any person, agency, bureau, corporation or association, including the state and any political subdivision thereof, to make any inquiry about, whether in any form of application or otherwise, or to act upon adversely to the individual involved, any arrest or criminal accusation of such individual not then pending against that individual which was followed by a termination of that criminal action or proceeding in favor of such individual, as defined in subdivision two of section 160.50 of the criminal procedure law, or by an order adjourning the criminal action in contemplation of dismissal, pursuant to section 170.55, 170.56, 210.46, 210.47 or 215.10 of the criminal procedure law, or by a youthful offender adjudication, as defined in subdivision one of section 720.35 of the criminal procedure law, or by a conviction for a violation sealed pursuant to section 160.55 of the criminal procedure law or by a conviction which is sealed pursuant to section 160.59 or 160.58 of the criminal procedure law, in connection with the licensing, housing, employment, including volunteer positions, or providing of credit or insurance to such individual; provided, further, that no person shall be required to divulge information pertaining to any arrest or criminal accusation of such individual not then pending against that individual which was followed by a termination of that criminal action or proceeding in favor of such individual, as defined in subdivision two of section 160.50 of the criminal procedure law, or by an order adjourning the criminal action in contemplation of dismissal, pursuant to section 170.55 or 170.56, 210.46, 210.47 or 215.10 of the criminal procedure law, or by a youthful offender adjudication, as defined in subdivision one of section 720.35 of the criminal procedure law, or by a conviction for a violation sealed pursuant to section 160.55 of the criminal procedure law, or by a conviction which is sealed pursuant to section 160.58 or 160.59 of the criminal procedure law. An individual required or requested to provide information in violation of this subdivision may respond as if the arrest, criminal accusation, or disposition of such arrest or criminal accusation did not occur. The provisions of this subdivision shall not apply to the licensing activities of governmental bodies in relation to the regulation of guns, firearms and other deadly weapons or in relation to an application for employment as a police officer or peace officer as those terms are defined in subdivisions thirty-three and thirty-four of section 1.20 of the criminal procedure law; provided further that the provisions of this subdivision shall not apply to an application for employment or membership in any law enforcement agency with respect to any arrest or criminal accusation which was followed by a youthful offender adjudication, as defined in subdivision one of section 720.35 of the criminal procedure law, or by a conviction for a violation sealed pursuant to section 160.55 of the criminal procedure law, or by a conviction which is sealed pursuant to section 160.58 or 160.59 of the criminal procedure law. For purposes of this subdivision, an action which has been adjourned in contemplation of dismissal, pursuant to section



#544

AO 245 S (Rev. 4/90) Sheet 1 - Judgment in a Criminal Case

FILED

MAY 25 1994

# United States District Court

SOUTHERN _____ District of _____ NEW YORK

S. D. OF N. Y.



UNITED STATES OF AMERICA

V.

ROBERT PANTON
a/k/a "BOB LEMON"

(Name of Defendant)

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

Case Number:  89-00346-02 (SWK)

MARTIN GEDULDIG

Defendant's Attorney

THE DEFENDANT:

☐ pleaded guilty to count(s) _____
☒ was found guilty on count(s) _1_ _____ after a
plea of not guilty.

Accordingly, the defendant is adjudged guilty of such count(s), which involve the following offenses:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 21 USC 812, 21 USC 841(a)(1) & 21 USC 841(b)(1)(A) (21 USC 846) | CONSPIRACY TO POSSESS WITH INTENT TO DISTRIBUTE HEROIN | 4/87 - 5/89 | 1 |

The defendant is sentenced as provided in pages 2 through __4__ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____
and is discharged as to such count(s).
☐ Count(s) _____ (is)(are) dismissed on the motion of the United States.
☒ It is ordered that the defendant shall pay a special assessment of $ _50.00_ , for count(s)
_1_ , which shall be due ☐ immediately ☐ as follows:

IT IS FURTHER ORDERED that the defendant shall notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

Defendant's Soc. Sec. No.: 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

Defendant's Date of Birth: 12/31/65

Defendant's Mailing Address:

40 MORNING SIDE AVE APT #52
NEW YORK, N.Y. 10027

Defendant's Residence Address:

SAME AS ABOVE

MAY 25, 1994

Date of Imposition of Sentence

Signature of Judicial Officer

SHIRLEY WOHL KRAM, U.S.D.J.

Name & Title of Judicial Officer

5-25-94

Date

Rev. 4/90) Sheet 2 - Imprisonment

endant:  ROBERT PANTON a/k/a ''BOB LEMON''        Judgment—Page  2  of  4
ase Number: S7 89-00346-02 (SWK)

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of _____ LIFE IMPRISONMENT

☐ The court makes the following recommendations to the Bureau of Prisons:

☒ The defendant is remanded to the custody of the United States marshal.
☐ The defendant shall surrender to the United States marshal for this district,
            a.m.
   ☐ at _____ p.m. on _____.
   ☐ as notified by the United States marshal.
☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons,
   ☐ before 2 p.m. on _____.
   ☐ as notified by the United States marshal.
   ☐ as notified by the probation office.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____ at

_____, with a certified copy of this judgment.

_____
United States Marshal

By _____
Deputy Marshal

*U.S GPO:1990-722-448/10286

sheet 3 - Supervised Release

ROBERT PANTON a/k/a "BOB LEMON"                    Judgment—Page __3__ of __4__
Number: S7 89-00346-02 (SWK)
SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of _____

5 years

While on supervised release, the defendant shall not commit another federal, state, or local crime and shall not illegally possess a controlled substance. The defendant shall comply with the standard conditions that have been adopted by this court (set forth below). If this judgment imposes a restitution obligation, it shall be a condition of supervised release that the defendant pay any such restitution that remains unpaid at the commencement of the term of supervised release. The defendant shall comply with the following additional conditions:

☐ The defendant shall report in person to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

☐ The defendant shall pay any fines that remain unpaid at the commencement of the term of supervised release.

☐ The defendant shall not possess a firearm or destructive device.

## STANDARD CONDITIONS OF SUPERVISION

While the defendant is on supervised release pursuant to this judgment, the defendant shall not commit another federal, state or local crime. In addition:

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;
2) the defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependents and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) the defendant shall notify the probation officer within 72 hours of any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

v. 4/90) Sheet 7 - Statement of Reasons

dant: ROBERT PANTON a/k/a "BOB LEMON"          Judgment—Page __4__ of __4__
e Number: S7 89-00346-02 (SWK)

## STATEMENT OF REASONS

☒ The court adopts the factual findings and guideline application in the presentence report.

OR

☐ The court adopts the factual findings and guideline application in the presentence report except (see attachment, if necessary):

**Guideline Range Determined by the Court:**

Total Offense Level: _____

Criminal History Category: _____

Imprisonment Range: _____ to _____ months

Supervised Release Range: _____ to _____ years

Fine Range: $ _____ to $ _____

☐ Fine is waived or is below the guideline range, because of the defendant's inability to pay.

Restitution: $ _____

☐ Full restitution is not ordered for the following reason(s):

☐ The sentence is within the guideline range, that range does not exceed 24 months, and the court finds no reason to depart from the sentence called for by application of the guidelines.

OR

☐ The sentence is within the guideline range, that range exceeds 24 months, and the sentence is imposed for the following reason(s):

OR

The sentence departs from the guideline range

☐ upon motion of the government, as a result of defendant's substantial assistance.

☐ for the following reason(s):

114

# E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                    Plaintiff,

    -against-

ROBERT PANTON,

                    Defendant.

No. 89 Cr. 346 (LAP)

MEMORANDUM & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

    Before the Court is Defendant Robert Panton's motion (dkt. no. 910) pursuant to 18 U.S.C. § 3582 (c)(1)(A) for resentencing pursuant to the First Step Act ("FSA").  The Government opposed the motion (dkt. no. 913), and Mr. Panton submitted additional letters detailing various supplemental authorities (dkt. nos. 912, 918).  For the reasons set out below, the motion is GRANTED.

I.    FACTUAL BACKGROUND

    a. Mr. Panton's Offense Conduct

    According to Mr. Panton's PSR, "[f]rom approximately April 1987 through May 1989, one organization was the primary source of heroin in the Bronx" – a "highly structured business organization" controlled by an individual named George Rivera "with members performing different functions and operating at different levels of responsibility, and with some members performing different functions at different times." (PSR ¶¶ 71, 73.) In April and May 1989, the Government arrested and charged thirty-three individuals

1

for their roles in Mr. Rivera's heroin distribution organization. (PSR ¶ 72; see also dkt. no. 910-2.)[1]

Mr. Panton was not one of those thirty-three individuals. Rather, he was arrested (and detained) on January 11, 1991, at which time he was charged and subsequently convicted at trial before the Honorable Shirley Wohl Kram of conspiracy to possess and distribute heroin in violation of 21 U.S.C. § 812, 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(A). (PSR ¶ 32, 111.) In particular, Mr. Panton, from approximately April 1988 to April 1989, ran a street-level distribution location (known as a "store" to members of Mr. Rivera's organization) at 122nd Street and 2nd Avenue in Manhattan. (PSR ¶¶ 88 115.) Because of the date that he joined Mr. Rivera's heroin distribution conspiracy, Mr. Panton was held responsible at sentencing for conspiring to possess and distribute approximately 41 kilograms of heroin, even though Mr. Rivera's organization sold a total of approximately 82 kilograms of heroin. (PSR ¶ 115.)

  b. The Probation Department's Calculation of Mr. Panton's Guidelines Offense Level

Section 2D1.1 of the Guidelines instructs that the base offense level for any narcotics-related offense is determined by

---

[1] The Government later dismissed the charges against two such individuals. (PSR ¶ 72.)

the total weight of narcotics distributed by a defendant (and those with whom s/he conspired) as detailed in the quantity tables of that section of the Guidelines. Based on its finding that he was responsible for trafficking in approximately 41 kilograms of heroin, the Probation Department determined that Mr. Panton's base offense level was 38. (PSR ¶ 115.)[2] It then increased that base offense level by:

- 2 offense levels pursuant to Section 2D1.1(b)(1) of the Guidelines for possession of a firearm (which was recovered from the apartment in which Mr. Panton was staying);

- 3 offense levels pursuant to Section 3B1.1(b) of the Guidelines for Mr. Panton's role as a "manager" of the "store" located at 122nd Street and 2nd Avenue in Manhattan; and

- 2 offense levels pursuant to Section 2C1.1 of the Guidelines for obstruction of justice (for perjuring himself during his trial testimony). (PSR ¶¶ 116, 117 and 119.)

Thus, in total, the Probation Department determined that Mr. Panton's adjusted Guidelines offense level was 45. (PSR ¶ 122.)

Based on certain fairly minor prior convictions in Manhattan Criminal Court (trespassing for entering the subway through an exit gate to avoid paying the fare and attempted criminal possession of a controlled substance, both of which were low-level

---

[2] Pursuant to Amendments 505 and 536 to the Guidelines, Mr. Panton's base offense level would be 36 today. But, because of the other Guidelines enhancements found by the Probation Department and Judge Kram, Mr. Panton's total adjusted Guidelines offense level still would not fall below 43 even after application of Amendments 505 and 536.

state misdemeanors and neither of which resulted in a prison term or even a probationary sentence), the Probation Department found that Mr. Panton had 1 criminal history point and therefore fell within Criminal History Category I. (PSR ¶¶ 124-28.)

Thus, based on a Guidelines offense level of 45 and Criminal History Category I, the Probation Department determined that Mr. Panton's Guidelines range of imprisonment was life. (PSR ¶ 131.) Notably, though, the Probation Department stated that it did not believe Mr. Panton should be imprisoned for life. Rather, it wrote that "[a]lthough the defendant must be punished for his crimes, a term of life imprisonment is considered unduly harsh. Absent any departure issues, it is being recommended in conformance with the guidelines." (PSR ¶ 29.)

c. Mr. Panton's Sentencing Hearing

Mr. Panton appeared before Judge Kram for sentencing on May 25, 1994. (See dkt. no. 910-3.) His attorney, Martin Geduldig (who represented him at sentencing but not at trial) presented argument principally concerning the Guidelines enhancements that the Probation Department included in Mr. Panton's offense level calculation, which arguments were based on the testimony presented at trial and the law concerning jointly undertaken criminal activity (as applied to the amount of heroin for which Mr. Panton was to be held accountable at sentencing). Judge Kram, in adjudicating Mr. Panton's post-trial, pre-sentencing motion

4

119

pursuant to Rule 33 of the Federal Rules of Criminal Procedure, also found that those enhancements applied to the calculation of Mr. Panton's Guidelines offense level. United States v. Panton, Case No. 89-CR- 346, 1994 WL 225441 (S.D.N.Y. May 25, 1994). At the conclusion of his argument concerning Mr. Panton's Guidelines offense level calculation, Mr. Geduldig expressed his frustration with the Guidelines as follows:

> [T]he sentence for somebody at Level 43 is life in prison. I don't know that there's too much that I could ask the Court to do. If the Court is going to find that's the sentence to be imposed, then whether Mr. Panton has led an exemplary life or has many children out on the street has no import. The Court is compelled to impose the sentence set forth on the [sentencing table]. I don't know what I could say, unless the Court is willing to adopt our argument and not include some these enhancements. The sentence Mr. Panton will receive from the Court is clear.

Mr. Panton also spoke at sentencing, imploring Judge Kram to impose a prison term shorter than life imprisonment. He noted that his conduct did not involve violence, that he was a father and that he was a college student at the time of his arrest. Mr. Panton also stated the following: "Facing a life imprisonment sentence as a first offender with no prior criminal activity other than a misdemeanor . . . there's not much that I can say. I mean, I could [talk] from here to now, but the situation still remains itself . . . ." Judge Kram then imposed the life sentence:

> I certainly know that you're aware that this trial went on for several months and I am very familiar with all of the

5

defendants and all of the circumstances. This was a very dangerous group of people, very violent, and extremely dangerous to our community.

The amount of drugs that were involved were horrendous. I think that your part in this was a very serious one. You were very much involved in all these aspects of it. I think you're a dangerous man. I think that you perjured yourself blatantly during the trial. I sat there during the trial and was impressed with the way you blatantly lied.

I think under the circumstances, I am going to sentence you to life imprisonment, the period that is recommended of five years of supervised release with no particular conditions indicated. There is no fine and the special assessment of $50.[3]

### d. Mr. Panton's Post-Conviction Litigation

Mr. Panton timely appealed his conviction, and, on January 19, 1996, the Court of Appeals affirmed his conviction. <u>United States v. Lemon</u>, 100 F.3d 942 (2d Cir. 1996). Mr. Panton thereafter filed an unsuccessful petition for a writ of certiorari before the U.S. Supreme Court. <u>Panton v. United States</u>, 519 U.S. 853 (1996).

Following denial of his direct appeal, Mr. Panton engaged in certain limited additional post-conviction litigation:

<u>First</u>, Mr. Panton filed a motion pursuant to 28 U.S.C. § 2255 to vacate, set aside or correct his sentence, arguing that he had received ineffective assistance of counsel. (Docket No. 649.) On October 18, 1999, Judge Kram denied that 28 U.S.C. § 2255 motion.

---

[3] (<u>See also</u> dkt. no. 910-4 (Judgment and Commitment Order, dated May 25, 1994).)

Panton v. United States, Case No. 89-CR-346 (SWK), 1999 WL 945523
(S.D.N.Y. Oct. 18, 1999). On October 19, 2000, the Court of Appeals
reversed and remanded Judge Kram's denial of Mr. Panton's 28 U.S.C.
§ 2255 motion, instructing Judge Kram to permit Mr. Panton to amend
that motion to consider the merits of his claim under Apprendi v.
New Jersey, 530 U.S. 466 (2000), which had been decided while the
appeal of his 28 U.S.C. § 2255 motion was pending. (Dkt. No. 910-
5.) The Court of Appeals, though, affirmed the denial of all of
Mr. Panton's other 28 U.S.C. § 2255 claims as procedurally barred
or meritless. (Id.) On April 22, 2002, Judge Kram denied Mr.
Panton's amended 28 U.S.C. § 2255 motion. Panton v. United States,
Case No. 89-CR-346 (SWK), 2002 WL 655205 (S.D.N.Y. Apr. 22, 2002).
And, on September 3, 2003, the Court of Appeals dismissed Mr.
Panton's appeal of Judge Kram's denial of his 28 U.S.C. § 2255
motion. (Dkt. no. 749.)

Second, on August 2, 2004, Mr. Panton moved pursuant to Rules
60(b)(5) and 60(b)(6) of the Federal Rules of Civil Procedure to
vacate Judge Kram's denial of his 28 U.S.C. § 2255 motion, arguing
that he had received ineffective assistance of appellate counsel.
(Dkt. no. 763.) He later amended that motion, clarifying that he
was challenging the integrity of the underlying proceedings rather
than the underlying constitutional challenges to his conviction.
(Dkt. no. 766.) On November 16, 2005, Judge Kram denied Mr.

Panton's Rule 60(b) motion. <u>Panton v. United States</u>, Case No. 89-CR-346, 2005 WL 3078224 (S.D.N.Y. Nov. 16, 2005).

<u>Third</u>, on November 27, 2005, Mr. Panton filed a motion pursuant to Rules 52(b) and 59(e) of the Federal Rules of Civil Procedure for reconsideration of the denial of his Rule 60(b) motion. That motion, though, was only docketed on the civil docket sheet associated with his 28 U.S.C. § 2255 motion. Mr. Panton thereafter filed two "Judicial Notices" restating his previous arguments. The second such notice advised the Court that his Rule 59(e) motion had been pending for more than two years. On April 9, 2008 Judge Kram construed Mr. Panton's first two judicial notices as additional motions pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. (Dkt. no. 794.) Because it was only docketed on his civil docket, though, Mr. Panton's Rule 59(e) motion was inadvertently overlooked. When that Rule 59(e) motion came to light, Judge Kram vacated her April 9, 2008 Order for consideration of the newly discovered motion. (Dkt. no. 802.) Mr. Panton thereafter submitted a final "Judicial Notice" on June 17, 2010. (Undocketed.)

Mr. Panton's case was subsequently reassigned to this Court after Judge Kram died. On November 20, 2018, this Court entered an Order transferring Mr. Panton's motion to the Court of Appeals for consideration as an application for leave to file a second or successive 28 U.S.C. § 2255 motion. (Docket No. 882.) On May 6,

2019, the Court of Appeals entered an Order denying Mr. Panton's application, finding that he had not made a prima facie showing that the requirements of 28 U.S.C. § 2255(h) had been satisfied. (Dkt. no. 887.)

       e. FSA Requests

On September 3, 2019, Defendant filed a request for an 18 U.S.C. Section 3582(c)(1)(A) reduction in sentence with the Warden of USP Big Sandy, the facility in which he was incarcerated.  On December 17, 2019, more than thirty days later, the Warden rejected the request as incomplete.  Thereafter, on April 17, 2020, counsel submitted a renewed request.  On June 23, 2020, more than sixty days later, the Warden rejected the renewed request.

II.   <u>APPLICABLE LAW</u>

      a. This Court has the Authority to Reduce Mr. Panton's Sentence to Time Served Pursuant to 18 U.S.C. § 3582(c)(1)(A)

Mr. Panton moves pursuant to 18 U.S.C. § 3582(c)(1)(A).  That section provides that district courts can modify a "final term of imprisonment" if "extraordinary and compelling reasons warrant such a reduction." Three points bear noting with regard to the operation of 18 U.S.C. § 3582(c)(1)(A).

First, in passing the statute, Congress empowered district courts, not the U.S. Parole Commission, as previously, to decide in individual cases if "there is a justification for reducing a term of imprisonment." <u>See</u> S. Rep. No. 98-225, at 56 (1983). Put

differently, Congress envisioned 18 U.S.C. § 3582(c)(1)(A) acting as a "safety valve[ ] for [the] modification of sentences" and intended for district courts to be able to reduce sentences when justified by the various factors and reasons that the U.S. Parole Commission previously had considered in making parole determinations. Id. at 121. Lawmakers further noted that the foregoing approach would keep "the sentencing power in the judiciary where it belongs," rather than with the U.S. Parole Commission, and that 18 U.S.C. § 3582(c)(1)(A) would allow for the "later review of sentences in particularly compelling situations." Id. This legislative history demonstrates that Congress, in passing the Comprehensive Crime Control Act of 1984, intended to give district courts an equitable power to employ on an individualized basis to correct sentences when "extraordinary and compelling reasons" indicate that the sentence initially imposed on any individual defendant no longer served legislative objectives.

Second, although the power to reduce sentences provided for by 18 U.S.C. § 3582(c)(1)(A) has most often been used to reduce the prison terms of elderly and/or terminally ill defendants, nothing in the statutory language or legislative history of 18 U.S.C. § 3582(c) indicates that Congress intended to limit its application to elderly defendants or defendants with compelling medical circumstances. Rather, if a judge finds the existence of any

10

"extraordinary and compelling reasons" warranting a sentence reduction, those reasons could, pursuant to 18 U.S.C. § 3582(c)(1)(A), form the legal basis for the reduction "of an unusually long sentence." Id. at 55-56. Indeed, the legislative history of 18 U.S.C. § 3582(c)(1)(A) indicates that lawmakers thought that "extraordinary and compelling reasons" for a sentence reduction should not be limited to medical condition, age, and family circumstances. In particular, recognizing that parole had historically played a key role in the federal criminal justice system, legislators explained how some defendants may warrant a sentence reduction (after service of some period of incarceration) based on any number of "circumstances:"

> The [Senate Judiciary] Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

Id. at 55-56 (1983) (emphasis added).

Third, notwithstanding all of the foregoing, Congress originally conditioned the reduction of any "final term of imprisonment" pursuant to 18 U.S.C. § 3582(c)(1)(A) on the filing of a motion by the Director of the BOP requesting such a reduction. Thus, district courts--until the recently enacted FSA--were only authorized to

reduce a sentence based on "extraordinary and compelling reasons" if asked to do so by the Director of the BOP.

> b. The U.S. Sentencing Commission Has Indicated that the "Extraordinary and Compelling Reasons" Upon Which a Sentence Reduction Pursuant to 18 U.S.C. § 3582(c)(1)(A) May Be Based Are Not Limited to Medical Condition, Age and Family Circumstances

In enacting the Comprehensive Crime Control Act of 1984, Congress tasked the U.S. Sentencing Commission (the "Sentencing Commission") with responsibility for developing standards for identifying the existence of "extraordinary and compelling reasons" for a sentence reduction. See 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"). When the Sentencing Commission acted in 2007, it promulgated a policy statement advising that "extraordinary and compelling reasons" warranting a sentence reduction could include medical condition, age, family circumstances and "other reasons." See U.S.S.G. § 1B1.13, Application Note 1(A) (Amendment 698).

Thereafter, in April 2013, the Office of the Inspector General of the Department of Justice (the "OIG") issued a report finding that the Director of the BOP rarely filed 18 U.S.C. § 3582(c)(1)(A) sentence reduction motions (even for defendants who clearly met the Sentencing Commission's objective criteria for a sentence

12

reduction).  See U.S. Dep't of Justice Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program (Apr. 2013) (Exhibit 20).[4]  In response, the Sentencing Commission expanded its guidance to district courts on qualifying circumstances and encouraged the BOP to file 18 U.S.C. § 3582(c)(1)(A) motions whenever a defendant meets the criteria set forth in Section 1B1.13 of the Guidelines.  See U.S.S.G. § 1B1.13, Application Note 4; United States v. Dimasi, 220 F. Supp. 3d 173, 175 (D. Mass. 2016) (discussing the progression from the OIG report to new "encouraging" guidelines).  In doing so, the Sentencing Commission identified several categories of qualifying "extraordinary and compelling reasons," including medical condition, age, family circumstances and "[o]ther reasons, for circumstances in which the Director of the BOP determines that there is an extraordinary and compelling reason other than, or in combination with," medical condition, age and family circumstances.  U.S.S.G. § 1B1.13, Application Note 1(A) (internal quotation marks omitted).

Finally, Congress set forth only one limitation when it delegated authority to the Sentencing Commission to develop

---

[4] See https://oig.justice.gov/reports/2013/e1306.pdf.

13

standards for identifying "extraordinary and compelling reasons" for a sentence reduction: "Rehabilitation of the defendant <u>alone</u> shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t) (emphasis added). On one hand, lawmakers no doubt legislated that sole limitation so that district courts would not use a defendant's rehabilitation, standing alone, as a basis for a sentence reduction, thereby creating a direct substitute for the parole system that Congress abolished when it passed the Comprehensive Crime Control Act of 1984. On the other hand, legislators' use of the modifier "alone" evidences that they believed that rehabilitation <u>is relevant</u> to the question of whether a sentence should be reduced and that rehabilitation, when considered together with other equitable factors, could constitute "extraordinary and compelling reasons" for a sentence reduction.

In late 2018, Congress passed the FSA, which, among other things, fundamentally transformed the process by which 18 U.S.C. § 3582(c)(1)(A) sentence reduction motions are adjudicated. In particular, instead of relying on the Director of the BOP to determine whether "extraordinary and compelling reasons" exist supportive of a sentence reduction and instead of relying on the Director of the BOP to file an 18 U.S.C. § 3582(c)(1)(A) sentence reduction motion, district courts today can resentence a defendant "upon motion of the defendant" as long as a defendant first files

14

a request for a sentence reduction motion with the warden of the facility in which s/he is being held that is rejected or the lapse of 30 days "from the receipt of such a request by the warden of the defendant's facility," whichever happens first. See 18 U.S.C. § 3582(c)(1)(A); United States v. Beck, Case No. 13-Cr-186-6, 2019 WL 2716505, at *5 (W.D.N.C. June 28, 2019) ("Among other things, [the FSA] add[s] a provision allowing courts to consider motions by defendants for compassionate release without a motion by the BOP Director so long as the defendant has asked the Director to bring such a motion the Director fails or refuses").

Thus, once a defendant files an 18 U.S.C. § 3582(c)(1)(A) sentence reduction motion after the occurrence of either of the two foregoing events, a district court may reduce that defendant's sentence to time served (or any other prison term short of the initial sentence) if it finds that: (1) "extraordinary and compelling reasons" exist for a sentence reduction after considering the 18 U.S.C. § 3553(a) factors; and (2) a reduced prison term is consistent with the applicable policy statements set forth in Section 1B1.13 of the Guidelines. See Beck, 2019 WL 2716505, at *6 ("Thus, courts may, on motions by defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically

identified in the application notes to the old policy statement").
And courts have utilized that power.

United States v. Cantu-Rivera, Case No. 89-CR-204, 2019 WL
2578272 (S.D. Tex. June 24, 2019), is instructive with regard to
court's newfound authority to reduce sentences based on
"extraordinary and compelling reasons" (even if those reasons do
not relate to medical condition, age or family circumstances).
Initially, the court in Cantu-Rivera explained that "[t]he [FSA]
amended 18 U.S.C. § 3582(c)(1)(A) to allow district courts to
modify sentences of imprisonment upon motion by the defendant if
the defendant has fully exhausted all [BOP] administrative rights
. . . or 30 days from the receipt of such a request by the warden
of the defendant's facility, whichever is earlier." Id. at *1
(internal quotation marks omitted). It then reduced that
defendant's life sentence (for conspiracy to possess with intent
to distribute in excess of five kilograms of cocaine) to time
served (after service of more than 30 years imprisonment) based
principally on "the extraordinary degree of rehabilitation Mr.
Cantu-Rivera has accomplished during the 30 years he has been
incarcerated," including "extensive educational achievements,"
such as "completion of over 4,000 hours of teaching while in
federal prison to complete a Teaching Aide apprenticeship with the
Department of Labor," his "service as a teaching assistant in

several prison facilities for high-school equivalency and English-as-a-Second-Language programs," and "his service in the BOP's suicide watch program, helping to care for inmates placed in solitary confinement due to suicide attempts." Id. at *2.

Similarly, in United States v. Cantu, Case No. 05-CR-458, 2019 WL 2498923 (S.D. Tex. June 17, 2019), the court noted that "[a] court may now," pursuant to 18 U.S.C. § 3582(c)(1)(A), "modify a defendant's sentence if it finds on either the BOP's or the defendant's motion that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" Id. at *1. It then reduced that defendant's 290-month sentence (which had previously been reduced to 210 months based on Amendments 782 and 788 to the Guidelines) to time served (after service of more than 14 years imprisonment) based principally on his medical condition, even though he "ha[d] not presented evidence that his reasons are extraordinary and compelling under the three explicitly defined reasons" set forth in Application Note 1 to Section 1B1.13 of the Guidelines. Id. at *3.

And, in United States v. McGraw, Case No. 02-CR-00018, 2019 WL 2059488 (S.D. Ind. May 9, 2019), the court stated that the FSA's modification of 18 U.S.C. § 3582(c)(1)(A) "now provides an

17

avenue for a defendant to seek a [sentence reduction directly] from the Court" and that "courts have universally turned to U.S.S.G. § 1B1.13 to provide guidance on the 'extraordinary and compelling reasons' that may warrant a sentence reduction." Id. at *1. It then reduced that defendant's life sentence (for possession with intent to distribute methamphetamine) to time served (after service of more than 17 years imprisonment) based principally on "his serious medical conditions," even though he had a long criminal history and had occupied a "leadership" position in the Diablos motorcycle gang. Id. at 2-6.

III. DISCUSSION

Although the parties quibble about whether Mr. Panton has exhausted his administrative remedies, it is clear at least that his April 17, 2020 renewed motion and the Warden's subsequent denial of that motion is sufficient for exhaustion. Accordingly, the Court moves to the merits.

Over some three decades in high and medium security facilities, Mr. Panton has 1) maintained a good disciplinary record, 2) taken advantage of numerous courses and other opportunities to enable a law-abiding life, 2) evidenced a desire to help the outside community during which he demonstrated incredible empathy and compassion in an encounter with a child sex abuse victim, 4) maintained an exceptional degree of contact with his children,

and, 5) unfortunately, developed several serious health issues. Because all of Mr. Panton's co-conspirators, except George Rivera, the leader of the drug organization, have been released or have release dates, releasing Mr. Panton would avoid a sentencing disparity. Mr. Panton also has a viable post-release plan. The combination of these factors constitutes "extraordinary and compelling circumstances" warranting release.

Mr. Panton has only six disciplinary infractions over almost thirty years in jail. None involves violence, weapons, gangs, narcotics, alcohol, or BOP staff. (One technically involved alcohol, but not on Mr. Panton's part. Apparently, he intervened in a dispute between two other inmates, one of whom was intoxicated, over the television channel they were watching.). This is a stellar record.

As set forth in more detail in the moving papers (dkt. no. 910), while incarcerated in USP Atlanta in 1994, Mr. Panton evidenced his concern for the outside community by participating in that facility's "Slow Down Program." That was a program in which Atlanta's family court sent juveniles with behavioral issues to meet with inmates for the purposes of getting a glimpse of one potential future and to hear from inmates who wished they had taken a different path in life. Although not reflected in an official BOP record, Mr. Panton states that, in counseling a young girl of approximately fifteen years old, he recognized signs of sexual

abuse—an observation he was able to make because of his experience with his own child, whose mother abused their child.  During the course of that session, the girl revealed to Mr. Panton that her father had been sexually abusing her, and he convinced her that that was wrong and that she should report it to the authorities.  When she agreed, Mr. Panton called over a female family court officer and explained what he had learned.  The girl left with the court officer, never to return, presumably because she had been removed from that home and placed in foster care.  Mr. Panton's concern that young people not follow his path and particularly his actions in rescuing the abused child are worthy of commendation.

Despite having no realistic hope of release, Mr. Panton used his time well in completing numerous courses during his incarceration.  Some, like the 500 hours of study in the Comprehensive Drug Unit, were aimed at enabling a law-abiding life.  While at USP Canaan, Mr. Panton completed the Challenge Program, another 500-hour program, to examine lifestyle and the factors that led to substance abuse and criminal behavior.  Included among other courses encouraging a law-abiding life that he completed were "History Highlights, a self-study course, and Emotional Intelligence.

Among the courses Mr. Panton took to facilitate post-release employment were Microsoft Office, Business Start-Up, and Industry

20

135

Safety Training. Particularly notable are his completion of the Professional Paralegal Program and the Professional Paralegal Specialty Program; Civil Litigation, from the Professional Career Development Institute, in both of which courses he mostly earned grades of A/A+. Consistent with his studies of the arts and theater management at Kingsborough Community College before his arrest, Mr. Panton also began writing during his incarceration. His success at that endeavor is demonstrated by his selection as a finalist by the Organization of Black Screenwriters, Inc. for a screenplay that he wrote entitled "Can You Cross Over?" Clearly, Mr. Panton has taken advantage while incarcerated of every opportunity to improve himself and to prepare for a law-abiding, productive life.

Mr. Panton has three children: Aaron Jenkins who lives in North Carolina and works in construction, Shamecca Panton who lives in Decatur, Georgia, and works as a dietary aide, and Dajoun Panton who lives in New York and works as a police officer in the NYPD. Dajoun wrote that, although his father has been incarcerated for much of the younger Mr. Panton's life, his father was "essential in molding me into the man I am today," having "counsel[ed]" him "on many things," including his "decision on becoming a New York City Police Officer, which [his father] fully supported." (Dkt. no. 910-10.) Similarly, Mr. Panton's daughter, Shamecca, wrote that he went to prison when she was only two years

136

old and that, even now that she is 30, "I feel that I still need my father in my life." (Dkt. no. 910-11.) Maintaining this degree of contact with his children over some thirty years betokens a strong family support system that bodes well for Mr. Panton's living a law-abiding life.

Unfortunately, Mr. Panton's health situation has not improved over time. He was hospitalized with Legionnaire's Disease, a type of pneumonia, in 1990, before his arrest. As his sister Grace Carrington, a healthcare worker, relates, Mr. Panton was admitted to Lenox Hill Hospital with the disease. While there, "the surgeon placed a central line in him that saved his life." (Dkt. no. 910-14). (Apparently, a central line is a catheter inserted in a large vein to administer medication to critically ill patients.) While incarcerated, Mr. Panton suffered from pneumonia in 2011 and required hospitalization at a non-BOP hospital. (See dkt. no. 910-15, Mr. Panton's medical records). Mr. Panton has also been exposed to tuberculosis and suffers from high blood pressure (that is controlled through medication). All of this medical history makes him more susceptible to COVID-19. (Dkt. no. 910 at 29.)

The Court also notes that except for George Rivera, who ran the narcotics distribution organization in which Mr. Panton participated and who was also sentenced to life in prison, all of the others charged and convicted for their roles in Mr. Rivera's organization have either been released from prison or have

22

scheduled release dates. (See dkt. no. 910 at 36-38.) Among them is David Cook, released June 28, 2016, whom the prosecutor on the case, Henry J. DePippo, viewed as "much more culpable" than Mr. Panton. (Letter of Henry J. DePippo dated August 7, 2019, dkt. no. 910-1.) Releasing Mr. Panton would avoid sentencing disparity.

Mr. Panton undoubtedly committed a serious crime that wreaked havoc and immeasurable suffering on his community. As noted, he was found responsible for distributing 41 kilos of heroin. At the same time, though, Mr. Panton has served a serious sentence of almost thirty years, more than enough to deter someone considering similar activity.

There can be no doubt that Mr. Panton has fully rehabilitated himself, and there is no need for further incarceration to protect the public from additional crimes by Mr. Panton. As noted above, the numerous courses he has completed while incarcerated have solidified his commitment to a law-abiding life and prepared him to be a productive—and employed—member of society. His stellar disciplinary record is also a demonstration of his ability to live a law-abiding life. Of course, the Court is cognizant that it may not grant relief under the FSA only for rehabilitation, but Mr. Panton presents several other reasons to grant relief.

As noted above, Mr. Panton demonstrated his concern for the outside community, particularly at-risk juveniles, by

23

participating in the Slow Down Program in Atlanta and counseling troubled youth not to follow the path he took. His actions in persuading a sexually abused teenager to report the crime and seek help was an extreme example of compassion and demonstrated a desire to do good by exercising a degree of initiative quite unusual in an incarcerated person. It was an extraordinary act.

As noted above, Mr. Panton has also stayed in touch with his family to an extraordinary extent. Indeed, his son, who hardly knew Mr. Panton before his incarceration, describes how his father influenced him to be the man he is today, serving with the NYPD. Mr. Panton's sisters also attest to his goodness, and two of them have invited him to live with them. After an absence of almost thirty years, this is also shows extraordinary family support.

As noted above, Mr. Panton's prior bouts with Legionnaire's Disease in 1990 and pneumonia in 2011, both of which were serious and required hospitalization over numerous days, together with his high blood pressure, make him particularly susceptible to COVID-19. This circumstance also compels release.

Finally, Mr. Panton has a viable release plan with exceptional family support. He has three sisters, Greta Clarke, a retired Nurse Practitioner, Grace Carrington, a delegate for the State of Florida, and Kandel Cornwall, who holds an accounting position with a nursing home. All three live in Florida. Ms. Cornwall

wrote about their family: "Robert is loving, kind and smart. Unfortunately he made some terrible choices along the way that lead him in this situation. . . . We are a supportive family and we will support him emotionally, financially along with a loving home and environment here in Florida." (Dkt. no. 910-12.) Darcel Anderson, mother of Mr. Panton's son, Dajoun, writes that "We would love to see Robert come home to be with his family." (Dkt. no. 910-13.) Along with the support of his children noted above, this high level of family support will assist Mr. Pantone in living a law-abiding life.

If released, Mr. Panton will live with his sister, Kandel Cornwall, in her single-family home. (Dkt. no. 910-12.) Mr. Panton's other sister, Grace Carrington, has also offered Mr. Panton a place in her home. (Dkt. no. 910-14.) Both sisters are healthcare workers and can attend to his needs.

Taking all these factors into account, the Court finds that Mr. Panton has demonstrated "exceptional and compelling circumstances" warranting release.

140

IV.  <u>CONCLUSION</u>

For the reasons discussed above, Defendant Robert Panton's motion for resentencing pursuant to 18 U.S.C. § 3582 (c)(1)(A) (dkt. no. 910) is <u>GRANTED</u>.  He is resentenced to time served plus one week.

**SO ORDERED.**

Dated:   New York, New York
         August 4, 2020

_____
LORETTA A. PRESKA
Senior United States District Judge



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                    Plaintiff,

-against-

ROBERT PANTON,

                    Defendant.

No. 89-CR-346 (LAP)

ORDER

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court is the pro se motion of Defendant Robert Panton for early termination of supervised release.  (Dkt. no. 944.)

On January 29, 1992, Mr. Panton was found guilty, following a jury trial, of conspiracy to possess with intent to distribute heroin, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(A).  Mr. Panton was sentenced on May 25, 1994 to life imprisonment followed by a term of five years supervised release.

On August 4, 2020, this Court granted Mr. Panton's motion for compassionate release pursuant to 18 U.S.C. § 3582(c), concluding that "[t]here can be no doubt that Mr. Panton has fully rehabilitated himself, and there is no need for further incarceration to protect the public from additional crimes by Mr. Panton."  (Dkt. no. 919 at 23.)

1

143

A district court may, in its discretion, "after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)," grant a defendant's motion for early termination of supervised release "after the expiration of one year of supervised release . . . if [the court] is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583(e).  In particular, courts consider the nature and circumstances of the offense and the history and characteristics of the defendant, considerations of deterrence, incapacitation and rehabilitation of the defendant, the sentencing range and policies in the Sentencing Commission's guidelines for the offense committed, the need to avoid unwarranted sentencing disparities among similarly-situated defendants, and the need to provide restitution to any victims of the offense. See 28 U.S.C. § 3553(a).

Upon his release from BOP custody in August 2020, Mr. Panton entered ICE custody for approximately 8 months.  Since approximately April 2021, he has been on supervised release. Hence, he has served at least one year of supervised release as required under the statute.

The Court concludes, after considering the Section 3553(a) factors, that early termination of supervised release is warranted in this case because it is in the interest of justice.

2

As the Court noted in its order granting Mr. Panton's motion for compassionate release:

> Over some three decades in high and medium
> security facilities, Mr. Panton has
> 1) maintained a good disciplinary record,
> 2) taken advantage of numerous courses and
> other opportunities to enable a law-abiding
> life, 3) evidenced a desire to help the
> outside community during which he demonstrated
> incredible empathy and compassion in an
> encounter with a child sex abuse victim,
> 4) maintained an exceptional degree of contact
> with his children, and, 5) unfortunately,
> developed several serious health issues.
> Because all of Mr. Panton's co-conspirators,
> except George Rivera, the leader of the drug
> organization, have been released or have
> release dates, releasing Mr. Panton would
> avoid a sentencing disparity.

Id. at 18-19. Mr. Panton has continued to put his money where his mouth is, avoiding recidivism while on supervised release and focusing his attention on his noble pursuit of working with at-risk youths and imparting on them his wisdom and guidance.

For all of these reasons, as elaborated further in the Court's order granting Mr. Panton compassionate release, the Court concludes that early termination of Mr. Panton's supervised release is in the interest of justice.

3

145

Mr. Panton's motion [dkt. no. 994]is GRANTED.  The Clerk of the Court is directed to mail a copy of this order to Mr. Panton at his last known address:

Robert Panton
17 Willow Place #1
Yonkers, NY 10701

**SO ORDERED.**

Dated: June 8, 2022
       New York, New York

LORETTA A. PRESKA
Senior United States District Judge

G

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
525 W. VAN BUREN, SUITE 500
CHICAGO, IL 60607


National Immigrant Justice Center
Navarrete Fernandez, Lhesly M
224 S Michigan Ave.
Suite 600
Chicago , IL 60604

In the matter of          File A 031-257-320      DATE: Jan 27, 2021
PANTON, ROBERT SAVIO


___ Unable to forward – No address provided.
_X_ Attached is a copy of the decision of the Immigration Judge. This decision
    is final unless an appeal is filed with the Board of Immigration Appeals
    within 30 calendar days of the date of the mailing of this written decision.
    See the enclosed forms and instructions for properly preparing your appeal.
    Your notice of appeal, attached documents, and fee or fee waiver request
    must be mailed to:    Board of Immigration Appeals
                          Office of the Clerk
                          5107 Leesburg Pike, Suite 2000
                          Falls Church, VA 22041
___ Attached is a copy of the decision of the immigration judge as the result
    of your Failure to Appear at your scheduled deportation or removal hearing.
    This decision is final unless a Motion to Reopen is filed in accordance
    with Section 242b(c)(3) of the Immigration and Nationality Act, 8 U.S.C. §
    1252b(c)(3) in deportation proceedings or section 240(b)(5)(C), 8 U.S.C. §
    1229a(b)(5)(C) in removal proceedings.  If you file a motion to reopen, your
    motion must be filed with this court:
                          IMMIGRATION COURT
                          525 W. VAN BUREN, SUITE 500
                          CHICAGO, IL 60607
___ Attached is a copy of the decision of the immigration judge relating to a
    Reasonable Fear Review. This is a final order. Pursuant to 8 C.F.R. §
    1208.31(g)(1), no administrative appeal is available. However, you may file
    a petition for review within 30 days with the appropriate Circuit Court of
    Appeals to appeal this decision pursuant to 8 U.S.C. § 1252; INA §242.

___ Attached is a copy of the decision of the immigration judge relating to a
    Credible Fear Review. This is a final order. No appeal is available.

___ Other: _____


                                   __I.C.__
                                   COURT CLERK
                                   IMMIGRATION COURT                    FF

    cc: ERIN KEELEY
        525 W VAN BUREN ST., STE 701
        CHICAGO, IL, 60607

IMMIGRATION COURT
525 W. VAN BUREN, SUITE 500
CHICAGO, IL  60607

In the Matter of

Case No.: A031-257-320

PANTON, ROBERT SAVIO
      Respondent

IN REMOVAL PROCEEDINGS

ORDER OF THE IMMIGRATION JUDGE

This is a summary of the oral decision entered on __**JAN 27, 2021**__ .
This memorandum is solely for the convenience of the parties.  If the
proceedings should be appealed or reopened, the oral decision will become
the official opinion in the case.

[ ✓ ]  The respondent was ordered removed from the United States to
       ▆▆▆▆▆ or in the alternative to .
[   ]  Respondent's application for voluntary departure was denied and
       respondent was ordered removed to ▆▆▆▆▆ or in the
       alternative to .
[   ]  Respondent's application for voluntary departure was granted until
       _____ upon posting a bond in the amount of $ _____
       with an alternate order of removal to ▆▆▆▆▆.

Respondent's application for:
[ ✗ ]  Asylum was ( )granted ( ✓ )denied( )withdrawn.
[ ✓ ]  Withholding of removal was ( )granted ( ✓ )denied  ( )withdrawn.
[   ]  A Waiver under Section _____ was ( )granted ( )denied  ( )withdrawn.
[   ]  Cancellation of removal under section 240A(a) was ( )granted  ( )denied
       ( )withdrawn.

Respondent's application for:
[   ]  Cancellation under section 240A(b)(1) was ( ) granted  ( ) denied
       ( ) withdrawn.  If granted, it is ordered that the respondent be issued
       all appropriate documents necessary to give effect to this order.
[   ]  Cancellation under section 240A(b) (2) was  ( )granted  ( )denied
       ( )withdrawn.  If granted it is ordered that the respondent be issued
       all appropriated documents necessary to give effect to this order.
[   ]  Adjustment of Status under Section _____ was ( )granted  ( )denied
       ( )withdrawn.  If granted it is ordered that the respondent be issued
       all appropriated documents necessary to give effect to this order.
[   ]  Respondent's application of ( ✓ ) withholding of removal  ( ✓ ) deferral of
       removal under Article III of the Convention Against Torture was
       ( ) granted  ( ✓ ) denied  ( ) withdrawn.
[   ]  Respondent's status was rescinded under section 246.
[   ]  Respondent is admitted to the United States as a _____ until _____.
[   ]  As a condition of admission, respondent is to post a $ _____ bond.
[   ]  Respondent knowingly filed a frivolous asylum application after proper
       notice.
[   ]  Respondent was advised of the limitation on discretionary relief for
       failure to appear as ordered in the Immigration Judge's oral decision.
[   ]  Proceedings were terminated.
[   ]  If you are under a final order of removal, and if you willfully fail
       or refuse to 1) depart when and as required, 2) make timely application
       in good faith for any documents necessary for departure, or 3) present
       yourself for removal at the time and place required, or, if you conspire
       to or take any action designed to prevent or hamper your departure, you
       shall be subject to civil money penalty of up to $813 for each day under

149

ALIEN NUMBER: 031-257-320        NAME: PANTON, ROBERT SAVIO

such violation. (INA section 274D(a)). If you are removable pursuant
to INA 237(a), then you shall further be fined and/or imprisoned for up
to 10 years. (INA section 243(a)(1)).

[X] Other: _LPR_ _STaTUS_ _TERMINated_ _.

Date:  Jan 27, 2021

_____
SAMUEL B. COLE
Immigration Judge

Appeal: Waived/Reserved    Appeal Due By:   2-26-21

CERTIFICATE OF SERVICE
THIS DOCUMENT WAS SERVED BY:  MAIL [M]  PERSONAL SERVICE [P]  ELECTRONIC SERVICE [E]
TO: [ ] ALIEN  [ ] ALIEN c/o Custodial Officer  [ ] ALIEN's ATT/REP  [ ] DHS
DATE: _1-27-2021_  BY: COURT STAFF
    Attachments: [ ] EOIR-33  [ ] EOIR-28  [ ] Legal Services List  [ ] Other

Q6



| | |
|---|---|
| **From:** | Perez, Laura |
| **To:** | Lhesly Navarrete Fernandez; Ozuna, Arizmendi A |
| **Subject:** | RE: Panton, Robert Savio 031 257 320 |
| **Date:** | Friday, October 1, 2021 5:53:50 PM |
| **Attachments:** | image001.png |

Good Evening,

Your client PANTON has been granted a stay for a period of one (1) year with an expiration date of September 30, 2022. Your client will remain on ATD monitoring during the one year period.

If you have any questions and/or concerns regarding this matter, please don't hesitate to contact me or DO Ozuna.

---

**From:** Lhesly Navarrete Fernandez <lfernandez@heartlandalliance.org>
**Sent:** Thursday, August 26, 2021 4:32 PM
**To:** Morales, LuisAntonio <LuisAntonio.Morales@ice.dhs.gov>; Ozuna, Arizmendi A <Arizmendi.A.Ozuna@ice.dhs.gov>
**Cc:** Perez, Laura <Laura.Perez@ice.dhs.gov>
**Subject:** RE: Panton, Robert Savio 031 257 320

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact ICE SOC SPAM with questions or concerns.

Good Afternoon Officer Ozuna,

Our office represent Mr. Robert Panton (A#031 257 320), a Jamaican national who was previously detained at Boone Detention Center in Kentucky. His case has since been transferred to the Miami Field Office. Attached please find his Request for Deferred Action for your consideration.

Should you have any questions regarding the request, please contact me directly at 312-660-1334.

Respectfully,

Lhesly Fernández
Detention Project, Staff Attorney

National Immigrant Justice Center
A HEARTLAND ALLIANCE Program
224 S. Michigan Ave., Suite 600, Chicago, IL 60604
T: 312.660.1334| F: 312.660.1505 | E: lfernandez@heartlandalliance.org

Confidentiality Notice: This e-mail message, including any attachments, is intended only for the person(s) or entity(ies) to which it is addressed and contains information that may be confidential, legally protected, privacy relevant, proprietary in nature or otherwise protected by law from disclosure. If you received this message in error, you are hereby notified that reading, sharing,

Office of Enforcement and Removal Operations
New York Field Office

U.S. Department of Homeland Security
26 Federal Plaza, Suite 1105
New York, N.Y. 10278



U.S. Immigration
and Customs
Enforcement

September 27, 2022

National Immigrant Justice Center
Attention: Diana Rashid
Detention Project Staff Attorney
224 S. Michigan Avenue, Suite 600
Chicago, IL 60604

Re: Application for a Stay of Deportation or Removal
    Robert Savio Panton, A031 257 320

Dear Ms. Diana Rashid:

I have reviewed your request for an administrative Stay of Removal. After a review of your client's administrative file as well as the facts and circumstances presented in your request, I have decided to grant your request for an administrative Stay of Removal.

The Stay of Removal will be granted for a period of one year from the date of this letter. Your client has been issued an Order of Supervision (OSUP) with electronic monitoring and is required to comply with the conditions as set forth in the OSUP.

Please be advised that a Stay of Removal is not an immigration benefit or an indefinite form of relief from removal. Any change in the facts or circumstances of your client's case may result in this office reconsidering its decision. As always, your client must keep this office informed of any change in address.

If you have any questions, please contact Deportation Officer R. Medina at 212-436-9324.

Sincerely,

For

Kenneth Genalo
Acting Field Office Director

www.ice.gov

0054

153

*Office of Enforcement and Removal Operations*
*Field Office New York City*

**U.S. Department of Homeland Security**
26 Federal Plaza, Suite 1105
New York, N.Y. 10278



**U.S. Immigration
and Customs
Enforcement**

August 25, 2023

Olivia Abrecht, Esq.
Detention Project Staff Attorney
National Immigrant Justice Center
224 S. Michigan Avenue, Suite 600
Chicago, IL 60604

Re: Robert Savio PANTON, A031 257 320

Dear Counselor Abrecht:

I have thoroughly reviewed the Form I-246, "*Application for a Stay of Deportation or Removal*," which you filed on behalf of your client referenced above. I have also carefully reviewed your client's immigration and criminal history and have considered the representations that you have made in your request for an extension of his administrative stay of removal, specifically, but not limited to, Mr. Panton's equities, including his contributions to the community and his medical concerns. I have also considered the letter of support authored by the Honorable Congressman Adriano Espaillat on your client's behalf.

As you know, on September 27, 2022, I granted a year-long administrative stay of removal to Mr. Panton because at the time of that request, Mr. Panton had a petition for review pending before the United States Court of Appeals for the Seventh Circuit, challenging his removal. As you are also likely aware, that petition for review was denied on June 15, 2023. I have determined that there is no longer a compelling reason to warrant an extension of the stay of removal and, therefore, the request is denied. Furthermore, Mr. Panton will not be granted deferred action. Please be advised that there is no administrative appeal from this decision.

That said, in my discretion, I will grant your client the opportunity to arrange for his removal (i.e., the execution of his removal order) from the United States at his own expense on or before March 26, 2024, thus avoiding the need for further detention. This opportunity is contingent on his reporting on September 27, 2023, at 11:00am to his Deportation Officer at 26 Federal Plaza, 9th floor, Room 9-110 for evaluation and placement on the Alternatives to Detention (ATD) program with GPS monitoring.

154

Robert Savio PANTON, A031 257 320
Pg 2

Any violation of the ATD program may cause a revocation of this discretionary opportunity to self-
remove and re-arrest by ERO. Should you have any questions regarding this matter, kindly contact
Deportation Officer, J. Rodriguez, either telephonically at (646) 296-3820, or via email at
Jaime.N.Rodriguez@ice.dhs.gov

Sincerely,

Kenneth Genalo
Field Office Director

cc: the Honorable Congressman Adriano Espaillat

www.ice.gov

0056

155

**UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES**

| | |
|---|---|
| Affidavit in Support of the Form I-918, Petition for U Nonimmigrant Status and I-192, Application for Advance Permission to Enter as a Nonimmigrant<br><br>For Robert Panton, A031-257-320 | AFFIDAVIT of Robert Panton |

**APPLICANT'S SWORN AFFIDAVIT**

I, Robert Savio Panton, declare under penalty of perjury that the following is true and correct:

**I.    Introduction**

1.   My name is Robert Savio Panton. I am 57 years old and I live in Harlem, New York. I was born in Kingston, Jamaica on December 31, 1965, but I have lived in the United States nearly all of my life. I do not have many memories of Jamaica and have no family there.

2.   My home is here in the United States, specifically in Harlem, where I grew up. I am a father to three adult U.S. citizen children and a grandfather to nine U.S. citizen grandchildren. My three sisters are all U.S. citizens.

*3.*   When I was young, I got involved in the sale of drugs in my community. I was arrested in 1991, and in 1994 I was sentenced to life in federal prison. I will forever regret my role in the devastating effects that drugs had in my community. Since my conviction, I have committed myself to making reparations. For me, that means mentoring and supporting youth in Harlem so that they do not make the same mistakes that I did. Since my release from prison, I have returned to Harlem and committed myself to developing more supports and programming for youth.

*4.*   In 1991, just before my arrest, I was the victim of a shooting that almost took my life. Two bullets hit me and I had to be taken to Metropolitan Hospital in critical condition. I feared I might never walk again. I almost didn't. While in the hospital, I did my best to cooperate with the police investigation.

*5.*   I wish I could say 30 years later that the shooting is a distant memory, but the reality is that I will never forget. It continues to haunt me to this day. I was diagnosed with PTSD and I find that loud noises still trigger intense feelings of fear and anxiety to this day.

II.    **I came to the United States at 4 Years Old and Grew Up in Harlem**

6.  I have very few memories of my life in Jamaica. I remember the sound of the mangos falling from trees onto the roof and I remember the airport when we left Jamaica. In Jamaica, my mother raised me and my two elder sisters Greta Clarke and Grace Carrington, on her own. My father passed away when I was about 2 years old.

7.  My mom brought me to the United States when I was four years old. I entered the United States as a Lawful Permanent Resident on or around October 28, 1970. I believe my mother took us back to Jamaica for a funeral in 1974, but other than that, I have never returned to Jamaica since then.

8.  When we moved to the United Stated, we lived in Harlem, New York. It was not easy for my mom to care of all of us. She was always at work, but she did the best she could. Sometimes, when I would get home from school, my mom would be at work but my older sisters were there to take care of me. In the '70s resources were scarce in Harlem. My mom worked hard to make sure we had food. We were better off than some of the people around us—but we were still living in the projects—and we did not have the necessary resources to get out.

9.  At first, I enjoyed school because I liked to learn. I also played various sports like basketball, football, and swimming. However, when I was about eight or nine years old, I started getting into trouble at school. The kids would taunt me about my Jamaican accent, my off-brand clothes, and not knowing the American culture. When my mom found out I was being taunted, she understood why I was getting into fights. Eventually I assimilated and the taunting stopped before I started high school. By that time, my accent had faded and I was able to fit in more.

10. I have heard that, "you are a reflection of your environment." Growing up in Harlem, drugs were all around me. As soon as I walked outside my house, I would see people selling drugs or using drugs. It is just what everyone around me did. All the men I saw around me in the community were involved with drugs.

11. When I was fifteen years old, I got into boxing. A guy on my block saw me fighting one day and he told me I had what it takes to be a boxer. He gave me the ring name "Bob Lemon," like the baseball player. A ring name is like a stage name, but for athletes. I talked to my mom about it and started training at Connie's Gym at 125th and Madison Avenue. I was somewhat talented. At one point, I was sparring with professionals and even participated in the 1982 Golden Gloves Championship at Madison Square Garden. I loved boxing because it was an opportunity for me to get out.

**III.    After a devastating injury, I got pulled into the sale of drugs in my community – a mistake I will forever regret and try to make amends for.**

12. My career as a boxer was going well until it was derailed by a hand injury and then a few years after, a serious back injury from a car accident. This caused me immense pain and I had to give up my dreams of boxing.

13. I tried to stay involved in my local gym by working as a boxing trainer even after my injuries. That is where I met George Rivera, an aspiring boxer who asked me to train him for a boxing championship. I should have stuck to boxing training. But then George offered me an opportunity to make more money if I agreed to manage the money at one of his street-level drug distribution locations, which was referred to as a "store."

14. I agreed and I will forever regret agreeing to take this job. At the time, drug usage and drug sales were a regular occurrence in my neighborhood in New York. After my injury, it seemed like I had no other option to make money. I was of course wrong and failed to think about the impact selling drugs would have on so many around me and my future. But at the time, I was focused on finding a way to make money to support my family with my boxing career in shambles. I was the only man in the family and I felt a lot of pressure to take care of my mom, and three sisters, Grace, Kandi, and Greta. I should have gone to college like my sisters. That was another mistake, but at the time, it felt impossible.

15. My job was to keep track of the money for the store and give it to George. I admit I knew the money was from the sale of heroin. During my involvement, I never touched the heroin itself or made the actual sale. That was not my role. I also never saw or did anything related to the receiving or packaging of the heroin. I did not know where George got it from or how much he was selling outside of my assigned "store." As far as I could tell, all of the money I made came from the one "store" I watched. I myself have never tried heroin.

16. When I look back on this big mistake I made, I think about how it was the crack era. I had some friends who were addicted to crack and I saw how harmful that was for them. I even helped one of my friends rehabilitate from his crack addiction. My mom had known him since he was a kid and we let him stay with us as he went through the withdrawal. I did this at the same time I was helping George with his sale of drugs. This was a terrible contradiction that I reflected on a lot over the years. Why would I help one kid suffering these harms of addiction who to this day is thankful to me, but also at the same time help George sell heroin?

17. Around 1989, George stopped attending our boxing training sessions. I later found out that he had been indicted and arrested for conspiracy to distribute heroin in the Bronx. The government also arrested and charged 32 other individuals for their role in George's organization at that time. I was not arrested at that time.

18. Over the next year, I moved on with my life. I attended classes at Kingsborough Community College. I was dreaming of making movies and I wanted to major in Arts Management. Most importantly, I got to be a father to my son Dajon Panton, who was born on October 31, 1989 and my daughter Shamecca Panton, was born on February 24, 1990. I loved

being a father. I remember waking up at 3:00 am with Dajon. I loved teaching him new things and I'll especially never forget the day he learned to walk. It was a very special thing to see his first steps. Shamecca was a very smiley baby. She would smile even when I was changing her diaper. Now I see that same smile in her baby, my grandbaby Mecca.

19. After the arrests in 1989, I had been nervous that people would think I worked with the government since I was never arrested. Being suspected as a snitch was a dangerous thing in Harlem in that era. Then, on January 10, 1991, I was walking near 123rd and 2nd Avenue when I was shot twice. I was shot in my right hip and on the left side of my face. I will never forget that moment. Everyone in the community was talking about how I was shot because people believed I had cooperated with the government in the arrest of George River and others. But no one wanted to come forward to the police for fear of reprisals or arrest.

20. In 1991, after being shot, I was arrested while at Metropolitan Hospital for my involvement in the drug operation. I was charged with conspiracy to possess and distribute 41 kilograms of heroin in violation of 21 U.S.C. § 812, 21 U.S.C. § 841(a)(1) and 21 U.S.C. 841(b)(1)(A).  I was convicted after a months-long trial of several defendants tried together. I received a life sentence for this conviction and served thirty years before a federal judge ordered my release.

21. I deeply regret that I contributed to this drug operation. The fact that I profited on the destruction of other lives was hard to reckon with and it has stayed with me since. I knew that the people buying heroin were addicted. I had seen the harms of addiction in my community especially with crack cocaine, but I was desensitized and tempted by money. I am fully accountable for my involvement in the conspiracy and understand why I was prosecuted for my role at the time. Today, thirty years later, I teach the lessons I have learned to young people so they can learn from my mistakes instead of making bad decisions like I did as a young man. That is my calling.

### IV.    Being shot in 1991 was traumatizing and, if not for the amazing care of doctors at Metropolitan Hospital, I could have died.

22. When I was shot on January 10, 1991, I was hit in my right hip and the left side of my face. Before the ambulance arrived, I was going in and out of consciousness. I remember hearing people scream. The screams would bring be back to consciousness. It felt like hours before the ambulance came. I remember telling a guy to take my boots off because I first felt pain radiating from my hip down my leg and then I started to feel numbness in my legs and I panicked.  At the same time, my face was also burning and itching all at the same time from the bullet that had hit me on my left side.

23. At the hospital, they gave me morphine through an IV for the pain. I was told that the bullet that entered my hip had hit my bladder. So in addition to fixing my leg, they also had to sew up my bladder and I believe they said I almost had to use a feces bag. The doctors also told me I could maybe lose a leg or I would be off balance in the future. I cannot explain

how terrifying it is to think you are going to lose your leg. Fortunately, it turned out that the surgery was successful and I was able to recover slowly and painfully.

24. For my face, they had to remove the bullet and then take a skin graft. I think they took skin from my buttocks to put over my wound on my face.

25. After about five days in the hospital, some detectives came to talk to me. I had spoken briefly with police right after the shooting, but I was in and out of consciousness so I do not think I was very helpful. At the hospital, I was still out of it from all the pain medication, but I did my best to answer the officer's questions and be helpful.

26. I do not remember exactly how many days I was in the hospital but I think it was about three weeks in total. I have tried to get the records, but it was thirty years ago and the hospital said they do not keep records that old. While I was at the hospital, my sisters Grace and Greta were allowed to visit me. The doctor wanted to keep me longer, but they would not let my daughter and son come visit me in the hospital, so I told them I would rather go to the prison, so that I could see my kids.

27. I am very grateful to all the amazing doctors who saved my life and my ability to walk and function. However, about a month or two after I was discharged, I had to be rushed back to the hospital because something was wrong with an artery and vein near my stomach. I am not a doctor, but from what I understood, the artery and the vein were interfering with each other. They had to install a clip in my stomach.

28. I still have some lingering injuries to this day from the shooting. I now have arthritis in my hip that is especially hard when it gets cold and I experience numbness in my feet that makes it hard to be physically active. I also have a twitch in my face from the nerve damage. I later had to have an operation on my eye because it droops.

29. In addition to my physical injuries, I quickly realized that I also was traumatized by what happened. I tried to push through it and act as if I was fine, but in reality, I was having intense nightmares about being shot and dying. I would wake up in the middle of the night sweating. I had these dreams over and over again about the shooting.

30. Sometimes, the memory would also come back to me in the daytime like a flashback. For example, if I let myself relax, then suddenly it would come to mind and I would feel like I was right back on the sidewalk bleeding in the cold.

31. I also spent my first years in jail terrified that I would be targeted again. I was always worried that something bad would happen. It was my first time in jail and someone had just tried to kill me, so I was always hyper-vigilant and on guard. Someone had tried to kill me for being a suspected snitch and they put me in the one place where everyone hates snitches the most. This anxiousness and anxiety was really hard to manage. I found that I

was scared to open up with people because I was afraid of being known as a "snitch". It was isolating and made it even harder to be incarcerated.

32. Around 2000, while I was at USP Canaan, I finally asked for help and spoke to a counselor in the psychology department. He referred me to the Chief Psychologist. I think his name was Dr. DePaulia or something along those lines. I met with him many times and he diagnosed me with PTSD. I ended up working as an orderly in the psychology department and would talk with him when I was done with my work. He always reminded me to concentrate on the fact that I was alive. He taught me how to take deep breaths with my mouth open to calm my heartrate. Even with help, I kept having the nightmare for 15-20 years.

33. Now, even though I try to put all of that in my past, I still sometimes have the recurring nightmare and whenever I hear a pop or a quick sound – the shooting comes back to my memory. When it comes to my memory – I feel how I felt back then. The fear comes back to you. My heart starts to race painfully. Especially when I hear a firecracker or something like that.

**V.     During my time in prison, I pushed myself to better myself and others by taking on leadership positions within the prison and mentoring young people who were in danger of going down the wrong path and ending up in prison.**

34. Although I faced life in prison, I took every opportunity available to me to better myself. Even before my sentence was final, I voluntarily completed over 500 hours of the Comprehensive Drug Unit. I was not addicted to drugs, but I felt it was important to educate myself about addiction if I was going to make amends.

35. While at the Metropolitan Correctional Center in New York pre-sentencing, I found the Law Library. I didn't expect to see all these legal minds working on their cases from prison. I found positive influences in the law library and a sense of at least a little safety that helped me during those first years.

36. In the library, they had a clerk that gave me advice about what to read. He helped me analyze certain things. I got hooked on the law. A guy named Willy was willing to teach me. He taught me how to Shepardize cases. How to find out what circuit you are in. What Stare Decisis is. I started spending 3 hours a day in the law library. Later, I got a job as a clerk at the Atlanta Penitentiary. It was my regular job 7 hours a day to help other people.

37. This ultimately led me to work towards my Bachelor's Degree and a paralegal certificate with a specialization in civil litigation. I also completed various programs to facilitate post-release employment such as Microsoft Office, Business Start-Up, and Industry Safety Training.

38. Early on in my incarceration, I also began to write screenplays. It was way for me to process what had happened to me. I took some creative writing classes, which ultimately inspired me to teach my own classes in the prison. In 2004, I submitted my screen play *Can You Cross Over?* to a competition hosted by the Organization of Black Screenwriters. I was honored to be selected as a finalist and it gave me the confidence I needed to continue writing. I have continued to write and have even written a children's book called "Tell Them The Truth," which aims to teach youth about their history.

39. As the years past and I got older, the guys coming in were younger and younger. They couldn't read or write very well. I ended up helping them a lot. Then I'd see them in the hallway doing something stupid. I would call them in and try to help them with their frustration. They don't make it easy, but I always tried. Eventually, I started being seen as the go-to guy if there was a problem. The guards started seeing me with respect. When they had problems with younger guys, they would come to me and ask me to help. I could help the young guys because I had made bad decisions in the past. I knew where that came from and what it felt like, and I could talk to them and they listened.

40. I also found religion in prison. I knew religion prior to going to jail. I grew up in the church. But when you are in trouble, you start praying for god's help more. Imam Sabree was a Muslim chaplain in the Atlanta penitentiary. He became a role model for me while I was in prison. He was in the streets before he went to Morehouse College and got a degree in language. The day I met him, I was surprised to see someone speak so articulate and truthful about life. After I heard him speak, I was there always after that. That's what led me to start studying and find out more about religion. Religion helped me have hope. I ended up being an Imam at some of the prisons that I served my time at. It was an honor to be seen as a leader and to help others in that role.

41. One of my proudest achievements in prison was the launch of program for youth who were in the family court system in Atlanta. I worked with the psychology department to launch it and I was one of the founding mentors. We called the program the "Slow Down Program," which allowed incarcerated individuals in Atlanta to mentor youth every week who had been arrested or were at risk of being arrested. I had wisdom and experience to offer these young people and they were receptive to my advice. I felt like I had found my calling.

42. We would sit with them and talk about their lives and try and mentor them. I remember one young guy in particular came in and he was dealing drugs. We talked about why he was doing it and I tried to convince him that it would be better to finish school. I was not sure if it worked or not, but later, he sent a letter to the prison to inform me that he had finished school. This kind of victory inspired me to want to keep going.

43. I was also recognized by the prison for one intervention that I made in particular. A young woman came to me and told me that she was experiencing sexual abuse at home. I listened

to her story and did my best to make sure she felt supported as I encouraged her to ask for help and report what was happening, which she did. Moments like these gave me sense of purpose despite my life sentence and energized me to continue pushing myself to do better.

44. I was lucky to have my family support me while I was in prison. My sisters were always there for me. Because of their support, I was able to cut off the guys that I knew from the neighborhood. My family gave me strength to do the right thing. Throughout my time in BOP, I had an exemplary disciplinary record. I only received 6 disciplinary infractions in nearly 30 years, none of which involved violence, weapons, gangs, or narcotics.

45. I also have to credit the mothers of my children too. They helped me keep a relationship with my children while I was incarcerated and that made me want to be better. I feel really proud that my son Dajon has become a New York City Police Officer. When he was trying to decide what to do with his life, I tried to steer him to being of service to his community. I could not be prouder of him and I am so grateful that he now lives close to me and we see each other every week.

**VI.    In August 2020, a federal judge reduced my life sentence to time served based on my rehabilitation and I was released from prison – only to be detained by Immigration and Customs Enforcement.**

46. Thanks to the First Step Act, which was signed into law by President Obama, I got the opportunity to request a reduction in my sentence. I filed a motion *pro se,* and Judge Preska appointed Harlan Protass as my lawyer. In 2020, Judge Preska reduced my sentence to time served. I will never forget what she wrote in her decision. She wrote that I had shown I was "fully rehabilitated" and that I was deserving of being home with my family. I remember feeling proud that all my work had paid off and that a judge who sees these types of cases everyday saw that I have changed and I am capable of doing good for others.

47. In August 2020, I was released and then detained. Immigration Customs Enforcement (ICE) picked me up from Big Sandy correctional facility in Kentucky and commenced removal proceedings against me based on my drug conviction.

48. While I was in detention, I tried to request certification for a U visa from the New York City Police Department, however I never got a final decision and I thought it was a lost cause.

**VII.    After my release from ICE detention, I returned to Harlem and committed myself to making reparations in my community.**

49. ICE released me from detention in April 2021. When I first got out, I went to Florida with my sisters. They were spoiling me. I knew they would help me get a job. But I knew I had

to do something in New York. I know being regretful is not enough. You have to make reparations, in the same place you polluted.

50. When I got to New York, I found out that all the people who used to sell drugs had a job and nobody from my generation was in drugs anymore. But I also knew from my experience in prison that there are things we can do with youngsters to make them realize they are making a big mistake getting involved with things like drugs and they don't need to go to jail to realize it.

51. I know I can help youth see that a life of selling drugs and violence is not worth it. My dream is that they do not have to go to jail to realize how they are hurting themselves and the people around them like I did. This mission is a way for me to attempt to make things right with myself. So I choose to give back to my community by giving youth the life lessons that I learned in prison.

52. I connected with other men from Harlem who had also gone to prison and wanted to make change. I founded a group called "Ingenious I Am" with Mahdi Salaam, a poet laureate, to start mentoring youth. We launched the "Too Young To Die" Campaign, which is committed to helping young people.

53. As part of the campaign, we have a suicide prevention hotline that runs directly to my cell phone and we collaborate with community organizations to organize events for youth. For example, I have volunteered with SCAN-Harbor, which runs afterschool programs in Harlem, and with Chambers Memorial Baptist Church

54. I am most proud of my work during the summer of 2022, I partnered with Antonio Hendrickson, the founder of Lead By Example, Reverse the Trend to design and run an 8 week summer program for teenagers. It met three times a week and included counseling and group activities. We need more programs like this in Harlem and it inspired me to continue developing programs to keep youth busy and prepare them for successful careers. Similarly, in the summer of 2023, I worked with Urban Home Ownership Corporation to design a summer internship program that would teach young people trades.

55. Since my release, I have also been able to become more involved in my children's lives. My son Dajon lives in Harlem and he is expecting his first child. I am so proud of everything he has accomplished and I cannot wait to be the kind of grandfather that changes diapers and babysits any chance I can. My daughter, Shamecca is living in Georgia with her daughter, who will be turning one year old soon. The two of them visit me in New York often and we have even talked about the possibility of her moving in with me in New York if I am able to stay in the United States.

**VIII.  I have lived in the United States for 50 years, but in some ways, I feel like I am just now living the life I always dreamed of. I hope I will get the chance to continue my work here in Harlem, my true home.**

56.  I may not be a U.S. Citizen, but the United States is my only home. After coming here at four years old, I known nothing else.

57.  I am not a young man anymore. I have a lot of health issues now and I need a lot of medical attention. The most challenging health condition right now is that I have a lot of knee and back pain with muscle spasms that result in some numbness and tingling. I see a number of specialists in New York to get treatment including Dr. Joyce Goldenberg who works at Central Park Physical Medicine & Rehab. I have trouble walking long distances and carrying heavy objects.

58.  My pain is so severe that I am considered partially disabled. I worry that Jamaica will not be able to provide me with decent medical care and my pain will only increase. I don't know a lot about Jamaica, but I know that it does not have doctors like here in the United States.

59.  I also fear that my past will come back to haunt me in Jamaica, where there are not the same law enforcement protections that we have here. I worry that I will encounter people who still think of me a "snitch" and would try to kill me again. I know that there is a lot of gang violence in Jamaica and I fear that gangs would target me because of past and my criminal record. All they will know about me is my criminal record. They wont know everything I have done to change my life.

60.  Despite my fears of deportation, because of religion, I wake up and think every day is a good day because you woke up. God knows what is coming and I hope you will see that I am a changed man who deserves a second chance. I made bad decisions. I regret those and use them to guide me even all these years later in every interaction I have with my family and with the youth who talk to me.

61.  My attorney says that I need a waiver for my application because of my conviction and because I do not currently have immigration documents. With regards to my conviction thirty years ago, I hope you can see how hard I have worked to redeem myself and to bring good into the world. For immigration, I have been having trouble getting a new passport because I do not have a copy of my birth certificate and came to the United States when I was a child. However, I am working with the Jamaican government to try and get a new copy and a passport. Also, although I was ordered removed in 2020, I benefitted from two consecutive stays of removal and have been given until March 26, 2024 to self deport. I hope that you will please give me the waiver so that I can stay with my family and keep helping my community.

62. I wish I could take away the bad decisions I made, but all I can do is apologize for them. I just keep working to use those times to guide others. To use my mistakes to help other people. I hope you will have room for my redemption. I hope the Creator accepts my repentance.

*Remainder of page intentionally left blank*

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

*Robert Panton*

12/21/2023

_____                    _____

Robert Savio Panton                                              Date

J

169

**UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES**

| | |
|---|---|
| Affidavit in Support of the Form I-918, Petition for U Nonimmigrant Status for Robert Panton, A031-257-320 | AFFIDAVIT of Grace Carrington |

**SWORN AFFIDAVIT OF GRACE CARRINGTON (APPLICANT'S SISTER)**

I, Grace Carrington, hereby declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief:

1. My name is Grace Carrington. I was born on August 9, 1963 in Kingston, Jamaica. I became a United States citizen when I was either in middle school or high school. I currently live in Coral Springs, Florida, and am President of G C Consulting INC DBA Quad Industries LLC.

2. I have three siblings. Robert Panton is my younger brother. My other two sisters and I have always supported him throughout his life despite his incarceration. We love him dearly and are proud of the man he has become.

3. I know he has made mistakes, but I also know that he spends every day making up for them. I have faith in Robert and I desperately want him to stay in the United States with his family. He has three grown children and nine grandchildren. Even though his children are adults, they still need their father and their children need their grandfather.

4. Now, after all these years, to have Robert deported to a county that he does not know will feel like a death sentence for him. His home is in Harlem and we ask you to please allow him to stay with us.

*Roberts Childhood in Harlem*

5. My family came to the United States in October 1970 when I was 7 years old. I don't have a single memory of our life in Jamaica. We moved to New York City.

6. We were of extremely meager means even though my mother worked hard. Robert was a very playful child and was always kindhearted and passionate. He never saw a single person that he didn't want to help. We grew up in the projects and there were a lot of people around us who were struggling or homeless. Robert would always give them a quarter or 50 cents no matter how poor we were.

7. Robert dreamed of being a professional boxer and he was talented. If it had not been for two injuries, he could have made a career from it.

*In 1991, Robert was shot in New York City and suffered severe injuries.*

8. I will never forget January 10, 1991. That was the day that I got a call from someone in the neighborhood. They told me that the ambulance had taken my brother to Metropolitan Hospital. I remember it was a really cold day and I was told that the paramedics had to wrap him in blankets to keep him warm.

9. After receiving the call, I rushed to the hospital and stayed by his bedside. I did not sleep for days and my sisters and I cried constantly thinking he might not make it.

10. I was at the hospital ever day until he recovered. At first, they were focused on triaging him and I couldn't get much information from the doctors. I feared the worst. My sister Greta had worked at Metropolitan Hospital and she knew all the doctors and nursing staff, so once they found out that Robert was Greta's brother, they started being more attentive and giving us more information.

11. When I saw Robert, I was in shock. He was all bandaged up. You almost couldn't tell what was wrong with him because there was so much gauze. Because of all the gauze on his head, I thought there was a brain injury and the worst thoughts ran through my head. He is my only brother and I could not bear the idea of losing him.

12. One of the bullets had actually hit his face and now he has a droop eye because of the nerve damage. The other bullet caused complications in his abdomen I believe. To this day, I know he has problems with the circulation in his feet, which I think is related to the shooting. He struggles with standing for long periods and walking longer distances.

13. I do not remember much of what the doctors told me in the hospital. All I remember is that they kept using the word "guarded" whenever they gave me news. They were concerned because of where the bullets were located, so even though they thought he would pull through, they seemed nervous for days after the shooting. At one point, they were worried that he would lose vision in one eye.

14. I was terrified. A gunshot is a gunshot and people do not often make it. My older sister Greta did a lot of praying with him. We thought he was a goner. Up until the fourth or fifth day, when they started cleaning wounds, we thought he was not going to make it. We did not really discuss the fear, but you felt it in the room. We all did.

15. His injuries were very serious and he could not advocate for himself. He knew we were in the room, but he really could not talk to us much because he was so badly injured. They would ask him simple things, sometimes he answered, and sometimes he did not. He was in a lot of pain and the pain medication made him even more confused.

16. While at the hospital, Robert was arrested for his role in a drug conspiracy. About two years prior, a lot of other men were arrested in New York, but Robert was not one of them. My understanding is that Robert was shot because someone in the neighborhood thought he was a police snitch. It's been a long time, so I don't remember the details, but I learned Robert was accused of managing money for someone dealing drugs and he was suspected as a snitch because he had not been arrested yet. Drugs were very common in Harlem back then, but I was still disappointed in Robert. I worry he did it because he so desperately wanted to be able to provide for our family.

17. After Robert was shot, the U.S. Marshalls came to the hospital to arrest Robert because of the allegations. I have to say that the U.S. Marshalls were very kind given the circumstances. They were helpful in making sure that doctors attended to Robert when necessary and they would help us get our questions answered.

18. After Robert got arrested, my fears for his health and safety only increased. I worried someone would try to harm him again and I was very scared that his health would regress outside of the hospital. Robert tried to be strong for us, but it took a long time for him to heal physically and mentally and he suffered a lot. I could see the pain on his face when he moved and he was very weak. I knew my brother to be a strong and healthy person, so it was hard to see him so debilitated.

19. Over the next 29 years, I watched my brother stay positive despite his long prison sentence. He made the best of it by trying to become a better person while in prison, and, as his family, we did our best to support him. He is a truly amazing human being with a huge heart. He always had faith that he would get a second chance to make up for his past and do good in the world. I'm proud to say he is making use of that second chance.

***Today, Robert has been released from prison and he is putting all his energy into his passion of helping young people in Harlem.***

20. I feel so blessed that Robert was given a second chance at life by Judge Preska. When I found out that she was releasing Robert from prison, I was willing to move mountains to get him to Florida. Unfortunately, he was detained by immigration agents instead. When he finally was released during the height of the pandemic, I was able to coordinate his travel to Florida and I picked him up at the airport. I will never forget that day. I was exhausted, but I would do it all over again for him. After staying with me and my sister in Florida for a bit, he wanted to return to our hometown, Harlem, to support the community.

21. Watching him rebuild his life and dedicate himself to supporting young people in Harlem has brought me so much joy. Our mother passed away before Robert's release. I believe she died of a broken heart because of Robert's extended incarceration. I know she would

be so proud of what he has done with his life since his release and I only wish she were here to see it.

22. Robert knows less than zero about Jamaica. I worry for his state of mind, safety and health if he were deported to Jamaica. Because he left Jamaica as a 4-year-old, I fear he will be an easy target for people. Jamaica is place where a lot of people are suffering and I fear for his safety. We need him here where he has the support of his family to keep healing and doing good in the world.

23. Robert's physical and mental health would be in jeopardy if he is sent back to Jamaica. He has a lot of medical needs and requires physical therapy due to chronic pain that he now experiences. In Jamaica, he would not have access to any of that.

24. I pray that my brother is allowed to stay in the only country he has ever known. Not only for Robert's sake, but for the sake of our entire family who has lost almost 3 decades of time with our loving brother, father to our nieces and nephews and a good human who wants to help at risk children have an opportunity for a better life by the grace of GOD.

*Page intentionally left blank*

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.



Grace Carrington

12/20/2023

Date



**Complaint Report**
PD 313-152 (Rev. 3-85-31)

PAGE 1 OF 1 PAGES

| | | | Jurisdiction | | Pct. of Report | D.C.R. No | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | 00 | | 025 | | 205 | | |

| | Time 1915 | Date 1/10/91 | Occurrence 1833 | 1/10/91 | Day of Week Thurs. | | | |
|---|---|---|---|---|---|---|---|---|

**Attempted Homicide** / ASSLT-2

Victim: Penton, Robert, S.    50 Paladino Avenue, NY, NY    Apt. No. 1B

Home Telephone 876-2005

Victim's Sex: 1 Male    Age 25    Race unknown

Reporter/Witness: Last Name, First

Home Telephone unknown    Business Telephone unknown    Stranger

Type of Location: Street    Address/Location of Occurrence: Opposite 2407 2nd Avenue

Case Status: ☐ Open ☒ Closed    Unit Referred To: Patrol

Wanted Arrested: Unknown

At t/p/o compl. states does not know who shot him nor why he was shot. Compl. removed to Metropolitan Hospital listed in stable condition at 2000 hrs. by Dr. Brosato.

Complaint Report Prepared By: P.O. ____ Castro    Title: PAA    Command 025

Tax Registry No. 885372    Command 025

Tax Registry No. 880/30    Command 25

**CRIMINAL RECORDS SECTION**

COMPLAINT - FOLLOW UP
INFORMATIONAL
PD 313-041A (Rev. 4-89)-31

| | | PAGE 1 OF 1 PAGE | |
|---|---|---|---|
| Time Att. Murder | Pct 25 | OCCB No. | Complaint No. 0295 | Date of This Report 1/15/91 |

| Date of Orig. Report 1/10/91 | Date of Report 1/10/91 | Case No. 0048 | Unit Reporting 25 sqd. | | Follow Up No. 2 |

Complainant's Name - Last, First, M.I.
**Panton, Robert**

| Last Name, First, M.I. | Address, Include City, State, Zip | Apt. No. |
|---|---|---|
| Home Telephone | Business Telephone | Position / Relationship | Sex | Race | Date of Birth | Age |

| Total No. of Perpetrators | Wanted | Arrested | Weapon ☐ Used ☐ Possessed | Describe Weapon (If firearm, give color, make, calibre, type, model, etc.) |
|---|---|---|---|---|

| Wanted ☐ | Arrested ☐ | Last Name, First, M.I. | | Address, Include City, State, Zip | Apt. No. | Res. Pct. |
|---|---|---|---|---|---|---|
| Sex | Race | Date of Birth | Age | Height | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No. |

☐ Eyeglasses ☐ Sunglasses Clothing Description
Nickname, First Name, Alias
Scars, Marks, M.O., Etc.
(Continue in "Details".)

| Wanted ☐ | Arrested ☐ | Last Name, First, M.I. | | Address, Include City, State, Zip | Apt. No. | Res. Pct. |
|---|---|---|---|---|---|---|
| Sex | Race | Date of Birth | Age | Height | Weight | Eye Color | Hair Color | Hair Length | Facial Hair | NYSID No. |

☐ Eyeglasses ☐ Sunglasses Clothing Description
Nickname, First Name, Alias
Scars, Marks, M.O., Etc.
(Continue in "Details".)

**AREA WITHIN BOX FOR DETECTIVE / LATENT FINGERPRINT OFFICER ONLY. THIS BOX WILL BE UTILIZED BY INVESTIGATOR WHENEVER POSSIBLE AND MUST BE FULLY COMPLETED WHEN USING THIS FORM TO CLOSE A CASE "NO RESULTS."**

| Comp. Interviewed ☒Yes ☐No | In Person ☐ | By Phone XX | Date 1/15/91 | Time | Results: Same as Comp. Report - Different (Explain in Details) XX ☐ |
|---|---|---|---|---|---|
| Witness Interviewed ☐ Yes ☐ No | In Person ☐ | By Phone ☐ | Date | Time | Results: Same as Comp. Report - Different (Explain in Details) ☐ ☐ |

| Canvass Conducted ☐ Yes ☐ No | ☐ Yes | Make Entry in Body Re. Time, Date Names, Addresses, Results | Crime Scene Visited ☐ Yes ☐ No | If Yes, Make Entry in Details for Time, Date Evidence Obtained |
|---|---|---|---|---|

| Complainant Viewed Photo ☐ Yes ☒ Refused ☐ Future | Results: |
|---|---|

| Witness Viewed Photo ☐ Yes ☐ Refused ☐ Future | Results: |
|---|---|

| Crime Scene Dusted ☐ Yes ☐ No | By (Enter Results in Details) | Crime Scene Photos ☐ Yes ☐ No | By (Enter Results in Details) |
|---|---|---|---|

If Closing Case "No Results" Check Appropriate Box and State Justification in Details.
☐C-1 Improper Referral   ☐C-2 Inaccurate Facts   ☒C-3 No Evidence / Can I ID   ☐C-4 Uncooperative Complainant   ☐C-5 "Leads" Exhausted

DETAILS:
**INVESTIGATION: ATT. MURDER**
**SUBJECT: INTERVIEW OF COMPLAINANT**

1.) On 1/15/91 the assigned along with Det. Zarnoch responded to Met.
Hosp. Ward 9A and interviewed the complainant regarding this case. At
that time the complainant stated that he was standing opp. 2407 2nd. Ave.
talking with approx. three other males (names unk.) when he heard a
number of shots (3-4). One of the males he was talking to started to run
towards Tiano Towers when he saw him fall. The complainant further stated
that he heard another shot at which time he was hit in the hip, he went
down, heard a couple of more shots one of which hit him above the lip.
The complainant stated that he heard a total of 10-12 shots but never
saw who was doing the shooting and cannot I.D. the shooter.

2.) On 1/15/91 this complainant was arrested at Met. Hosp. on out-
standing Federal Charges by the U.S. Marshalls. Marshall Bill Scott ▓▓▓▓
▓▓.

3.) In view of the foregoing it is requested that this case be marked
CLOSED - COMPLAINANT CAN'T ID...C-3.

| CASE ☐ ACTIVE ☒CLOSED | DATE REVIEWED / CLOSED /17 | IF ACTIVE DATE OF NEXT REVIEW | |
|---|---|---|---|
| Reporting Officer | Rank Det. | Shield No. | NAME PRINTED R. Stewart | TAX REG. NO. 870616 | COMMAND |
| Reviewing Officer | Rank | ENTER DESIGNATORS | SIGNATURE | C.O.'s INITIALS |

1st COPY CRIMINAL RECORDS SECTION    2nd COPY UNIT REFERRED TO    3rd COPY BOROUGH ROBBERY SQUAD

| COMPLAINT - FOLLOW UP INFORMATIONAL PD 313-081A (Rev 4 BV) 31 | | | | PAGE __1__ OF __1__ PAGE | | |
|---|---|---|---|---|---|---|

**Att. Murder**  Pct **25**   RCCB No   Complaint No **0295**  Date of this Report **1/10/91**

| Date of Orig. Report 1/10/91 | Date Assigned 1/10/91 | Case No 0048 | Unit Reporting 25 Sqd. | Follow Up No 1 |
|---|---|---|---|---|

Complainant's Name  Last First M I **Panton, Robert**

INVESTIGATION: ATT. MURDER
SUBJECT: RESPONSE TO SCENE / ATT. T' INTERVIEW VICTIM

1.) On 1/10/91 the assigned along with Dets. Marin and Zarnoch responded to E.123 St. & 2nd. Ave. in response to a notification of a shooting. Upon arrival the assigned was informed by Patrol Sgt. Smith that there were two victims, one was removed to Met. Hosp. in Serious Condition and the other to Harlem Hosp. with a gunshot wound to the buttocks.

2.) On this same date the assigned responded to Met. Hosp. and attempted to interview victim Robert Panton. The victim was unable to be spoken to at this time and I was informed by the attending Physician that his wounds were not life threatening.

3.) Case Active.

CASE ⊠ACTIVE  ☐CLOSED   DATE REVIEWED 'CLOSED  1/17   IF ACTIVE DATE OF NEXT REVIEW N/A

Det.   NAME PRINTED  R. Stewart   TAX REG NO  870616

L

**Effective: January 22, 2019**

McKinney's Penal Law § 125.00

## § 125.00 Homicide defined

Currentness

Homicide means conduct which causes the death of a person under circumstances constituting murder, manslaughter in the first degree, manslaughter in the second degree, or criminally negligent homicide.

**Credits**

(L.1965, c. 1030. Amended L.2019, c. 1, § 6, eff. Jan. 22, 2019.)

**Editors' Notes**

**Effective: September 25, 2022**

McKinney's Penal Law § **120.05**

## § **120.05** Assault in the second degree

<span style="color:blue">Currentness</span>

A person is guilty of assault in the second degree when:

1. With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person; or

2. With intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument; or

3. With intent to prevent a peace officer, a police officer, prosecutor as defined in subdivision thirty-one of section 1.20 of the criminal procedure law, registered nurse, licensed practical nurse, public health sanitarian, **New York** city public health sanitarian, sanitation enforcement agent, **New York** city sanitation worker, a firefighter, including a firefighter acting as a paramedic or emergency medical technician administering first aid in the course of performance of duty as such firefighter, an emergency medical service paramedic or emergency medical service technician, or medical or related personnel in a hospital emergency department, a city marshal, a school crossing guard appointed pursuant to section two hundred eight-a of the general municipal law, a traffic enforcement officer, traffic enforcement agent or employee of any entity governed by the public service law in the course of performing an essential service, from performing a lawful duty, by means including releasing or failing to control an animal under circumstances evincing the actor's intent that the animal obstruct the lawful activity of such peace officer, police officer, prosecutor as defined in subdivision thirty-one of section 1.20 of the criminal procedure law, registered nurse, licensed practical nurse, public health sanitarian, **New York** city public health sanitarian, sanitation enforcement agent, **New York** city sanitation worker, firefighter, paramedic, technician, city marshal, school crossing guard appointed pursuant to section two hundred eight-a of the general municipal law, traffic enforcement officer, traffic enforcement agent or employee of an entity governed by the public service law, he or she causes physical injury to such peace officer, police officer, prosecutor as defined in subdivision thirty-one of section 1.20 of the criminal procedure law, registered nurse, licensed practical nurse, public health sanitarian, **New York** city public health sanitarian, sanitation enforcement agent, **New York** city sanitation worker, firefighter, paramedic, technician or medical or related personnel in a hospital emergency department, city marshal, school crossing guard, traffic enforcement officer, traffic enforcement agent or employee of an entity governed by the public service law; or

3-a. With intent to prevent an employee of a local social services district directly involved in investigation of or response to alleged abuse or neglect of a child, a vulnerable elderly person or an incompetent or physically disabled person, from performing such investigation or response, the actor, not being such child, vulnerable elderly person or incompetent or physically disabled person, or with intent to prevent an employee of a local social services district directly involved in providing public assistance and care from performing his or her job, causes physical injury to such employee including by means of releasing or failing to control an animal under circumstances evincing the actor's intent that the animal obstruct the lawful activities of such employee; or

3-b. With intent to prevent an employee of the **New York** city housing authority from performing his or her lawful duties while located on housing project grounds, real property, or a building owned, managed, or operated by such authority he or she causes physical injury to such employee; or

3-c. With intent to prevent an employee providing direct patient care, who is not a nurse pursuant to title eight of the education law, whose principal employment responsibility is to carry out direct patient care for one or more patients in any hospital, nursing home, residential health care facility, general hospital, government agency including any chronic disease hospital, maternity hospital, outpatient department, emergency center or surgical center under article twenty-eight of the public health law, from performing a lawful duty, he or she causes physical injury to such employee providing direct patient care; or

4. He recklessly causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument; or

4-a. He recklessly causes physical injury to another person who is a child under the age of eighteen by intentional discharge of a firearm, rifle or shotgun; or

5. For a purpose other than lawful medical or therapeutic treatment, he intentionally causes stupor, unconsciousness or other physical impairment or injury to another person by administering to him, without his consent, a drug, substance or preparation capable of producing the same; or

6. In the course of and in furtherance of the commission or attempted commission of a felony, other than a felony defined in article one hundred thirty which requires corroboration for conviction, or of immediate flight therefrom, he, or another participant if there be any, causes physical injury to a person other than one of the participants; or

7. Having been charged with or convicted of a crime and while confined in a correctional facility, as defined in subdivision three of section forty of the correction law, pursuant to such charge or conviction, with intent to cause physical injury to another person, he causes such injury to such person or to a third person; or

8. Being eighteen years old or more and with intent to cause physical injury to a person less than eleven years old, the defendant recklessly causes serious physical injury to such person; or

9. Being eighteen years old or more and with intent to cause physical injury to a person less than seven years old, the defendant causes such injury to such person; or

10. Acting at a place the person knows, or reasonably should know, is on school grounds and with intent to cause physical injury, he or she:

(a) causes such injury to an employee of a school or public school district; or

(b) not being a student of such school or public school district, causes physical injury to another, and such other person is a student of such school who is attending or present for educational purposes. For purposes of this subdivision the term "school grounds" shall have the meaning set forth in subdivision fourteen of section 220.00 of this chapter; or

11. With intent to cause physical injury to a train operator, ticket inspector, conductor, signalperson, bus operator, station agent, station cleaner, terminal cleaner, station customer assistant; person whose official duties include the sale or collection of tickets, passes, vouchers, or other revenue payment media for use on a train or bus or the collection or handling of revenues therefrom; a person whose official duties include the maintenance, repair, inspection, troubleshooting, testing or cleaning of buses, a transit signal system, elevated or underground subway tracks, transit station structure, including fare equipment, escalators, elevators and other equipment necessary to passenger service, commuter rail tracks or stations, train yard, revenue train in passenger service, or a train or bus station or terminal; or a supervisor of such personnel, employed by any transit or commuter rail agency, authority or company, public or private, whose operation is authorized by **New York** state or any of its political subdivisions, a city marshal, a school crossing guard appointed pursuant to section two hundred eight-a of the general municipal law, a traffic enforcement officer, traffic enforcement agent, prosecutor as defined in subdivision thirty-one of section 1.20 of the criminal procedure law, sanitation enforcement agent, **New York** city sanitation worker, public health sanitarian, **New York** city public health sanitarian, registered nurse, licensed practical nurse, emergency medical service paramedic, or emergency medical service technician, he or she causes physical injury to such train operator, ticket inspector, conductor, signalperson, bus operator, station agent, station cleaner, terminal cleaner, station customer assistant; person whose official duties include the sale or collection of tickets, passes, vouchers or other revenue payment media for use on a train or bus or the collection or handling of revenues therefrom; a person whose official duties include the maintenance, repair, inspection, troubleshooting, testing or cleaning of buses, a transit signal system, elevated or underground subway tracks, transit station structure, including fare equipment, escalators, elevators and other equipment necessary to passenger service, commuter rail tracks or stations, train yard, revenue train in passenger service, or a train or bus station or terminal; or a supervisor of such personnel, city marshal, school crossing guard appointed pursuant to section two hundred eight-a of the general municipal law, traffic enforcement officer, traffic enforcement agent, prosecutor as defined in subdivision thirty-one of section 1.20 of the criminal procedure law, registered nurse, licensed practical nurse, public health sanitarian, **New York** city public health sanitarian, sanitation enforcement agent, **New York** city sanitation worker, emergency medical service paramedic, or emergency medical service technician, while such employee is performing an assigned duty on, or directly related to, the operation of a train or bus, cleaning of a train or bus station or terminal, assisting customers, the sale or collection of tickets, passes, vouchers, or other revenue media for use on a train or bus, or maintenance or cleaning of a train, a bus, or bus station or terminal, signal system, elevated or underground subway tracks, transit station structure, including fare equipment, escalators, elevators and other equipment necessary to passenger service, commuter rail tracks or stations, train yard or revenue train in passenger service, or such city marshal,

school crossing guard, traffic enforcement officer, traffic enforcement agent, prosecutor as defined in subdivision thirty-one of section 1.20 of the criminal procedure law, registered nurse, licensed practical nurse, public health sanitarian, **New York** city public health sanitarian, sanitation enforcement agent, **New York** city sanitation worker, emergency medical service paramedic, or emergency medical service technician is performing an assigned duty; or

11-a. With intent to cause physical injury to an employee of a local social services district directly involved in investigation of or response to alleged abuse or neglect of a child, vulnerable elderly person or an incompetent or physically disabled person, the actor, not being such child, vulnerable elderly person or incompetent or physically disabled person, or with intent to prevent an employee of a local social services district directly involved in providing public assistance and care from performing his or her job, causes physical injury to such employee; or

11-b. With intent to cause physical injury to an employee of the **New York** city housing authority performing his or her lawful duties while located on housing project grounds, real property, or a building owned, managed, or operated by such authority he or she causes physical injury to such employee; or

11-c. With intent to cause physical injury to an employee providing direct patient care, who is not a nurse pursuant to title eight of the education law, whose principal employment responsibility is to carry out direct patient care for one or more patients in any hospital, nursing home, residential health care facility, general hospital, government agency including any chronic disease hospital, maternity hospital, outpatient department, emergency center or surgical center under article twenty-eight of the public health law, he or she causes physical injury to such employee providing direct patient care while such employee is performing a lawful duty; or

12. With intent to cause physical injury to a person who is sixty-five years of age or older, he or she causes such injury to such person, and the actor is more than ten years younger than such person; or

13. Being confined to a secure treatment facility, as such term is defined in subdivision (o) of section 10.03 of the mental hygiene law, and with intent to cause physical injury to an employee of such secure treatment facility performing his or her duties, he or she causes such injury to such person; or

14. With intent to prevent or obstruct a process server, as defined in section eighty-nine-t of the general business law, from performing a lawful duty pursuant to article three of the civil practice law and rules, or intentionally, as retaliation against such a process server for the performance of the process server's duties pursuant to such article, including by means of releasing or failing to control an animal evincing the actor's intent that the animal prevent or obstruct the lawful duty of the process server or as retaliation against the process server, he or she causes physical injury to such process server.

Assault in the second degree is a class D felony.

## Credits

(L.1965, c. 1030. Amended L.1967, c. 791, § 7; L.1968, c. 37, § 1; L.1972, c. 598, § 2; L.1974, c. 239, § 1; L.1974, c. 660, § 1; L.1975, c. 134, § 1; L.1975, c. 667, § 37; L.1980, c. 471, § 25; L.1980, c. 843, § 39; L.1981, c. 372, §§ 4, 5; L.1984, c. 284, § 1; L.1985, c. 262, § 1; L.1990, c. 477, § 2; L.1996, c. 122, § 4; L.1998, c. 269, § 1, eff. Nov. 1, 1998; L.1998, c. 287, § 1, eff. Nov. 1, 1998; L.2000, c. 181, § 13, eff. Nov. 1, 2000; L.2002, c. 598, § 1, eff. Nov. 1, 2002; L.2003, c. 607, § 1, eff. Nov. 1, 2003; L.2006, c. 100, § 1, eff. Nov. 1, 2006; L.2008, c. 45, § 1, eff. July 22, 2008; L.2008, c. 68, § 1, eff. June 29, 2008; L.2010, c. 318, §§ 1, 2, eff. Nov. 1, 2010; L.2010, c. 345, § 1, eff. Sept. 12, 2010; L.2012, c. 377, § 1, eff. Sept. 16, 2012; L.2012, c. 434, § 1, eff. Nov. 1, 2012; L.2013, c. 1, § 32, eff. March 16, 2013; L.2013, c. 259, §§ 1, 2, eff. Jan. 27, 2014; L.2014, c. 196, § 1, eff. Nov. 1, 2014; L.2014, c. 197, § 1, eff. Sept. 3, 2014; L.2015, c. 423, § 1, eff. Nov. 1, 2016; L.2015, c. 472, § 1, eff. Nov. 1, 2016; L.2015, c. 477, § 1, eff. Nov. 1, 2016; L.2015, c. 487, § 1, eff. Feb. 18, 2016; L.2016, c. 267, § 1, eff. Nov. 1, 2016; L.2016, c. 268, § 1, eff. Nov. 1, 2016; L.2016, c. 281, § 1; L.2016, c. 281, § 2, eff. Nov. 1, 2016; L.2022, c. 233, § 1, eff. Sept. 25, 2022.)

## Editors' Notes



# Henry J. DePippo

hdepippo@rochester.rr.com

Elizabeth G. Oyer
Pardon Attorney
U.S. Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530
USPardon.Attorney@usdoj.gov

November 29, 2023

Re:    **Presidential Pardon Application for Robert Savio Panton**

Dear Ms. Oyer,

I write in support of Mr. Panton's application for a presidential pardon. From 1988 to 1994, I served with the Office of the U.S. Attorney for the Southern District of New York. I began in the office as an Assistant U.S. Attorney, became Senior Trial Counsel, and ultimately Deputy Chief of the Criminal Division. Of relevance to this letter, I served as the lead prosecutor in the criminal case involving Mr. Panton, from the indictment through the months-long trial and sentencing by the U.S. District Court.

I have read Mr. Panton's letter of remorse and his statement of offense, as well as the August 4, 2020, resentencing decision by Judge Preska to release Mr. Panton for time served (nearly 30 years). In light of Mr. Panton's acceptance of responsibility and expression of remorse and his continued positive trajectory since his release, I support Mr. Panton's application for a pardon. In particular, I personally see no reason to deport Mr. Panton to Jamaica at this point. Of course I am writing on behalf of myself personally and not on behalf of the Department or the U.S. Attorney's Office.

Sincerely,

Henry J. DePippo

185

N

November 17, 2023

U.S. Department of Justice
Office of the Pardon Attorney
950 Pennsylvania Ave. NW
Washington, DC 20530

Dear President Biden and the Office of the Pardon Attorney:

I write in support of my constituent, Mr. Robert Panton, regarding his request for a presidential pardon so that he may be spared the second punishment of deportation for a non-violent drug offense committed over thirty years ago.

Mr. Panton exemplifies the possibilities afforded by true and earnest rehabilitation, and he possesses an exemplary desire to give back to his community by sharing his story and working with other young Black men whom he sees as being "at risk" in the same ways he once was. Mr. Panton wants to be with his family, serve his community, and continue his years-long work of sharing his life experience with young people to set them on the right path. Instead, he now faces deportation after spending 30 years in prison for a single nonviolent drug offense—all of which undermines the spirit of both drug sentencing reform and Mr. Panton's previous compassionate release from prison.

For these reasons, Mr. Panton is the ideal candidate for a presidential pardon—a beloved community leader who has already served more than his fair share of prison time due solely to since-repealed sentencing laws that systematically discriminated against Black men like him. He is a living embodiment of the meaning of both "second chances" and "rehabilitation," as he is tirelessly giving of his time and energy to community members in need, making up for his lost years with his children and his grandchildren, and serving as the consummate role model for at-risk youth.

Mr. Panton's story and work in New York City offer a shining example of the profoundly positive effect that rehabilitated individuals can have in our communities. Mr. Panton served 30 years in federal prison due to an overly harsh sentence imposed on a 1991 conviction for a non-violent drug offense—a conviction which, under today's modernized sentencing laws, would result in a significantly shorter sentence of likely one-third of that time. While in prison, Mr. Panton dedicated his days to helping young people by starting the "Slow Down Program," where he mentored young people coping with trauma and violence to deter them from a life of crime. Mr. Panton's dedication to improving the lives of at-risk youth while in prison was a factor that

eventually led to his compassionate release in 2020. In issuing his release, a federal district court judge described Mr. Panton's prison record as leaving "no doubt that Mr. Panton has fully rehabilitated himself, [leaving] no need for further incarceration to protect the public from additional crimes by Mr. Panton." However, upon his release from prison in August 2020, Mr. Panton was immediately taken into immigration custody. After nine months in immigration detention, Immigration Customs Enforcement (ICE) released Mr. Panton in 2021.

In the years since his release from ICE custody, Mr. Panton has become an award-winning and beloved leader in our New York City community, where he has tirelessly mentored young people through his "Too Young to Die" campaign. In the last year alone, Mr. Panton's campaign has developed new partnerships with respected community organizations such as SCAN Harbor Harlem and Lead by Example Reverse the Trend in order to increase mentorship programming for youth. Additionally, last summer, Mr. Panton ran an eight-week-long summer program with Lead by Example for teenagers ages 12 to 17 that included field trips and counseling sessions. This past summer, in recognition of the clear need for more job readiness programs in our community, Mr. Panton collaborated with the Urban Home Ownership Corporation and the Institute for Career Development to mentor six young people in maintenance skills, preparing them for well-paying jobs upon graduation. Our community is lucky to have Mr. Panton's passion for mentoring youth, his talent for bringing together stakeholders in service of our youth, and his unique understanding of the support that young people need to thrive.

Mr. Panton's roots in the community also include his loving family. Throughout his incarceration, Mr. Panton maintained relationships with his three adult children, including with his son Dajon, who has served as a police officer with the New York City Police Department since 2015. During Mr. Panton's time in federal prison, Mr. Panton would mail materials from his prison paralegal courses to young Dajon and encourage him to pursue a career upholding the law. Dajon eventually graduated from John Jay College of Criminal Justice in 2011, thanks in large part to Mr. Panton's influence as a positive role model. Dajon is now expecting a child and is eager to watch his own father serve as "the role model of a rehabilitated man" for his grandchildren.

Yet, Mr. Panton's second chance to be a father, grandfather, and community leader will be taken away from him if ICE moves forward with his deportation, as they currently plan to do as on the lone basis of the conviction for which Mr. Panton seeks a pardon. Mr. Panton has resided in the United States as a lawful permanent resident since the 1970s and has no ties to his country of birth, Jamaica. He is one of many immigrants who continues to suffer the consequences of harsh civil immigration laws that condition deportation on decisions made in the criminal legal system prior to recent criminal justice reforms. These recent reforms include decreases in the lengths of sentences imposed for drug offenses in light of the disproportionate impacts of such sentences on Black and Brown individuals. Without a pardon, Mr. Panton—who received a life sentence in his 20s for a non-violent offense—will not benefit from these critical reforms and efforts to rectify racial injustice in the criminal legal system because they do not extend to immigration consequences for criminal convictions.

You have committed your Administration to reviewing pardon and clemency petitions "that advance equity and justice, provide second chances, and enhance the wellbeing and safety of all Americans." Mr. Panton served a 30-year sentence for a single nonviolent crime because of laws and policies that we now recognize to have been disparately harmful to Black communities. Despite this, Mr. Panton used his prison time to better himself and the lives of others and emerged from these experiences rehabilitated in every sense of the word. He has seized the second chance given to him for all it is worth. In the two-plus years since his release, Mr. Panton has not only made the most of every moment with his family, but he has also tirelessly dedicated himself to giving back to those in need in our New York City community. Deporting Mr. Panton now would deprive him of the chance to spend his remaining years improving the lives of countless New York City youth, and our New York City community would greatly suffer.

For these reasons, Mr. Panton is a uniquely qualified candidate for a presidential pardon who I strongly believe exemplifies the goals of "rehabilitation and redemption" that your administration has prioritized when issuing pardons. Mr. Panton, through his selfless acts of mentorship and education, is using his second chance—and his unique story of redemption—to make our communities safer. I am incredibly grateful for his efforts, and I respectfully request that his pardon application receives your full and fair consideration consistent with all laws, rules, and agency policy.

Thank you for your administration's dedicated commitment to reforming our broken criminal justice system and for your consideration of Mr. Panton's request for a presidential pardon.

Sincerely,

Adriano Espaillat
Member of Congress (NY-13)

0090

189



U.S. Department of Justice
Office of the Pardon Attorney
950 Pennsylvania Ave. NW
Washington, DC 20530

November 20, 2023

Re:     Support for Presidential Pardon for Robert Panton

Dear President Biden:

I write to express my support for a presidential pardon for Mr. Robert Panton.  In 1994, a judge in the Southern District of New York sentenced Mr. Panton to life imprisonment for nonviolent drug offenses committed several years earlier.  Although Mr. Panton has been released from prison, he currently faces deportation to Jamaica.  Deportation would cause grave harm, not only to him and his family, but also to countless New Yorkers who benefit from Mr. Panton's mentorship and community work.

Through his work in the community and commitment to supporting young people, Mr. Panton demonstrates every day the ways in which rehabilitated individuals can make our communities stronger. He has resided in the U.S. as a lawful permanent resident for fifty years—thirty of which he spent in federal prison for a single, non-violent drug conviction.  During the COVID-19 crisis, a federal judge granted Mr. Panton compassionate release from incarceration. The judge described Mr. Panton's prison record as leaving "no doubt that Mr. Panton has fully rehabilitated himself, and there is no need for further incarceration to protect the public from additional crimes by Mr. Panton."[1] However, upon his release from prison in August 2020, Mr. Panton was immediately placed in removal proceedings by Immigration and Customs Enforcement (ICE).

Mr. Panton was released from ICE custody in 2021, and in the years since he has become a beloved leader in his community. Mr. Panton is a dedicated mentor to young people through his "Too Young to Die" campaign and works in partnerships he has developed with respected community organizations such as SCAN Harbor, Lead by Example Reverse the Trend, and the Urban Home Ownership Corporation, to create and expand programming for at-risk youth. Mr.

---

[1] USA v. Robert Panton, Case 1:89-cr-00346-LAP, Doc. No. 919, Filed August 4, 2020 (U.S. District Court Southern District of New York).

Panton also directed a summer program with Lead by Example for teenagers and collaborated with the Urban Home Ownership Corporation and the Institute for Career Development to help youth gain maintenance skills that would allow them to thrive and contribute to their families and communities after graduation.

Mr. Panton's commitment to the young people he mentors is absolute. As part of his Too Young to Die efforts, he has created a suicide prevention hotline that goes directly to his personal cell phone. At all hours of the day and night, Mr. Panton is on the phone with young people who need support.

Mr. Panton is beloved by his community and, equally, treasured by his own family. Despite his years of incarceration, Mr. Panton ensured that he remained close with his three adult U.S. citizen children. Mr. Panton's son Dajon has served as a police officer with the New York City Police Department since 2015 and credits his life of service in large part to his father's influence. Mr. Panton saw the potential in his son to serve, and mailed him materials from his prison paralegal courses while encouraging him to consider a career in law enforcement. Today, Mr. Panton is proud of his son's service, and deeply committed to nurturing and mentoring his grandchildren by modeling what it means to give back to the community.

Mr. Panton is making the most of his second chance to be a father, grandfather, and leader in his community. Yet this second chance will be cruelly taken away if Mr. Panton is deported on the basis of his decades-old criminal conviction. Having lived in the United States for more than fifty years, Mr. Panton has no ties to Jamaica, his country of birth. Deportation would constitute a harsh and disproportionate consequence of decisions made in the criminal legal system prior to recent criminal sentencing reforms that recognize the disparate and harmful impact of drug-related sentencing on Black and Brown individuals.[2]

It is a credit to your administration that you have committed to reviewing pardon and clemency petitions "that advance equity and justice, provide second chances, and enhance the wellbeing and safety of all Americans."[3] Mr. Panton served an extremely harsh sentence but has emerged from the corrections system fully rehabilitated and reformed.  Since leaving prison, Mr. Panton has led by example within his community to help New York City teens avoid making the same mistakes he made in his youth. He has taken his second chance seriously, making the most of every moment with his family while tirelessly giving back to those in need in his community.

Deporting Mr. Panton now would cruelly take these opportunities away from him. Perhaps most importantly, however, should Mr. Panton's conviction result in deportation, our own communities will suffer tremendously. Through hard work, acts of mentorship, and a big heart,

---

[2] Renée Feltz, *Why US drug reform still couldn't stop deportation of two immigrants*, THE GUARDIAN (Apr. 1, 2016), https://www.theguardian.com/us-news/2016/apr/01/us-immigration-deportation-drug-reform-junior-francisco; Renée Feltz, *Immigrant facing deportation could be first to benefit from US drug law reform*, THE GUARDIAN, (Mar. 28, 2016), https://www.theguardian.com/us-news/2016/mar/28/immigration-drug-sentencing-laws-prison-junior-francisco.
[3] *Statement by President Joe Biden on Clemency and Second Chance Month*, WHITE HOUSE (Apr. 26, 2022) https://www.whitehouse.gov/briefing-room/statements-releases/2022/04/26/statement-by-president-joe-biden-on-clemency-and-second-chance-month/.

Mr. Panton is using his second chance to help improve the lives and futures of our children. Our communities are stronger and safer because of his work.

For all of these reasons, Mr. Panton is uniquely qualified for a presidential pardon in furtherance of the goals you have outlined. I greatly appreciate your consideration of this request and thank you for giving careful time and attention to Mr. Panton's application.

Sincerely,

Ranking Member
House Judiciary Committee

P

November 16, 2023

Re: NGO Support Letter for Black Harlem Leader Seeking Presidential Pardon

Dear President Biden & the Office of Pardon Attorney:

We are a group of civil society organizations including civil rights, racial justice, and immigrant rights groups. We write to urge you to grant a presidential pardon to Robert Panton, a beloved Harlem leader who deserves this unique grant of discretion in light of his invaluable contributions to our communities. Granting a pardon would honor your administration's stated commitment to racial equity and ensure that Mr. Panton can continue his invaluable work in the only home he knows–Harlem, New York.

Mr. Panton served more than thirty years in federal prison for a single drug conviction he received in the early 1990s–a harsh sentence due to mandatory sentencing enhancements that existed at the time. Today, that same conviction would result in significantly less prison time for someone in Mr. Panton's position due to recent sentencing reforms. These reforms were passed to remedy outdated criminal legal policies from the War on Drugs era, which had particularly harsh and disproportionate impacts on Black men like Mr. Panton.

In 2021, after serving three decades for his single conviction under these outdated sentencing rules, a federal judge in New York released Mr. Panton. Under recently revised sentencing rules, this judge finally had the discretion to grant Mr. Panton the freedom he had earned through his hard work and service to others during his three decades in prison. The judge noted, "there is no need for further incarceration to protect the public from additional crimes by Mr. Panton," and commended him for his empathy and service to others.

Mr. Panton's commitment to giving back to his community is in fact, unparalleled. During his time in prison, he spearheaded a program through the family courts to help dozens of young people cope with trauma and violence; and now, back in his community where he belongs, Mr. Panton leads a campaign to share the lessons he learned in his own life with young people coping with trauma. His personal cell phone number is a direct-dial for youth contemplating suicide.

Mr. Panton is also a loving father of three children and nine grandchildren. Even during his years inside, Mr. Panton worked hard to maintain a close relationship with his children. His son, a New York Police Department officer, credits his decision to enter public service to his father's mentorship and support.

But now, after serving three decades in prison and despite his exceptional work for young people, Mr. Panton faces deportation. He immigrated to the United States from Jamaica as a

young child and has lived here for 50 years. However, under current immigration laws, Mr. Panton's single conviction from over thirty years ago gives immigration authorities the right to deport him to a country he does not know. In other words, Mr. Panton faces a second punishment for the same conviction for which he already served thirty years–a punishment that would tear him from the loved ones in his life that he worked hard to return home to from prison as well as the young mentees who see him as a lifeline.

A presidential pardon would give Mr. Panton the chance to remain in the United States and effectively prevent his deportation. In January 2021, your administration powerfully committed through executive order to advance "racial equity and support for underserved communities through the federal government." In recent years, important federal legal reforms have aimed to remedy the injustices of drug laws from the past that disproportionately punished Black men. A presidential pardon would ensure that Mr. Panton actually benefits from these reforms, and it would appropriately honor the transformation he undertook in prison, which earned him his place back amidst his community, which stands to benefit from his service.

Our communities need Black leaders like Mr. Panton who bring to the table their own lived experiences that offer unparalleled credibility and empathy for young people navigating their own futures and challenges. We urge you to grant.


Sincerely,

African Advocacy Network
African Communities Together
African Immigration Initiative
Asian Americans Advancing Justice | AAJC
Black Alliance for Just Immigration
Brooklyn Defender Services
CARECEN
CARECEN NY
CASA
California Collaborative for Immigrant Justice
Center for Constitutional Rights
Center for Gender & Refugee Studies
Coalición de Derechos Humanos
Coalition for Humane Immigrant Rights (CHIRLA)
Communities United for Status & Protection (CUSP)
Detention Watch Network
Drug Policy Alliance

Franciscan Justice Circles
Freedom For Immigrants
Haitian Bridge Alliance
Human Rights Watch
Immigrant Justice Network
Immigrant Legal Defense
Immigrant Legal Resource Center
NAKASEC
National Employment Law Project
National Immigrant Justice Center
National Immigration Law Center
National Immigration Project
New York Lawyers for the Public Interest
North American Climate, Conservation and Environment (NACCE)
Ohio Immigrant Alliance
Otros Dreams en Acción
Oxfam America
Pangea Legal Services
Presente
PushBlack
Repatriate Our Patriots
Rhizome Center for Migrants
Robert F. Kennedy Human Rights
Rocky Mountain Immigrant Advocacy Network
Southeast Asia Resource Action Center
Tsuru for Solidarity
UndocuBlack Network
Washington Lawyers' Committee for Civil Rights and Urban Affairs

Q

November 16, 2023

Re: New Yorkers Support a Presidential Pardon for Beloved Harlem Leader Robert Panton

Dear President Biden & the Office of Pardon Attorney:

We are a group of New York organizations who share a commitment to ensuring that our communities are safe and vibrant. We write to urge you to grant a presidential pardon to Robert Panton–a beloved Harlem leader and youth mentor.

Robert has lived in the United States for over 50 years. He is a devoted father and a role model to his grandchildren. He is a hard-working and respected community leader, mentoring and educating young people in Harlem and New York City through many organizations. His exceptional work for our communities is his way of passing on the lessons he has learned through incarceration. He is a model of the powerful ways in which the transformation of one person can enhance the value and richness of our New York communities and impact hundreds of others.

Robert served more than thirty years in federal prison for a single drug conviction he received in the early 1990s. He used his time inside prison to improve himself and to serve his community. He not only obtained his college degree and technical training, but he also spearheaded a program through the family court system to help dozens of young people cope with trauma and violence. He met regularly with children to support them during their hardest times—work he continues today for young people in Harlem now that he is back in his community.

While inside prison, Robert also mentored those around him, offering life advice and counsel to other men serving time. Many have contacted Robert in their years since release to thank him for his support as they start new chapters in their transformed lives. This outreach from formerly incarcerated men is a testament to Robert's mentorship and the value he brings to everyone around him.

When a federal judge in New York granted Robert release from federal prison in 2021, she noted that "there can be no doubt that Mr. Panton has fully rehabilitated himself, and there is no need for further incarceration to protect the public from additional crimes by Mr. Panton." She commended Robert for his empathy, compassion, and admirable desire to help others.

Robert's commitment to give back to his community is unparalleled, as evidenced by the non-stop advocacy work he did while incarcerated, but especially through the tremendous impact he has had on young people since his release. Through his "Too Young to Die Campaign" and other organizations, Robert shares the lessons he learned in his own life with young people

coping with trauma. His personal cell phone number is a direct-dial for kids contemplating suicide. In their most urgent moments of need, Robert is who they call.

But now, Robert faces deportation to a country he does not know. Under outdated and unjust immigration laws, Robert is subject to deportation for the conviction he received over thirty years ago. His deportation would punish not only him for a second time but also his three children, his nine grandchildren, and the countless young people throughout New York City who benefit from his mentorship and support.

A presidential pardon would give Robert the second chance he was promised so that he could stay in Harlem, where he belongs. Our communities need leaders like Robert who bring to the table their own lived experiences that offer unparalleled credibility and empathy for young people navigating their own futures and challenges. He is exactly the kind of man and role model that is worthy of an honor of this degree from the President of the United States. We urge you to grant.


Sincerely,

African Communities Together
Black Alliance for Just Immigration
Brooklyn Law School
Bronx Defenders
Center for Constitutional Rights
Clemency Coalition of New York
Communities United for Status & Protection
Desis Rising Up & Moving
Envision Freedom Fund
Families for Freedom
First Friends of New Jersey and New York
Franciscan Justice Circles
Free Migration Project
Immigrant Defense Project
Just Futures Law
Make the Road New York
Mekong NYC
New York Day of Remembrance Committee
New York Immigration Coalition
New York University Immigrant Rights Clinic
New York Lawyers for the Public Interest

Rhizome Center for Migrants
Robert F. Kennedy Human Rights
Rockland Immigration Coalition
Southeast Asian Defense Project
SURJ NYC
Surveillance Resistance Lab
Syracuse Peace Council
UnLocal
UndocuBlack Network

R



**CHAMBERS MEMORIAL BAPTIST CHURCH**
219 East 123rd Street • New York, NY 10035
*Bishop Lawrence E. Edgerton Sr.*

Date:   August 31, 2023

To:     Congress Person, Senators, ICE, etc.

From:   Bishop Lawrence Edgerton Sr.

Re:     Robert Panton being subjected to deportation proceedings


I have been the Reverend and Bishop of Chambers Memorial Baptist Church for over 30 years, the church in which Robert grew up in. I have written letters on behalf of Robert Panton that have proven to be in accordance with my good judgment. A federal Judge, Loretta A. Preska has used my opinion and her wisdom of Robert Panton, and released him from federal prison on the basis of Robert's conduct. Robert was in prison serving a life sentence for a nonviolent first time drug offender charged with one count of conspiracy to distribute $10 bags of heroin.

Robert served 30 years of a life sentence. A federal Judge thought his conduct in prison of helping youths in the "Slow Down Program", a program in which family court sent troubled youths to communicate with convicted inmates to help guide them not to make the same mistakes they did. Outside of those efforts Robert received a paralegal diploma and a specialty diploma in civil litigation. Changing his life in prison is what rehabilitation is all about.

Now with Robert's gained freedom, he has formed a youth organization called ingeniousiam.com. This site provides a suicide prevention hot-line that has Robert's direct number with 24/7 access to him. This is the example America would like to set to the world, that second chances are worth giving, that some young people will use it for good. Robert has just won the "Community Warrior Award" in Harlem, in his amateur boxing name "Bob Lemon". Brown Eyes Magazine, African Immigrants Commission of NY & CT, and Holistic Harlem Inc. gave Robert this award based on his youth organizations work.

I'm not even beginning to talk about the effect deportation would have on Robert's 3 children and 10 grandchildren who are all citizens and waited for years to have this redeemed man back in their life. The community would suffer if one of their lost sons found his way in prison to be a great leader of the youth, and now he's unavailable to

them due to unfair immigration laws, that appear to be double jeopardy for being punished twice for the same crime.

I ask this honorable tribunal to give my letter of support the same consideration as the Honorable Judge Preska did when she released Robert, to do the good work with youth out in the free world, that he did in prison. Robert is on task right now making me proud.

I thank you for your time and consideration in this matter.

Please feel free to contact me with any questions.

Respectfully submitted,

Bishop Lawrence Edgerton Sr.

S

November 30, 2023

U.S. Department of Justice
Office of the Pardon Attorney
950 Pennsylvania Avenue NW
Washington DC 20530

To whom it may concern,

I am writing to support Robert Panton's application for a presidential pardon. My name is Swann Streety, Ordained Deacon at Chambers Memorial Baptist Church located in Spanish Harlem where Robert and I grew up. Presently I am the Public Relations Representative, Events Planner and Administrator, Liaison for Feed the Children, Department of Youth and Community Development, United Way, Federation of Protestant Welfare Agency, American Baptist Churches of Metro New York, Driscoll Foods as well as The Foodbank of NYC. I am responsible for ordering pantry food to distribute to the community as well as grants administrator.

My relationship with Robert is that of a childhood friend and a big brother. Robert and I have known each other for over 50 years as we grew up in the same housing complex, attended the same JHS. We also attended Chambers Memorial Baptist Church together where we also went to Fresh Air Fund sleep away camps during the summer. Robert has always been a dedicated brother to his siblings, a big brother and a great friend. He has always been an advocator of positive activities in the community, even during our youthful years at JHS 45 community center.

Though I did not have a relationship with Robert during his incarceration, Robert and I's relationship has flourished since his release in the sense that we are both passionate about our work for the community. Just as Robert is in pursuit of positive outlets for the youth, we at Chambers are on the same path. There is a great need for afterschool programs, community centers and outlets for the youth so that they remain off the streets and not inducted into gangs. Robert and I had access to these outlets when we grew up. Since Roberts return he has been pursuing these avenues and have received awards for doing so.

I have seen Robert change over the years as he has a refusal in his spirit to return to any of his past activities or associates. He remains positive, creative, passionate and committed to the Youth and community at large.

A presidential pardon will allow Robert to stay in the United States with his family and community. We need him here and we very much hope that he will have the opportunity to continue giving back to his community.

For these reasons, I respectfully ask you to consider his application and recommend him for a pardon.

Thank you very much,

Swann Streety
50 Paladino Avenue – 15F
New York, NY 10035





8 W 126th St, New York, NY 10037  TEL: 718-671-2322

Date: June 20, 2023

My name is Antonio Hendrickson, CEO of "Lead by Example" organization. I have known Robert Panton, aka, Bob Lemon since public school. His organization, that he is the cofounder of, "Ingenious I am LLC" partnered with my company to organize and be Director of a summer Youth Program for 8 weeks in the Summer of 2022.  Robert has been trying diligently to reach the hearts and minds of young people for decades.  Robert and Mahdi Salaam started a "To Young To Die Campaign" for youths lives.

We won the Vibe Grant last year and conducted the program with efficiency and professionalism that Won Robert an Award for activities in the Community. The "Community Warrior Award" given under his boxing name (respected in the community) was one that made me proud.  I subcontracted the Vibe Grant with Roberts Ingenious I Am LLC, because I personally know of his passion to make sure youth have the information about the streets and the consequences that leads to bad decisions, that the price is too much to pay.

Robert Panton aka Bob Lemon is the ideal person to speak truth to the youngsters about drugs, crime, prison, and growing up without father or a mother; which can be an appropriate excuse. But unacceptable, when it comes to "reversing the trend". Myself and Bob have spent decades in prison for a nonviolent drug offense charge of conspiracy. When Robert speak to the youth in the streets, they get it from him 'raw and uncut'.  The truth does not have to be dressed up, because the war to win the hearts and minds of these youth today is a struggle that is a marathon.

Robert has been where they are at now, and understands the life lessons they need to hear. Robert being in this country shows what redemption is all about, and how a second chance in any circumstance is supposed benefit himself and his community. Bob Lemon does this automatically and this is someone our community needs.

Thank you for your time and consideration in this matter.

Sincerely
Antonio Hendrickson

208

U



# U.H.O. MANAGEMENT CORP.

494 Eighth Avenue, 19th Floor, New York, NY 10001
(212) 563-0310 ◆ Fax (212)268-1068

U.S. Department of Justice

Office of the Pardon Attorney

950 Pennsylvania Avenue NW

Washington DC 20530

To whom it may concern:

I write today on behalf of Robert Panton, a beloved member of our community, to emphatically support his request for a Presidential Pardon.

My name is Sheila E. Dotson, I am the Site Manager for Urban Home Ownership Corp.. My office is located at 105 West 127 Street, New York, NY 10027. We are a nonprofit organization that provides housing to underserved people in Central Harlem. Robert Panton was recommended by me for the Job as a Maintenance Supervisor for the 19 buildings owned by U.H.O Corporation in Central Harlem. In the Community Robert has been nicknamed "good doer". Due to going out of his way to help anyone in need. We provide a better quality of life for the people of Harlem, with the hire of Robert.

Robert is on call 24 hours a day to solve problems for tenants, by connecting them with the Superintendent that he believes can solve the problem in the most reasonable and respectable manner.

I am not ashamed to point out that Robert has at times gone against company policy of having to fix something that is not required or the responsibility of U.H.O Corp.. Robert will state unapologetically, "if it were your mother, sister or grandmother living here, would you have it fixed." Of course the answer to him is, yes. Then Robert comes with his famous reply, "Well we're all family in one way or another, so let's fix it." This is the compassion I've seen from Robert in his work ethics at U.H.O. Corp..

Outside of that Robert has a youth organization called "Ingenious I Am LLC", at ingeniousiam.com. His efforts with the youth has garnished him a "community warrior" award. Most recently he came to work tired and I asked him, sarcastically; long night. Robert explained to me that a 19 year old named Jordan was in the rehabilitation clinic in Nantucket New York, and was put out of the program for violating policy. At 11:00 p.m. Robert went with the young man, Jordan's friend Ben, to go pick up Jordan's mother Emily in the Bronx , drive them to go get Jordan from the rehabilitation clinic. Robert lives on 123 Street in Harlem, and a trip to Nantucket New York brought him home at 1:45 a.m., but not after Robert stopped at a restaurant to buy Ben, Jordan and his mom dinner at a restaurant that opened late.

I accepted this story at face value knowing Robert. An hour after he arrived a phone call came to the office from a young man named Jordan. It was transferred to the office I share with Robert. The young man, Jordan, spoke to me first and I told him that Robert was on another call. Jordan Quickly told me he just wanted to thank Robert for "leaving his bed to come rescue me". I looked over to Robert and smiled. I told Jordan that I would have Robert call him back. I asked him, how did you get this number?" Jordan responded that Robert gave him my business card and told him "if he can't get me, call the office and tell Sheila what you need".

These are the types of unselfish actions that are needed in my community to help the youth realize that they matter.

I can tell you about the two of many interns that Robert mentored at U.H.O. Corp., and upon completion of this internship, the two young men Louis and Saul, stated to me they didn't want to go anywhere else and wanted to fill out an application to work for Urban Home Ownership Corporation. Those two young men are now employed by us, working directly under Robert's supervision.

To lose this type of person, with this level of commitment to help our youth, would be a disaster.  By Robert being deported for a nonviolent drug crime, he served a draconia sentence for, and fully rehabilitated himself in prison; earning a paralegal diploma and specialty diploma in civil litigation, while creating a "slow down program" for youth, family court is sending to the United States Penitentiary to speak with incarcerated inmates like Robert, to get guidance they are not accepting from others. This is extraordinary.

Please do not deport Mr. Robert Panton; you would disarm the community with the strongest weapon I've seen so far, for getting to the minds and hearts of our misguided youth. A second chance is what this country was built on. America made mistakes with slavery and Jim Crow laws that does not exist today, and have been forgiven by the world. Give Robert the second chance he deserves.

Thank you for your time and consideration.

Sincerely,

Sheila E. Davis Dotson

10/19/2023



November 14, 2023

U.S. Department of Justice

Office of the Pardon Attorney

950 Pennsylvania Avenue NW

Washington DC 20530

To whom it may concern,

It gives me great pleasure to write this letter of support for Robert S. Panton's application for a presidential pardon. Robert and I grew up together in New York City and became friends. When I think back to when we were teens, we would have deep conversations regarding life and what we planned to do with our lives. We both had dreams of going to college and making something of ourselves.

Robert is, unfortunately, an example of the effects that the inner city environment can have on many of the young people who dwell there. He was a young boy from the inner city who got lost and made several decisions that found him on the wrong side of the law. What impresses me about Robert is his taking full responsibility for his actions, blaming no one or anything for his past decisions or actions, an attribute you don't always find in many incarcerated individuals. He realizes that he has another chance to make a difference. So he is now committed to working with young people to ensure they don't find themselves making the same mistakes he made while growing up. Helping them identify what life can look like when they stay focused, find purpose, and achieve higher learning.

We have so many young people growing up in the inner city struggling to make good decisions, the same way Robert did growing up as a youth. However, he had many years to ponder his life and where his decisions landed him. During his incarceration, he discovered what he wanted to do, and found peace in his purpose. His purpose is to guide and mentor young boys and girls to grow up to be the best men and women they can be—working with them to be positive contributors to society. Upon his release from prison, he went to work on Ingenious I Am, the Too Young to Die Campaign, and successfully supervised a City Summer Youth Program. All three programs offer mentorship and experiences that many inner-city youth may not typically have. His positive attitude, demeanor, and message draw in people, young and old to listen to what he has to say, and he has a lot of knowledge to share.

It is important to note the humanistic side of Robert. He gives, has a good heart, and helps others when and where possible. He gives when he has very little himself. Several months ago, he told me about an incident that melted my heart: He was riding the bus and started a conversation with a man sitting with his daughter; it was obvious they were celebrating something. I am not sure how the conversation started, but the result was that Robert gave the man the last few dollars he had in his pocket. The gesture allowed the man to buy ice cream to celebrate his young daughter's graduation achievement. The young man was so grateful because he had nothing to give his daughter on this special day. She was so excited that her dad was buying her ice cream. Not many people would befriend a stranger on the bus and later become impactful in that individual's life. The encounter moved Robert to help the young man by connecting him to others that could connect him to services.

Despite his past, Robert is a good person with a loving heart. He is smart, committed, focused, and hard-working. He is a true example of getting a second chance and making the best of the opportunity. A cohort of individuals is supporting and helping him realize his plight as a positive contributor to society. His impact has only touched the surface; he has more work planned. Deporting him would be a disservice to Robert, the young people he serves, and those working with him to effect positive change in the inner city.

I have and will continue to support him in his efforts to be his best self as he is lifting as he climbs.

I truly hope that you will see the value Robert brings to our community and grant him a pardon, so that he may continue to support his family and community for many years to come.

Sincerely,

Wendy J Thornton

Wthorton928@gmail.com



Sworn to before me on this 5TH Day of December, 2023

Manuel Gonzalez

MANUEL GONZALEZ
Notary Public - State of New York
NO. 01GO6180924
Qualified in Bronx County
My Commission Expires Jan 22, 2024

0115

214



U.S. Department of Justice
Office of the Pardon Attorney
950 Pennsylvania Ave. NW
Washington, DC 20530

October 30, 2023

Re:    Support for Presidential Pardon for Robert Panton

Dear President Biden:

My name is Dajon Panton, I am a U.S. citizen and Robert Panton's youngest son. I am a New York City Police Officer, who graduated from John Jay School of Criminal law, with my father pushing me all the way. Although he was incarcerated for the majority of my life, he has been essential in molding me into the man I am today. Through the years, he counseled me on many things. One of the most important being my decision on becoming a New York City Police Officer, which he fully supported. I had this teacher guide me to a beautiful career in law enforcement, and life of protecting and serving the public. My Dad Robert Panton is a role model I'm proud of today. He is a changed man and I hope you will consider him for  presidential pardon.

Everyday I look at my father's progress, I think of a life without him by my side, and tears would come out of my eyes. If my father was not in this country, the loss won't only be to my first child in my wife's pregnant stomach, it would be to all the youth that are benefitting from him every day. My sister Shamecca Panton just had her first child, Mecca Panton, 4 month ago. This family needs the role model of rehabilitated man in our life forever.

My father was released from prison after serving 30 years for a nonviolent drug charge offense, on one count of conspiracy. It is his only felony conviction. My father's sentence was unconstitutional. He was given enhanced penalties for conduct he was not charged with, nor indicted for, or convicted of. In 2020, he was released by Senior Judge Preska of the Southern District of New York. Judge Preska, in granting my father his freedom, talked about the extraordinary things my father accomplished in prison, and further commented on the work my father could do in society to help youngsters from falling into the justice system of long prison sentences.

Redemption is one of the things prisons are supposed to give a person an incentive to do, in the rehabilitation process. My father has done that and more, but now he is going to be punished again with deportation after he already paid his debt to society. My father actions since his release show that he is an asset to our family (including his children and grandchildren) and the community at large.

Since his release from ICE detention, my father partnered with poet laureate Mahdi Salaam to create an organization called "ingeniousiam.com"; and started the "Too Young To Die Campaign", which is aimed at preventing destructive youth actions that are causing them to take their lives too early. This organization's mission statement is "to encourage young people to accept guidance and have the courage to ask for help". My father has been going to schools to speak to young people about alternative choices that can give the youth a hopeful future outside of the prison walls. This work is invaluable to our Harlem community. He has also set up two paramount services to the community: 1) a suicide prevention for the youth; 2) an Amber alert for your and old people when they are perceived missing by their loved ones.

In the time, my father has been out in the community, he has shown that he can make a positive contribution. Simply put, we need more men like my father exiting the prison system, not exiting the country.

Please analyze his life and actions to be one worthy of being here with his family and teaching the youths to make the mistakes he did. Judge Preska heard my plea and released my father from a sentence of life in prison. I hope you will now hear by plea and allow my father to stay in the United States, his home since he was four years old by granting him a presidential pardon.

Sincerely,

Dajon Panton
222 E. 111 Street #6F
New York, NY 10029
(347) 279-0420





November 14, 2023

U.S. Department of Justice
Office of the Pardon Attorney
950 Pennsylvania Ave. NW
Washington, DC 20530


Dear President Biden,


My name is Shamecca Panton, the only daughter of Robert Panton. I am writing this letter asking you to please grant my father a presidential pardon.

My father went to jail when I was 2 years old. I am 33 years old now and I feel that I still need my father in my life. It was very difficult growing up without my father in my life. When I was younger I had dropped out of high school at 16. I suffered from Depression, I was in and out of rehabs and went to jail. I was lost in the world but going to jail and rehab change my life. When I was released from jail I had went to a half way house, an sober house then I got a job saved some money up and moved to Decatur, Georgia. I moved to Decatur, Ga because I needed a change and to be in a different environment. I got a job here as a dietary aide. I am waiting for my apartment to come in. I tell you all of this to show you I have change for the better. I know my father have changed for the better also.

My father has been there for me in so many ways, I could write for days telling you about it. I am a single parent and when I'm pressed financially due to a shortage of cash my dad's wallet is opened immediately. My dad does not know the word "no" to me and others also. But this is the beginning of his generosity. My dad started Ingenious I AM that serves the youth with guidance to stay away from a criminal life style and drugs. It has a suicide prevention hotline that goes directly to my father's phone 24/7. The difference he makes with his advice and willingness to listen to others' complaints is remarkable.

To remove my dad from these children's life and me and my daughters for a mistake 33 years ago, that he has paid his debt to society by serving 30 years for a nonviolent first time drug conviction 1 count of conspiracy, doesn't make sense. My dad is a credible messenger. The youth are listening to him, it would be an injustice to the youth, my new born daughter Mecca, my brothers, and my whole family if my dad was not in our life here in the United States.

I just came back from visiting my dad in New York. It was a beautiful visit with my daughter. My dad got to be a grandfather and help take care of my daughter. If I knew he was going to be able to stay in the United States I could move to New York and live with him, so that he could spend more time with her. It would be so nice to have his help in raising her.

Please give him a second chance at live. I love my dad with all my heart and I know that he is a different person today. As he watched me grow from a distance as I have watch him grow.

Please consider granting him a pardon and may God be with you.

Thank you for hearing my cry and concerns for my father.

Sincerely

Shamecca Panton





221

Date: November 13, 2023
From: Aaron Hariss Jenkins
Re: In support of Pardon for my father Robert PANTON.

Dear President Biden,

My father was sentenced to life in prison for a non-violent offense. He went to prison when I was five years old, so my dad couldn't raise me. My heart was broken when I realized that he might never come home. But my dad was not despondent. He had faith that God would release him when he was ready. So this taught me that a person has to make choices wisely, or blame no one but himself.

 I'm glad that he didn't waste his time in jail, and assisted some other young men to live productive lives in prison. Now my dad is free and helping raise 8 grandchildren in North Carolina and youngsters in New York through the Too Young To Die Campaign. Please let my dad continue this positive journey in The United States. Where he learned everything he knows; and is now using it for good!

Please grant my dad a Pardon Mr. President. My dad will make you proud of this decision, just as the judge said when when she released him.


Thank you for your time.

Aaron H. Jenkins,

The son of a good man!
Robert PANTON

Z

223

To whom it may concern,

I am the girlfriend of Robert Panton also known as Bob L Lemon. I am a nurse for the last 19 years at New York Presbyterian Hospital, in Harlem New York. We grew up in the projects on 124th St., and 2nd Ave. called Wagner me and Robert knew each other for approximately 35 years. Since he has come home, we have become good friends and turned it in to a relationship of someone to love forever. I purposed marriage to Bob and was not surprised when he said "we should wait until the out come of these proceedings are over, to see if we will be separated in a different country or here together". This selflessness is Bob all day and night. Robert's devotion to children and the community has made me proud of him regardless of how he got to this point. His education as far as the streets and drugs and crime are concerned, is one that makes him exceptional at reaching the hearts of the young people in Harlem. It was easy for him to reach my heart by being courteous, kind and respectful. But being raised by a single mother with three sisters, I could see how he learned to have respect for women, and has grown into maturity that has reached my heart. Many children in my neighborhood grow up seeing fast money and a life that makes them want to get it anyway they can. It's hard when men like Robert and others get into trouble that they can't get out of; like a long prison sentence. Bob has used his life in prison to make it better for himself and all the inmates. Now as a free man, he's constantly trying to innovate new ways to reach young people before they make the mistake he has. I'm thankful to be in this man's life and have him as a guidance to me and my two daughters who are 17 and 27 years old. I do not think that at a certain age children are educated enough to the wrongs and right of life to not make mistakes. But having a strong role model as Robert in my life has shown me that even at 27 years old, my daughter looks up to him to learn more about what a man should be like. I am asking everybody to consider all the evidence and exhibits about Robert and answer, The one question; "is society and Harlem in particular, better with Robert Panton here in the United States, or is United States better if Robert is deported. The answer unanimously will be that it is a necessity to have Bob here in the United States of America. Because of people like Robert, and his redemption story, we hope that every citizen of this country, that goes to prison comes out with goals that is admirable, such as saving the youth; and remind them that they are worth it. I thank you for taking the time out to hear my testimonial about a man I love and respect. I'm asking the bodies of Congress, Supreme Court, and anywhere else that makes decisions to give this man the second chance he has earned thanks to the Honorable Judge Preska to straighten out his mistakes by working with the youth of my community, so he can give back what so many is in need of, guidance. United States of America is the Place of second chances. This should be a plain and simple statement that is understandable, because America has made mistakes, attempted to redeem its self from it; that was forgiven by African-Americans here. Give Robert the same chance to produce evidence constantly that shows he is a benefit to society, give Robert Panton the pardon that he deserves, after paying his debt to society, so he can do the work that he has already begun. Thank you for your time and consideration in this matter that is so important to me and many others in the United States, and Harlem in particular!

Yours Truly

Lillie Correa

lilliecorrea@gmail.com

Date: 11/20/2023