K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
UNITED STATES OF AMERICA,

                Plaintiff,

-against-

ROBERT PANTON,

                Defendant.
```

No. 89 Cr. 346 (LAP)

MEMORANDUM & ORDER

EXHIBIT

**B**

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court is Defendant Robert Panton's motion (dkt. no. 910) pursuant to 18 U.S.C. § 3582 (c)(1)(A) for resentencing pursuant to the First Step Act ("FSA"). The Government opposed the motion (dkt. no. 913), and Mr. Panton submitted additional letters detailing various supplemental authorities (dkt. nos. 912, 918). For the reasons set out below, the motion is GRANTED.

I.   FACTUAL BACKGROUND

     a. Mr. Panton's Offense Conduct

According to Mr. Panton's PSR, "[f]rom approximately April 1987 through May 1989, one organization was the primary source of heroin in the Bronx" – a "highly structured business organization" controlled by an individual named George Rivera "with members performing different functions and operating at different levels of responsibility, and with some members performing different functions at different times." (PSR ¶¶ 71, 73.) In April and May 1989, the Government arrested and charged thirty-three individuals

1

for their roles in Mr. Rivera's heroin distribution organization. (PSR ¶ 72; see also dkt. no. 910-2.)[1]

Mr. Panton was not one of those thirty-three individuals. Rather, he was arrested (and detained) on January 11, 1991, at which time he was charged and subsequently convicted at trial before the Honorable Shirley Wohl Kram of conspiracy to possess and distribute heroin in violation of 21 U.S.C. § 812, 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(A). (PSR ¶ 32, 111.) In particular, Mr. Panton, from approximately April 1988 to April 1989, ran a street-level distribution location (known as a "store" to members of Mr. Rivera's organization) at 122nd Street and 2nd Avenue in Manhattan. (PSR ¶¶ 88 115.) Because of the date that he joined Mr. Rivera's heroin distribution conspiracy, Mr. Panton was held responsible at sentencing for conspiring to possess and distribute approximately 41 kilograms of heroin, even though Mr. Rivera's organization sold a total of approximately 82 kilograms of heroin. (PSR ¶ 115.)

      b. The Probation Department's Calculation of Mr. Panton's Guidelines Offense Level

Section 2D1.1 of the Guidelines instructs that the base offense level for any narcotics-related offense is determined by

---

[1] The Government later dismissed the charges against two such individuals. (PSR ¶ 72.)

the total weight of narcotics distributed by a defendant (and those
with whom s/he conspired) as detailed in the quantity tables of
that section of the Guidelines. Based on its finding that he was
responsible for trafficking in approximately 41 kilograms of
heroin, the Probation Department determined that Mr. Panton's base
offense level was 38. (PSR ¶ 115.)[2]  It then increased that base
offense level by:

- 2 offense levels pursuant to Section 2D1.1(b)(1) of the
  Guidelines for possession of a firearm (which was recovered
  from the apartment in which Mr. Panton was staying);

- 3 offense levels pursuant to Section 3B1.1(b) of the
  Guidelines for Mr. Panton's role as a "manager" of the "store"
  located at 122nd Street and 2nd Avenue in Manhattan; and

- 2 offense levels pursuant to Section 2C1.1 of the Guidelines
  for obstruction of justice (for perjuring himself during his
  trial testimony). (PSR ¶¶ 116, 117 and 119.)

Thus, in total, the Probation Department determined that Mr.
Panton's adjusted Guidelines offense level was 45. (PSR ¶ 122.)

Based on certain fairly minor prior convictions in Manhattan
Criminal Court (trespassing for entering the subway through an
exit gate to avoid paying the fare and attempted criminal
possession of a controlled substance, both of which were low-level

---

[2] Pursuant to Amendments 505 and 536 to the Guidelines, Mr. Panton's
base offense level would be 36 today. But, because of the other
Guidelines enhancements found by the Probation Department and
Judge Kram, Mr. Panton's total adjusted Guidelines offense level
still would not fall below 43 even after application of Amendments
505 and 536.

3

state misdemeanors and neither of which resulted in a prison term
or even a probationary sentence), the Probation Department found
that Mr. Panton had 1 criminal history point and therefore fell
within Criminal History Category I. (PSR ¶¶ 124-28.)

Thus, based on a Guidelines offense level of 45 and Criminal
History Category I, the Probation Department determined that Mr.
Panton's Guidelines range of imprisonment was life. (PSR ¶ 131.)
Notably, though, the Probation Department stated that it did not
believe Mr. Panton should be imprisoned for life. Rather, it wrote
that "[a]lthough the defendant must be punished for his crimes, a
term of life imprisonment is considered unduly harsh. Absent any
departure issues, it is being recommended in conformance with the
guidelines." (PSR ¶ 29.)

c. Mr. Panton's Sentencing Hearing

Mr. Panton appeared before Judge Kram for sentencing on May
25, 1994. (See dkt. no. 910-3.) His attorney, Martin Geduldig (who
represented him at sentencing but not at trial) presented argument
principally concerning the Guidelines enhancements that the
Probation Department included in Mr. Panton's offense level
calculation, which arguments were based on the testimony presented
at trial and the law concerning jointly undertaken criminal
activity (as applied to the amount of heroin for which Mr. Panton
was to be held accountable at sentencing). Judge Kram, in
adjudicating Mr. Panton's post-trial, pre-sentencing motion

4

pursuant to Rule 33 of the Federal Rules of Criminal Procedure,
also found that those enhancements applied to the calculation of
Mr. Panton's Guidelines offense level. United States v. Panton,
Case No. 89-CR- 346, 1994 WL 225441 (S.D.N.Y. May 25, 1994). At
the conclusion of his argument concerning Mr. Panton's Guidelines
offense level calculation, Mr. Geduldig expressed his frustration
with the Guidelines as follows:

> [T]he sentence for somebody at Level 43 is life in prison. I
> don't know that there's too much that I could ask the Court
> to do. If the Court is going to find that's the sentence to
> be imposed, then whether Mr. Panton has led an exemplary life
> or has many children out on the street has no import. The
> Court is compelled to impose the sentence set forth on the
> [sentencing table]. I don't know what I could say, unless the
> Court is willing to adopt our argument and not include some
> these enhancements. The sentence Mr. Panton will receive from
> the Court is clear.

Mr. Panton also spoke at sentencing, imploring Judge Kram to
impose a prison term shorter than life imprisonment. He noted that
his conduct did not involve violence, that he was a father and
that he was a college student at the time of his arrest. Mr. Panton
also stated the following: "Facing a life imprisonment sentence as
a first offender with no prior criminal activity other than a
misdemeanor . . . there's not much that I can say. I mean, I could
[talk] from here to now, but the situation still remains itself
. . . ." Judge Kram then imposed the life sentence:

> I certainly know that you're aware that this trial went on
> for several months and I am very familiar with all of the

5

defendants and all of the circumstances. This was a very
dangerous group of people, very violent, and extremely
dangerous to our community.

The amount of drugs that were involved were horrendous. I
think that your part in this was a very serious one. You were
very much involved in all these aspects of it. I think you're
a dangerous man. I think that you perjured yourself blatantly
during the trial. I sat there during the trial and was
impressed with the way you blatantly lied.

I think under the circumstances, I am going to sentence you
to life imprisonment, the period that is recommended of five
years of supervised release with no particular conditions
indicated. There is no fine and the special assessment of
$50.[3]

d. Mr. Panton's Post-Conviction Litigation

Mr. Panton timely appealed his conviction, and, on January

19, 1996, the Court of Appeals affirmed his conviction. United

States v. Lemon, 100 F.3d 942 (2d Cir. 1996). Mr. Panton thereafter

filed an unsuccessful petition for a writ of certiorari before the

U.S. Supreme Court. Panton v. United States, 519 U.S. 853 (1996).

Following denial of his direct appeal, Mr. Panton engaged in

certain limited additional post-conviction litigation:

First, Mr. Panton filed a motion pursuant to 28 U.S.C. § 2255

to vacate, set aside or correct his sentence, arguing that he had

received ineffective assistance of counsel. (Docket No. 649.) On

October 18, 1999, Judge Kram denied that 28 U.S.C. § 2255 motion.

---

[3] (See also dkt. no. 910-4 (Judgment and Commitment Order, dated
May 25, 1994).)

Panton v. United States, Case No. 89-CR-346 (SWK), 1999 WL 945523
(S.D.N.Y. Oct. 18, 1999). On October 19, 2000, the Court of Appeals
reversed and remanded Judge Kram's denial of Mr. Panton's 28 U.S.C.
§ 2255 motion, instructing Judge Kram to permit Mr. Panton to amend
that motion to consider the merits of his claim under Apprendi v.
New Jersey, 530 U.S. 466 (2000), which had been decided while the
appeal of his 28 U.S.C. § 2255 motion was pending. (Dkt. No. 910-
5.) The Court of Appeals, though, affirmed the denial of all of
Mr. Panton's other 28 U.S.C. § 2255 claims as procedurally barred
or meritless. (Id.) On April 22, 2002, Judge Kram denied Mr.
Panton's amended 28 U.S.C. § 2255 motion. Panton v. United States,
Case No. 89-CR-346 (SWK), 2002 WL 655205 (S.D.N.Y. Apr. 22, 2002).
And, on September 3, 2003, the Court of Appeals dismissed Mr.
Panton's appeal of Judge Kram's denial of his 28 U.S.C. § 2255
motion. (Dkt. no. 749.)

Second, on August 2, 2004, Mr. Panton moved pursuant to Rules
60(b)(5) and 60(b)(6) of the Federal Rules of Civil Procedure to
vacate Judge Kram's denial of his 28 U.S.C. § 2255 motion, arguing
that he had received ineffective assistance of appellate counsel.
(Dkt. no. 763.) He later amended that motion, clarifying that he
was challenging the integrity of the underlying proceedings rather
than the underlying constitutional challenges to his conviction.
(Dkt. no. 766.) On November 16, 2005, Judge Kram denied Mr.

7

Panton's Rule 60(b) motion. <u>Panton v. United States</u>, Case No. 89-CR-346, 2005 WL 3078224 (S.D.N.Y. Nov. 16, 2005).

<u>Third</u>, on November 27, 2005, Mr. Panton filed a motion pursuant to Rules 52(b) and 59(e) of the Federal Rules of Civil Procedure for reconsideration of the denial of his Rule 60(b) motion. That motion, though, was only docketed on the civil docket sheet associated with his 28 U.S.C. § 2255 motion. Mr. Panton thereafter filed two "Judicial Notices" restating his previous arguments. The second such notice advised the Court that his Rule 59(e) motion had been pending for more than two years. On April 9, 2008 Judge Kram construed Mr. Panton's first two judicial notices as additional motions pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. (Dkt. no. 794.) Because it was only docketed on his civil docket, though, Mr. Panton's Rule 59(e) motion was inadvertently overlooked. When that Rule 59(e) motion came to light, Judge Kram vacated her April 9, 2008 Order for consideration of the newly discovered motion. (Dkt. no. 802.) Mr. Panton thereafter submitted a final "Judicial Notice" on June 17, 2010. (Undocketed.)

Mr. Panton's case was subsequently reassigned to this Court after Judge Kram died. On November 20, 2018, this Court entered an Order transferring Mr. Panton's motion to the Court of Appeals for consideration as an application for leave to file a second or successive 28 U.S.C. § 2255 motion. (Docket No. 882.) On May 6,

2019, the Court of Appeals entered an Order denying Mr. Panton's application, finding that he had not made a prima facie showing that the requirements of 28 U.S.C. § 2255(h) had been satisfied. (Dkt. no. 887.)

    e. FSA Requests

On September 3, 2019, Defendant filed a request for an 18 U.S.C. Section 3582(c)(1)(A) reduction in sentence with the Warden of USP Big Sandy, the facility in which he was incarcerated. On December 17, 2019, more than thirty days later, the Warden rejected the request as incomplete. Thereafter, on April 17, 2020, counsel submitted a renewed request. On June 23, 2020, more than sixty days later, the Warden rejected the renewed request.

II.  **APPLICABLE LAW**

    a. This Court has the Authority to Reduce Mr. Panton's
       Sentence to Time Served Pursuant to 18 U.S.C.
       § 3582(c)(1)(A)

Mr. Panton moves pursuant to 18 U.S.C. § 3582(c)(1)(A). That section provides that district courts can modify a "final term of imprisonment" if "extraordinary and compelling reasons warrant such a reduction." Three points bear noting with regard to the operation of 18 U.S.C. § 3582(c)(1)(A).

First, in passing the statute, Congress empowered district courts, not the U.S. Parole Commission, as previously, to decide in individual cases if "there is a justification for reducing a term of imprisonment." See S. Rep. No. 98-225, at 56 (1983). Put

9

differently, Congress envisioned 18 U.S.C. § 3582(c)(1)(A) acting as a "safety valve[ ] for [the] modification of sentences" and intended for district courts to be able to reduce sentences when justified by the various factors and reasons that the U.S. Parole Commission previously had considered in making parole determinations. Id. at 121. Lawmakers further noted that the foregoing approach would keep "the sentencing power in the judiciary where it belongs," rather than with the U.S. Parole Commission, and that 18 U.S.C. § 3582(c)(1)(A) would allow for the "later review of sentences in particularly compelling situations." Id. This legislative history demonstrates that Congress, in passing the Comprehensive Crime Control Act of 1984, intended to give district courts an equitable power to employ on an individualized basis to correct sentences when "extraordinary and compelling reasons" indicate that the sentence initially imposed on any individual defendant no longer served legislative objectives.

Second, although the power to reduce sentences provided for by 18 U.S.C. § 3582(c)(1)(A) has most often been used to reduce the prison terms of elderly and/or terminally ill defendants, nothing in the statutory language or legislative history of 18 U.S.C. § 3582(c) indicates that Congress intended to limit its application to elderly defendants or defendants with compelling medical circumstances. Rather, if a judge finds the existence of any

10

"extraordinary and compelling reasons" warranting a sentence reduction, those reasons could, pursuant to 18 U.S.C. § 3582(c)(1)(A), form the legal basis for the reduction "of an unusually long sentence." Id. at 55-56. Indeed, the legislative history of 18 U.S.C. § 3582(c)(1)(A) indicates that lawmakers thought that "extraordinary and compelling reasons" for a sentence reduction should not be limited to medical condition, age, and family circumstances. In particular, recognizing that parole had historically played a key role in the federal criminal justice system, legislators explained how some defendants may warrant a sentence reduction (after service of some period of incarceration) based on any number of "circumstances:"

> The [Senate Judiciary] Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

Id. at 55-56 (1983) (emphasis added).

Third, notwithstanding all of the foregoing, Congress originally conditioned the reduction of any "final term of imprisonment" pursuant to 18 U.S.C. § 3582(c)(1)(A) on the filing of a motion by the Director of the BOP requesting such a reduction. Thus, district courts--until the recently enacted FSA--were only authorized to

11

reduce a sentence based on "extraordinary and compelling reasons" if asked to do so by the Director of the BOP.

   b. The U.S. Sentencing Commission Has Indicated that the "Extraordinary and Compelling Reasons" Upon Which a Sentence Reduction Pursuant to 18 U.S.C. § 3582(c)(1)(A) May Be Based Are Not Limited to Medical Condition, Age and Family Circumstances

In enacting the Comprehensive Crime Control Act of 1984, Congress tasked the U.S. Sentencing Commission (the "Sentencing Commission") with responsibility for developing standards for identifying the existence of "extraordinary and compelling reasons" for a sentence reduction. See 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"). When the Sentencing Commission acted in 2007, it promulgated a policy statement advising that "extraordinary and compelling reasons" warranting a sentence reduction could include medical condition, age, family circumstances and "other reasons." See U.S.S.G. § 1B1.13, Application Note 1(A) (Amendment 698).

Thereafter, in April 2013, the Office of the Inspector General of the Department of Justice (the "OIG") issued a report finding that the Director of the BOP rarely filed 18 U.S.C. § 3582(c)(1)(A) sentence reduction motions (even for defendants who clearly met the Sentencing Commission's objective criteria for a sentence

12

reduction). See U.S. Dep't of Justice Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program (Apr. 2013) (Exhibit 20).[4] In response, the Sentencing Commission expanded its guidance to district courts on qualifying circumstances and encouraged the BOP to file 18 U.S.C. § 3582(c)(1)(A) motions whenever a defendant meets the criteria set forth in Section 1B1.13 of the Guidelines. See U.S.S.G. § 1B1.13, Application Note 4; United States v. Dimasi, 220 F. Supp. 3d 173, 175 (D. Mass. 2016) (discussing the progression from the OIG report to new "encouraging" guidelines). In doing so, the Sentencing Commission identified several categories of qualifying "extraordinary and compelling reasons," including medical condition, age, family circumstances and "[o]ther reasons, for circumstances in which the Director of the BOP determines that there is an extraordinary and compelling reason other than, or in combination with," medical condition, age and family circumstances. U.S.S.G. § 1B1.13, Application Note 1(A) (internal quotation marks omitted).

Finally, Congress set forth only one limitation when it delegated authority to the Sentencing Commission to develop

---

[4] See https://oig.justice.gov/reports/2013/e1306.pdf.

13

standards for identifying "extraordinary and compelling reasons" for a sentence reduction: "Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t) (emphasis added). On one hand, lawmakers no doubt legislated that sole limitation so that district courts would not use a defendant's rehabilitation, standing alone, as a basis for a sentence reduction, thereby creating a direct substitute for the parole system that Congress abolished when it passed the Comprehensive Crime Control Act of 1984. On the other hand, legislators' use of the modifier "alone" evidences that they believed that rehabilitation is relevant to the question of whether a sentence should be reduced and that rehabilitation, when considered together with other equitable factors, could constitute "extraordinary and compelling reasons" for a sentence reduction.

In late 2018, Congress passed the FSA, which, among other things, fundamentally transformed the process by which 18 U.S.C. § 3582(c)(1)(A) sentence reduction motions are adjudicated. In particular, instead of relying on the Director of the BOP to determine whether "extraordinary and compelling reasons" exist supportive of a sentence reduction and instead of relying on the Director of the BOP to file an 18 U.S.C. § 3582(c)(1)(A) sentence reduction motion, district courts today can resentence a defendant "upon motion of the defendant" as long as a defendant first files

14

a request for a sentence reduction motion with the warden of the facility in which s/he is being held that is rejected or the lapse of 30 days "from the receipt of such a request by the warden of the defendant's facility," whichever happens first. See 18 U.S.C. § 3582(c)(1)(A); United States v. Beck, Case No. 13-Cr-186-6, 2019 WL 2716505, at *5 (W.D.N.C. June 28, 2019) ("Among other things, [the FSA] add[s] a provision allowing courts to consider motions by defendants for compassionate release without a motion by the BOP Director so long as the defendant has asked the Director to bring such a motion the Director fails or refuses").

Thus, once a defendant files an 18 U.S.C. § 3582(c)(1)(A) sentence reduction motion after the occurrence of either of the two foregoing events, a district court may reduce that defendant's sentence to time served (or any other prison term short of the initial sentence) if it finds that: (1) "extraordinary and compelling reasons" exist for a sentence reduction after considering the 18 U.S.C. § 3553(a) factors; and (2) a reduced prison term is consistent with the applicable policy statements set forth in Section 1B1.13 of the Guidelines. See Beck, 2019 WL 2716505, at *6 ("Thus, courts may, on motions by defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically

identified in the application notes to the old policy statement").
And courts have utilized that power.

United States v. Cantu-Rivera, Case No. 89-CR-204, 2019 WL
2578272 (S.D. Tex. June 24, 2019), is instructive with regard to
court's newfound authority to reduce sentences based on
"extraordinary and compelling reasons" (even if those reasons do
not relate to medical condition, age or family circumstances).
Initially, the court in Cantu-Rivera explained that "[t]he [FSA]
amended 18 U.S.C. § 3582(c)(1)(A) to allow district courts to
modify sentences of imprisonment upon motion by the defendant if
the defendant has fully exhausted all [BOP] administrative rights
. . . or 30 days from the receipt of such a request by the warden
of the defendant's facility, whichever is earlier." Id. at *1
(internal quotation marks omitted). It then reduced that
defendant's life sentence (for conspiracy to possess with intent
to distribute in excess of five kilograms of cocaine) to time
served (after service of more than 30 years imprisonment) based
principally on "the extraordinary degree of rehabilitation Mr.
Cantu-Rivera has accomplished during the 30 years he has been
incarcerated," including "extensive educational achievements,"
such as "completion of over 4,000 hours of teaching while in
federal prison to complete a Teaching Aide apprenticeship with the
Department of Labor," his "service as a teaching assistant in

16

several prison facilities for high-school equivalency and English-as-a-Second-Language programs," and "his service in the BOP's suicide watch program, helping to care for inmates placed in solitary confinement due to suicide attempts." Id. at *2.

Similarly, in United States v. Cantu, Case No. 05-CR-458, 2019 WL 2498923 (S.D. Tex. June 17, 2019), the court noted that "[a] court may now," pursuant to 18 U.S.C. § 3582(c)(1)(A), "modify a defendant's sentence if it finds on either the BOP's or the defendant's motion that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" Id. at *1.  It then reduced that defendant's 290-month sentence (which had previously been reduced to 210 months based on Amendments 782 and 788 to the Guidelines) to time served (after service of more than 14 years imprisonment) based principally on his medical condition, even though he "ha[d] not presented evidence that his reasons are extraordinary and compelling under the three explicitly defined reasons" set forth in Application Note 1 to Section 1B1.13 of the Guidelines.  Id. at *3.

And, in United States v. McGraw, Case No. 02-CR-00018, 2019 WL 2059488 (S.D. Ind. May 9, 2019), the court stated that the FSA's modification of 18 U.S.C. § 3582(c)(1)(A) "now provides an

17

avenue for a defendant to seek a [sentence reduction directly] from the Court" and that "courts have universally turned to U.S.S.G. § 1B1.13 to provide guidance on the 'extraordinary and compelling reasons' that may warrant a sentence reduction." Id. at *1. It then reduced that defendant's life sentence (for possession with intent to distribute methamphetamine) to time served (after service of more than 17 years imprisonment) based principally on "his serious medical conditions," even though he had a long criminal history and had occupied a "leadership" position in the Diablos motorcycle gang. Id. at 2-6.

### III. DISCUSSION

Although the parties quibble about whether Mr. Panton has exhausted his administrative remedies, it is clear at least that his April 17, 2020 renewed motion and the Warden's subsequent denial of that motion is sufficient for exhaustion. Accordingly, the Court moves to the merits.

Over some three decades in high and medium security facilities, Mr. Panton has 1) maintained a good disciplinary record, 2) taken advantage of numerous courses and other opportunities to enable a law-abiding life, 2) evidenced a desire to help the outside community during which he demonstrated incredible empathy and compassion in an encounter with a child sex abuse victim, 4) maintained an exceptional degree of contact with his children,

and, 5) unfortunately, developed several serious health issues. Because all of Mr. Panton's co-conspirators, except George Rivera, the leader of the drug organization, have been released or have release dates, releasing Mr. Panton would avoid a sentencing disparity. Mr. Panton also has a viable post-release plan. The combination of these factors constitutes "extraordinary and compelling circumstances" warranting release.

Mr. Panton has only six disciplinary infractions over almost thirty years in jail. None involves violence, weapons, gangs, narcotics, alcohol, or BOP staff. (One technically involved alcohol, but not on Mr. Panton's part. Apparently, he intervened in a dispute between two other inmates, one of whom was intoxicated, over the television channel they were watching.). This is a stellar record.

As set forth in more detail in the moving papers (dkt. no. 910), while incarcerated in USP Atlanta in 1994, Mr. Panton evidenced his concern for the outside community by participating in that facility's "Slow Down Program." That was a program in which Atlanta's family court sent juveniles with behavioral issues to meet with inmates for the purposes of getting a glimpse of one potential future and to hear from inmates who wished they had taken a different path in life. Although not reflected in an official BOP record, Mr. Panton states that, in counseling a young girl of approximately fifteen years old, he recognized signs of sexual

abuse—an observation he was able to make because of his experience
with his own child, whose mother abused their child.  During the
course of that session, the girl revealed to Mr. Panton that her
father had been sexually abusing her, and he convinced her that
that was wrong and that she should report it to the
authorities.  When she agreed, Mr. Panton called over a female
family court officer and explained what he had learned.  The girl
left with the court officer, never to return, presumably because
she had been removed from that home and placed in foster care.  Mr.
Panton's concern that young people not follow his path and
particularly his actions in rescuing the abused child are worthy
of commendation.

Despite having no realistic hope of release, Mr. Panton used
his time well in completing numerous courses during his
incarceration.  Some, like the 500 hours of study in the
Comprehensive Drug Unit, were aimed at enabling a law-abiding
life.  While at USP Canaan, Mr. Panton completed the Challenge
Program, another 500-hour program, to examine lifestyle and the
factors that led to substance abuse and criminal
behavior.  Included among other courses encouraging a law-abiding
life that he completed were "History Highlights, a self-study
course, and Emotional Intelligence.

Among the courses Mr. Panton took to facilitate post-release
employment were Microsoft Office, Business Start-Up, and Industry

20

Safety Training. Particularly notable are his completion of the Professional Paralegal Program and the Professional Paralegal Specialty Program; Civil Litigation, from the Professional Career Development Institute, in both of which courses he mostly earned grades of A/A+. Consistent with his studies of the arts and theater management at Kingsborough Community College before his arrest, Mr. Panton also began writing during his incarceration. His success at that endeavor is demonstrated by his selection as a finalist by the Organization of Black Screenwriters, Inc. for a screenplay that he wrote entitled "Can You Cross Over?" Clearly, Mr. Panton has taken advantage while incarcerated of every opportunity to improve himself and to prepare for a law-abiding, productive life.

Mr. Panton has three children: Aaron Jenkins who lives in North Carolina and works in construction, Shamecca Panton who lives in Decatur, Georgia, and works as a dietary aide, and Dajoun Panton who lives in New York and works as a police officer in the NYPD. Dajoun wrote that, although his father has been incarcerated for much of the younger Mr. Panton's life, his father was "essential in molding me into the man I am today," having "counsel[ed]" him "on many things," including his "decision on becoming a New York City Police Officer, which [his father] fully supported." (Dkt. no. 910-10.) Similarly, Mr. Panton's daughter, Shamecca, wrote that he went to prison when she was only two years

21

old and that, even now that she is 30, "I feel that I still need my father in my life." (Dkt. no. 910-11.) Maintaining this degree of contact with his children over some thirty years betokens a strong family support system that bodes well for Mr. Panton's living a law-abiding life.

Unfortunately, Mr. Panton's health situation has not improved over time. He was hospitalized with Legionnaire's Disease, a type of pneumonia, in 1990, before his arrest. As his sister Grace Carrington, a healthcare worker, relates, Mr. Panton was admitted to Lenox Hill Hospital with the disease. While there, "the surgeon placed a central line in him that saved his life." (Dkt. no. 910-14). (Apparently, a central line is a catheter inserted in a large vein to administer medication to critically ill patients.) While incarcerated, Mr. Panton suffered from pneumonia in 2011 and required hospitalization at a non-BOP hospital. (See dkt. no. 910-15, Mr. Panton's medical records). Mr. Panton has also been exposed to tuberculosis and suffers from high blood pressure (that is controlled through medication). All of this medical history makes him more susceptible to COVID-19. (Dkt. no. 910 at 29.)

The Court also notes that except for George Rivera, who ran the narcotics distribution organization in which Mr. Panton participated and who was also sentenced to life in prison, all of the others charged and convicted for their roles in Mr. Rivera's organization have either been released from prison or have

22

88

scheduled release dates. (See dkt. no. 910 at 36-38.) Among them is David Cook, released June 28, 2016, whom the prosecutor on the case, Henry J. DePippo, viewed as "much more culpable" than Mr. Panton. (Letter of Henry J. DePippo dated August 7, 2019, dkt. no. 910-1.) Releasing Mr. Panton would avoid sentencing disparity.

Mr. Panton undoubtedly committed a serious crime that wreaked havoc and immeasurable suffering on his community. As noted, he was found responsible for distributing 41 kilos of heroin. At the same time, though, Mr. Panton has served a serious sentence of almost thirty years, more than enough to deter someone considering similar activity.

There can be no doubt that Mr. Panton has fully rehabilitated himself, and there is no need for further incarceration to protect the public from additional crimes by Mr. Panton. As noted above, the numerous courses he has completed while incarcerated have solidified his commitment to a law-abiding life and prepared him to be a productive—and employed—member of society. His stellar disciplinary record is also a demonstration of his ability to live a law-abiding life. Of course, the Court is cognizant that it may not grant relief under the FSA only for rehabilitation, but Mr. Panton presents several other reasons to grant relief.

As noted above, Mr. Panton demonstrated his concern for the outside community, particularly at-risk juveniles, by

23

participating in the Slow Down Program in Atlanta and counseling troubled youth not to follow the path he took.  His actions in persuading a sexually abused teenager to report the crime and seek help was an extreme example of compassion and demonstrated a desire to do good by exercising a degree of initiative quite unusual in an incarcerated person.  It was an extraordinary act.

As noted above, Mr. Panton has also stayed in touch with his family to an extraordinary extent.   Indeed, his son, who hardly knew Mr. Panton before his incarceration, describes how his father influenced him to be the man he is today, serving with the NYPD.  Mr. Panton's sisters also attest to his goodness, and two of them have invited him to live with them.  After an absence of almost thirty years, this is also shows extraordinary family support.

As noted above, Mr. Panton's prior bouts with Legionnaire's Disease in 1990 and pneumonia in 2011, both of which were serious and required hospitalization over numerous days, together with his high blood pressure, make him particularly susceptible to COVID-19.  This circumstance also compels release.

Finally, Mr. Panton has a viable release plan with exceptional family support.  He has three sisters, Greta Clarke, a retired Nurse Practitioner, Grace Carrington, a delegate for the State of Florida, and Kandel Cornwall, who holds an accounting position with a nursing home.  All three live in Florida.   Ms. Cornwall

24

wrote about their family: "Robert is loving, kind and smart. Unfortunately he made some terrible choices along the way that lead him in this situation. . . . We are a supportive family and we will support him emotionally, financially along with a loving home and environment here in Florida." (Dkt. no. 910-12.) Darcel Anderson, mother of Mr. Panton's son, Dajoun, writes that "We would love to see Robert come home to be with his family." (Dkt. no. 910-13.) Along with the support of his children noted above, this high level of family support will assist Mr. Pantone in living a law-abiding life.

If released, Mr. Panton will live with his sister, Kandel Cornwall, in her single-family home. (Dkt. no. 910-12.) Mr. Panton's other sister, Grace Carrington, has also offered Mr. Panton a place in her home. (Dkt. no. 910-14.) Both sisters are healthcare workers and can attend to his needs.

Taking all these factors into account, the Court finds that Mr. Panton has demonstrated "exceptional and compelling circumstances" warranting release.

25

IV.  CONCLUSION

For the reasons discussed above, Defendant Robert Panton's motion for resentencing pursuant to 18 U.S.C. § 3582 (c)(1)(A) (dkt. no. 910) is GRANTED.  He is resentenced to time served plus one week.

**SO ORDERED.**

Dated:    New York, New York
          August 4, 2020

_____
LORETTA A. PRESKA
Senior United States District Judge

L

# Henry J. DePippo

hdepippo@rochester.rr.com

Elizabeth G. Oyer
Pardon Attorney
U.S. Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530
USPardon.Attorney@usdoj.gov

November 29, 2023

Re:    **Presidential Pardon Application for Robert Savio Panton**

Dear Ms. Oyer,

I write in support of Mr. Panton's application for a presidential pardon. From
1988 to 1994, I served with the Office of the U.S. Attorney for the Southern
District of New York. I began in the office as an Assistant U.S. Attorney,
became Senior Trial Counsel, and ultimately Deputy Chief of the Criminal
Division. Of relevance to this letter, I served as the lead prosecutor in the
criminal case involving Mr. Panton, from the indictment through the months-
long trial and sentencing by the U.S. District Court.

I have read Mr. Panton's letter of remorse and his statement of offense, as
well as the August 4, 2020, resentencing decision by Judge Preska to release
Mr. Panton for time served (nearly 30 years). In light of Mr. Panton's
acceptance of responsibility and expression of remorse and his continued
positive trajectory since his release, I support Mr. Panton's application for a
pardon. In particular, I personally see no reason to deport Mr. Panton to
Jamaica at this point. Of course I am writing on behalf of myself personally
and not on behalf of the Department or the U.S. Attorney's Office.

Sincerely,

Henry J. DePippo

M

ADRIANO ESPAILLAT
13TH DISTRICT, NEW YORK

RANKING MEMBER OF THE
APPROPRIATIONS LEGISLATIVE
BRANCH SUBCOMMITTEE

BUDGET COMMITTEE MEMBER

2332 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-4365

# Congress of the United States
## House of Representatives
### Washington, DC 20515

November 17, 2023

U.S. Department of Justice
Office of the Pardon Attorney
950 Pennsylvania Ave. NW
Washington, DC 20530

Dear President Biden and the Office of the Pardon Attorney:

I write in support of my constituent, Mr. Robert Panton, regarding his request for a presidential pardon so that he may be spared the second punishment of deportation for a non-violent drug offense committed over thirty years ago.

Mr. Panton exemplifies the possibilities afforded by true and earnest rehabilitation, and he possesses an exemplary desire to give back to his community by sharing his story and working with other young Black men whom he sees as being "at risk" in the same ways he once was. Mr. Panton wants to be with his family, serve his community, and continue his years-long work of sharing his life experience with young people to set them on the right path. Instead, he now faces deportation after spending 30 years in prison for a single nonviolent drug offense—all of which undermines the spirit of both drug sentencing reform and Mr. Panton's previous compassionate release from prison.

For these reasons, Mr. Panton is the ideal candidate for a presidential pardon—a beloved community leader who has already served more than his fair share of prison time due solely to since-repealed sentencing laws that systematically discriminated against Black men like him. He is a living embodiment of the meaning of both "second chances" and "rehabilitation," as he is tirelessly giving of his time and energy to community members in need, making up for his lost years with his children and his grandchildren, and serving as the consummate role model for at-risk youth.

Mr. Panton's story and work in New York City offer a shining example of the profoundly positive effect that rehabilitated individuals can have in our communities. Mr. Panton served 30 years in federal prison due to an overly harsh sentence imposed on a 1991 conviction for a non-violent drug offense—a conviction which, under today's modernized sentencing laws, would result in a significantly shorter sentence of likely one-third of that time. While in prison, Mr. Panton dedicated his days to helping young people by starting the "Slow Down Program," where he mentored young people coping with trauma and violence to deter them from a life of crime. Mr. Panton's dedication to improving the lives of at-risk youth while in prison was a factor that

eventually led to his compassionate release in 2020. In issuing his release, a federal district court judge described Mr. Panton's prison record as leaving "no doubt that Mr. Panton has fully rehabilitated himself, [leaving] no need for further incarceration to protect the public from additional crimes by Mr. Panton." However, upon his release from prison in August 2020, Mr. Panton was immediately taken into immigration custody. After nine months in immigration detention, Immigration Customs Enforcement (ICE) released Mr. Panton in 2021.

In the years since his release from ICE custody, Mr. Panton has become an award-winning and beloved leader in our New York City community, where he has tirelessly mentored young people through his "Too Young to Die" campaign. In the last year alone, Mr. Panton's campaign has developed new partnerships with respected community organizations such as SCAN Harbor Harlem and Lead by Example Reverse the Trend in order to increase mentorship programming for youth. Additionally, last summer, Mr. Panton ran an eight-week-long summer program with Lead by Example for teenagers ages 12 to 17 that included field trips and counseling sessions. This past summer, in recognition of the clear need for more job readiness programs in our community, Mr. Panton collaborated with the Urban Home Ownership Corporation and the Institute for Career Development to mentor six young people in maintenance skills, preparing them for well-paying jobs upon graduation. Our community is lucky to have Mr. Panton's passion for mentoring youth, his talent for bringing together stakeholders in service of our youth, and his unique understanding of the support that young people need to thrive.

Mr. Panton's roots in the community also include his loving family. Throughout his incarceration, Mr. Panton maintained relationships with his three adult children, including with his son Dajon, who has served as a police officer with the New York City Police Department since 2015. During Mr. Panton's time in federal prison, Mr. Panton would mail materials from his prison paralegal courses to young Dajon and encourage him to pursue a career upholding the law. Dajon eventually graduated from John Jay College of Criminal Justice in 2011, thanks in large part to Mr. Panton's influence as a positive role model. Dajon is now expecting a child and is eager to watch his own father serve as "the role model of a rehabilitated man" for his grandchildren.

Yet, Mr. Panton's second chance to be a father, grandfather, and community leader will be taken away from him if ICE moves forward with his deportation, as they currently plan to do as on the lone basis of the conviction for which Mr. Panton seeks a pardon. Mr. Panton has resided in the United States as a lawful permanent resident since the 1970s and has no ties to his country of birth, Jamaica. He is one of many immigrants who continues to suffer the consequences of harsh civil immigration laws that condition deportation on decisions made in the criminal legal system prior to recent criminal justice reforms. These recent reforms include decreases in the lengths of sentences imposed for drug offenses in light of the disproportionate impacts of such sentences on Black and Brown individuals. Without a pardon, Mr. Panton—who received a life sentence in his 20s for a non-violent offense—will not benefit from these critical reforms and efforts to rectify racial injustice in the criminal legal system because they do not extend to immigration consequences for criminal convictions.

You have committed your Administration to reviewing pardon and clemency petitions "that advance equity and justice, provide second chances, and enhance the wellbeing and safety of all Americans." Mr. Panton served a 30-year sentence for a single nonviolent crime because of laws and policies that we now recognize to have been disparately harmful to Black communities. Despite this, Mr. Panton used his prison time to better himself and the lives of others and emerged from these experiences rehabilitated in every sense of the word. He has seized the second chance given to him for all it is worth. In the two-plus years since his release, Mr. Panton has not only made the most of every moment with his family, but he has also tirelessly dedicated himself to giving back to those in need in our New York City community. Deporting Mr. Panton now would deprive him of the chance to spend his remaining years improving the lives of countless New York City youth, and our New York City community would greatly suffer.

For these reasons, Mr. Panton is a uniquely qualified candidate for a presidential pardon who I strongly believe exemplifies the goals of "rehabilitation and redemption" that your administration has prioritized when issuing pardons. Mr. Panton, through his selfless acts of mentorship and education, is using his second chance—and his unique story of redemption—to make our communities safer. I am incredibly grateful for his efforts, and I respectfully request that his pardon application receives your full and fair consideration consistent with all laws, rules, and agency policy.

Thank you for your administration's dedicated commitment to reforming our broken criminal justice system and for your consideration of Mr. Panton's request for a presidential pardon.

Sincerely,

Adriano Espaillat
Member of Congress (NY-13)

N

JIM JORDAN, Ohio
CHAIRMAN

JERROLD NADLER, New York
RANKING MEMBER

ONE HUNDRED EIGHTEENTH CONGRESS

# Congress of the United States
## House of Representatives
### COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–6906
judiciary.house.gov

U.S. Department of Justice
Office of the Pardon Attorney
950 Pennsylvania Ave. NW
Washington, DC 20530

November 20, 2023

Re:    Support for Presidential Pardon for Robert Panton

Dear President Biden:

I write to express my support for a presidential pardon for Mr. Robert Panton.  In 1994, a judge in the Southern District of New York sentenced Mr. Panton to life imprisonment for nonviolent drug offenses committed several years earlier.  Although Mr. Panton has been released from prison, he currently faces deportation to Jamaica.  Deportation would cause grave harm, not only to him and his family, but also to countless New Yorkers who benefit from Mr. Panton's mentorship and community work.

Through his work in the community and commitment to supporting young people, Mr. Panton demonstrates every day the ways in which rehabilitated individuals can make our communities stronger. He has resided in the U.S. as a lawful permanent resident for fifty years—thirty of which he spent in federal prison for a single, non-violent drug conviction.  During the COVID-19 crisis, a federal judge granted Mr. Panton compassionate release from incarceration. The judge described Mr. Panton's prison record as leaving "no doubt that Mr. Panton has fully rehabilitated himself, and there is no need for further incarceration to protect the public from additional crimes by Mr. Panton."[1] However, upon his release from prison in August 2020, Mr. Panton was immediately placed in removal proceedings by Immigration and Customs Enforcement (ICE).

Mr. Panton was released from ICE custody in 2021, and in the years since he has become a beloved leader in his community. Mr. Panton is a dedicated mentor to young people through his "Too Young to Die" campaign and works in partnerships he has developed with respected community organizations such as SCAN Harbor, Lead by Example Reverse the Trend, and the Urban Home Ownership Corporation, to create and expand programming for at-risk youth. Mr.

---

[1] USA v. Robert Panton, Case 1:89-cr-00346-LAP, Doc. No. 919, Filed August 4, 2020 (U.S. District Court Southern District of New York).

Panton also directed a summer program with Lead by Example for teenagers and collaborated with the Urban Home Ownership Corporation and the Institute for Career Development to help youth gain maintenance skills that would allow them to thrive and contribute to their families and communities after graduation.

Mr. Panton's commitment to the young people he mentors is absolute. As part of his Too Young to Die efforts, he has created a suicide prevention hotline that goes directly to his personal cell phone. At all hours of the day and night, Mr. Panton is on the phone with young people who need support.

Mr. Panton is beloved by his community and, equally, treasured by his own family. Despite his years of incarceration, Mr. Panton ensured that he remained close with his three adult U.S. citizen children. Mr. Panton's son Dajon has served as a police officer with the New York City Police Department since 2015 and credits his life of service in large part to his father's influence. Mr. Panton saw the potential in his son to serve, and mailed him materials from his prison paralegal courses while encouraging him to consider a career in law enforcement. Today, Mr. Panton is proud of his son's service, and deeply committed to nurturing and mentoring his grandchildren by modeling what it means to give back to the community.

Mr. Panton is making the most of his second chance to be a father, grandfather, and leader in his community. Yet this second chance will be cruelly taken away if Mr. Panton is deported on the basis of his decades-old criminal conviction. Having lived in the United States for more than fifty years, Mr. Panton has no ties to Jamaica, his country of birth. Deportation would constitute a harsh and disproportionate consequence of decisions made in the criminal legal system prior to recent criminal sentencing reforms that recognize the disparate and harmful impact of drug-related sentencing on Black and Brown individuals.[2]

It is a credit to your administration that you have committed to reviewing pardon and clemency petitions "that advance equity and justice, provide second chances, and enhance the wellbeing and safety of all Americans."[3] Mr. Panton served an extremely harsh sentence but has emerged from the corrections system fully rehabilitated and reformed.  Since leaving prison, Mr. Panton has led by example within his community to help New York City teens avoid making the same mistakes he made in his youth. He has taken his second chance seriously, making the most of every moment with his family while tirelessly giving back to those in need in his community.

Deporting Mr. Panton now would cruelly take these opportunities away from him. Perhaps most importantly, however, should Mr. Panton's conviction result in deportation, our own communities will suffer tremendously. Through hard work, acts of mentorship, and a big heart,

---

[2] Renée Feltz, *Why US drug reform still couldn't stop deportation of two immigrants*, THE GUARDIAN (Apr. 1, 2016), https://www.theguardian.com/us-news/2016/apr/01/us-immigration-deportation-drug-reform-junior-francisco; Renée Feltz, *Immigrant facing deportation could be first to benefit from US drug law reform*, THE GUARDIAN, (Mar. 28, 2016), https://www.theguardian.com/us-news/2016/mar/28/immigration-drug-sentencing-laws-prison-junior-francisco.
[3] *Statement by President Joe Biden on Clemency and Second Chance Month*, WHITE HOUSE (Apr. 26, 2022) https://www.whitehouse.gov/briefing-room/statements-releases/2022/04/26/statement-by-president-joe-biden-on-clemency-and-second-chance-month/.

Mr. Panton is using his second chance to help improve the lives and futures of our children. Our communities are stronger and safer because of his work.

For all of these reasons, Mr. Panton is uniquely qualified for a presidential pardon in furtherance of the goals you have outlined. I greatly appreciate your consideration of this request and thank you for giving careful time and attention to Mr. Panton's application.

Sincerely,

Ranking Member
House Judiciary Committee



THE COUNCIL
OF
THE CITY OF NEW YORK

**Yusef Salaam**
COUNCIL MEMBER, 9ᵗʰ DISTRICT, MANHATTAN

DISTRICT OFFICE
163 LENOX AVENUE, UNIT 5B
NEW YORK, NY 11225
TEL: 212-678-4505

CITY HALL OFFICE
250 BROADWAY, SUITE 1776
NEW YORK, NY 10007
TEL: 212-788-7397

CHAIR
PUBLIC SAFETY

COMMITTEES
AGING
CIVIL SERVICE AND LABOR
FINANCE

SUBCOMMITTEE
LANDMARKS, PUBLIC SITINGS, AND
DISPOSITIONS
ZONING AND FRANCHISES

CAUCUS
BLACK, LATINO AND ASIAN CAUCUS

December 24, 2024

U.S. Department of Justice
Office of the Pardon Attorney
950 Pennsylvania Ave. NW
Washington, DC 20530

Re: Robert Panton Request for Pardon

Dear President Biden and the Office of the Pardon Attorney,

Robert Panton is my constituent and a remarkable leader in our Harlem community who urgently requires a Presidential pardon for a non-violent drug offense committed thirty years ago. Absent a pardon, he will face immediate deportation to Jamaica, a country he does not know. I write in full support of Mr. Panton with the hope that you will consider him for a pardon this holiday season and keep him home with his children and grandchildren, where he belongs.

In the years since his release from incarceration, Mr. Panton has embodied a spirit of transformation and service to his community, making reparations by helping young people avoid the same mistakes that he made. His work through the "Too Young to Die" campaign, which he founded, and collaborations with local organizations such as Lead By Example and Urban Home Ownership Corporation to provide youth enrichment and mentorship opportunities is exactly what Harlem needs.

My staff and I have come to know Robert well. He is known affectionately in our community as "Bob Lemon", a name that dates to his days as a boxer in his youth.  Since his return to our community Mr. Panton has started his own not for profit who caters to the most vulnerable teenagers in our community. We share his vision of a Harlem that is unified by a common goal of providing our young people with bright futures. We look forward to working with him in this endeavor for years to come.

Mr. Panton's deportation would contradict recent racial justice efforts to address and rectify the systematic discrimination against Black men like him in our criminal legal system. Mr. Panton deserves a second chance at life here in Harlem, just like so many other Black men in our community, who have returned home after years of incarceration under draconian "War on Drugs" era sentences that disproportionately punished Black men and destabilized whole communities. Mr. Panton's home is Harlem, and we welcome him here with open arms as he works to make our community safer for all.

Mr. Panton served 30 years in federal prison due to an overly harsh sentence, which, under today's modernized sentencing laws, would be significantly shorter. While in prison, Mr. Panton dedicated his days to helping young people by starting the "Slow Down Program," where he mentored young people coping with trauma and

DISTRICT OFFICE
163 LENOX AVENUE, UNIT 5B
NEW YORK, NY 11225
TEL: 212.678.4505

CITY HALL OFFICE
250 BROADWAY, SUITE 1776
NEW YORK, NY 10007
TEL: 212.788.7397

THE COUNCIL
OF
THE CITY OF NEW YORK

**Yusef Salaam**
COUNCIL MEMBER, 9ᵗʰ DISTRICT, MANHATTAN

CHAIR
PUBLIC SAFETY

COMMITTEES
AGING
CIVIL SERVICE AND LABOR
FINANCE

SUBCOMMITTEE
LANDMARKS, PUBLIC SITINGS, AND
DISPOSITIONS
ZONING AND FRANCHISES

CAUCUS
BLACK, LATINO AND ASIAN CAUCUS

violence. Mr. Panton's dedication to improving the lives of youth while in prison was a factor that eventually led to his compassionate release in 2020. In issuing his release, a federal district court judge described Mr. Panton's prison record as leaving "no doubt that Mr. Panton has fully rehabilitated himself, [leaving] no need for further incarceration. Mr. Panton has also convinced the original prosecutor, former AUSA Henry DePippo of his rehabilitation. Mr. DePippo has written a letter of support for Mr. Panton's pardon application – confirming that there is a consensus Mr. Panton is a trusted member of our New York Community and an asset to our young people. He should not be separate from his family and neighbors, who need him as much as he needs them.

Mr. Panton's son, NYPD Officer Dajon Panton is also a constituent of our district. I hope you will consider Dajon, his wife and baby. Please do not deprive them of the opportunity to care for Mr. Panton and allow Mr. Panton to be the father and grandfather that they deserve. Mr. Panton's second chance to be a father, grandfather, and community leader will be taken away from him if ICE moves forward with his deportation. Mr. Panton has resided in the United States as a lawful permanent resident since the 1970s and has no ties to his birth, Jamaica. He is one of many Black immigrants who continues to suffer the consequences of harsh civil immigration laws that condition deportation on decisions made in the criminal legal system prior to recent criminal justice reforms.

For these reasons, Mr. Panton is a uniquely qualified candidate for a presidential pardon who I strongly believe exemplifies the goals of "rehabilitation and redemption" that your administration has prioritized when issuing pardons. Mr. Panton, through his selfless acts of mentorship and education, is using his second chance—and his unique story of redemption—to make our communities safer. I am incredibly grateful for his efforts, and I respectfully request that his pardon application receives your full and fair consideration consistent with all laws, rules, and agency policy.

Thank you for your administration's dedicated commitment to racial justice and for your consideration of Mr. Panton's request for a presidential pardon.

Sincerely,

Yusef Salaam
New York City Council Member, District 9ᵗʰ

P

November 16, 2023

Re: NGO Support Letter for Black Harlem Leader Seeking Presidential Pardon

Dear President Biden & the Office of Pardon Attorney:

We are a group of civil society organizations including civil rights, racial justice, and immigrant rights groups. We write to urge you to grant a presidential pardon to Robert Panton, a beloved Harlem leader who deserves this unique grant of discretion in light of his invaluable contributions to our communities. Granting a pardon would honor your administration's stated commitment to racial equity and ensure that Mr. Panton can continue his invaluable work in the only home he knows–Harlem, New York.

Mr. Panton served more than thirty years in federal prison for a single drug conviction he received in the early 1990s–a harsh sentence due to mandatory sentencing enhancements that existed at the time. Today, that same conviction would result in significantly less prison time for someone in Mr. Panton's position due to recent sentencing reforms. These reforms were passed to remedy outdated criminal legal policies from the War on Drugs era, which had particularly harsh and disproportionate impacts on Black men like Mr. Panton.

In 2021, after serving three decades for his single conviction under these outdated sentencing rules, a federal judge in New York released Mr. Panton. Under recently revised sentencing rules, this judge finally had the discretion to grant Mr. Panton the freedom he had earned through his hard work and service to others during his three decades in prison. The judge noted, "there is no need for further incarceration to protect the public from additional crimes by Mr. Panton," and commended him for his empathy and service to others.

Mr. Panton's commitment to giving back to his community is in fact, unparalleled. During his time in prison, he spearheaded a program through the family courts to help dozens of young people cope with trauma and violence; and now, back in his community where he belongs, Mr. Panton leads a campaign to share the lessons he learned in his own life with young people coping with trauma. His personal cell phone number is a direct-dial for youth contemplating suicide.

Mr. Panton is also a loving father of three children and nine grandchildren. Even during his years inside, Mr. Panton worked hard to maintain a close relationship with his children. His son, a New York Police Department officer, credits his decision to enter public service to his father's mentorship and support.

But now, after serving three decades in prison and despite his exceptional work for young people, Mr. Panton faces deportation. He immigrated to the United States from Jamaica as a

young child and has lived here for 50 years. However, under current immigration laws, Mr. Panton's single conviction from over thirty years ago gives immigration authorities the right to deport him to a country he does not know. In other words, Mr. Panton faces a second punishment for the same conviction for which he already served thirty years–a punishment that would tear him from the loved ones in his life that he worked hard to return home to from prison as well as the young mentees who see him as a lifeline.

A presidential pardon would give Mr. Panton the chance to remain in the United States and effectively prevent his deportation. In January 2021, your administration powerfully committed through executive order to advance "racial equity and support for underserved communities through the federal government." In recent years, important federal legal reforms have aimed to remedy the injustices of drug laws from the past that disproportionately punished Black men. A presidential pardon would ensure that Mr. Panton actually benefits from these reforms, and it would appropriately honor the transformation he undertook in prison, which earned him his place back amidst his community, which stands to benefit from his service.

Our communities need Black leaders like Mr. Panton who bring to the table their own lived experiences that offer unparalleled credibility and empathy for young people navigating their own futures and challenges. We urge you to grant.


Sincerely,

African Advocacy Network
African Communities Together
African Immigration Initiative
Asian Americans Advancing Justice | AAJC
Black Alliance for Just Immigration
Brooklyn Defender Services
CARECEN
CARECEN NY
CASA
California Collaborative for Immigrant Justice
Center for Constitutional Rights
Center for Gender & Refugee Studies
Coalición de Derechos Humanos
Coalition for Humane Immigrant Rights (CHIRLA)
Communities United for Status & Protection (CUSP)
Detention Watch Network
Drug Policy Alliance

2

Franciscan Justice Circles
Freedom For Immigrants
Haitian Bridge Alliance
Human Rights Watch
Immigrant Justice Network
Immigrant Legal Defense
Immigrant Legal Resource Center
NAKASEC
National Employment Law Project
National Immigrant Justice Center
National Immigration Law Center
National Immigration Project
New York Lawyers for the Public Interest
North American Climate, Conservation and Environment (NACCE)
Ohio Immigrant Alliance
Otros Dreams en Acción
Oxfam America
Pangea Legal Services
Presente
PushBlack
Repatriate Our Patriots
Rhizome Center for Migrants
Robert F. Kennedy Human Rights
Rocky Mountain Immigrant Advocacy Network
Southeast Asia Resource Action Center
Tsuru for Solidarity
UndocuBlack Network
Washington Lawyers' Committee for Civil Rights and Urban Affairs

Q

November 16, 2023

Re: New Yorkers Support a Presidential Pardon for Beloved Harlem Leader Robert Panton

Dear President Biden & the Office of Pardon Attorney:

We are a group of New York organizations who share a commitment to ensuring that our communities are safe and vibrant. We write to urge you to grant a presidential pardon to Robert Panton–a beloved Harlem leader and youth mentor.

Robert has lived in the United States for over 50 years. He is a devoted father and a role model to his grandchildren. He is a hard-working and respected community leader, mentoring and educating young people in Harlem and New York City through many organizations. His exceptional work for our communities is his way of passing on the lessons he has learned through incarceration. He is a model of the powerful ways in which the transformation of one person can enhance the value and richness of our New York communities and impact hundreds of others.

Robert served more than thirty years in federal prison for a single drug conviction he received in the early 1990s. He used his time inside prison to improve himself and to serve his community. He not only obtained his college degree and technical training, but he also spearheaded a program through the family court system to help dozens of young people cope with trauma and violence. He met regularly with children to support them during their hardest times—work he continues today for young people in Harlem now that he is back in his community.

While inside prison, Robert also mentored those around him, offering life advice and counsel to other men serving time. Many have contacted Robert in their years since release to thank him for his support as they start new chapters in their transformed lives. This outreach from formerly incarcerated men is a testament to Robert's mentorship and the value he brings to everyone around him.

When a federal judge in New York granted Robert release from federal prison in 2021, she noted that "there can be no doubt that Mr. Panton has fully rehabilitated himself, and there is no need for further incarceration to protect the public from additional crimes by Mr. Panton." She commended Robert for his empathy, compassion, and admirable desire to help others.

Robert's commitment to give back to his community is unparalleled, as evidenced by the non-stop advocacy work he did while incarcerated, but especially through the tremendous impact he has had on young people since his release. Through his "Too Young to Die Campaign" and other organizations, Robert shares the lessons he learned in his own life with young people

coping with trauma. His personal cell phone number is a direct-dial for kids contemplating suicide. In their most urgent moments of need, Robert is who they call.

But now, Robert faces deportation to a country he does not know. Under outdated and unjust immigration laws, Robert is subject to deportation for the conviction he received over thirty years ago. His deportation would punish not only him for a second time but also his three children, his nine grandchildren, and the countless young people throughout New York City who benefit from his mentorship and support.

A presidential pardon would give Robert the second chance he was promised so that he could stay in Harlem, where he belongs. Our communities need leaders like Robert who bring to the table their own lived experiences that offer unparalleled credibility and empathy for young people navigating their own futures and challenges. He is exactly the kind of man and role model that is worthy of an honor of this degree from the President of the United States. We urge you to grant.


Sincerely,

African Communities Together
Black Alliance for Just Immigration
Brooklyn Law School
Bronx Defenders
Center for Constitutional Rights
Clemency Coalition of New York
Communities United for Status & Protection
Desis Rising Up & Moving
Envision Freedom Fund
Families for Freedom
First Friends of New Jersey and New York
Franciscan Justice Circles
Free Migration Project
Immigrant Defense Project
Just Futures Law
Make the Road New York
Mekong NYC
New York Day of Remembrance Committee
New York Immigration Coalition
New York University Immigrant Rights Clinic
New York Lawyers for the Public Interest

Rhizome Center for Migrants
Robert F. Kennedy Human Rights
Rockland Immigration Coalition
Southeast Asian Defense Project
SURJ NYC
Surveillance Resistance Lab
Syracuse Peace Council
UnLocal
UndocuBlack Network

R



Brown Eyez Magazine

African Immigrants Commission of NY & CT, Inc.

Holistic Harlem, Inc.

# THE HOLISTIC HEALTH & WELLNESS FAIR

Presents this

## COMMUNITY WARRIOR AWARD

to

Pejanne Fleury, Publisher of Brown Eyez Magazine

Imani Scott, Chair of Holistic Harlem, Inc.

Mory Kouyate, Chair of African Imm. Comm. NY/CT

S

U.S. Department of Justice
Office of the Pardon Attorney
950 Pennsylvania Ave. NW
Washington, DC 20530

October 30, 2023

Re:    Support for Presidential Pardon for Robert Panton

Dear President Biden:

My name is Dajon Panton, I am a U.S. citizen and Robert Panton's youngest son. I am a New York City Police Officer, who graduated from John Jay School of Criminal law, with my father pushing me all the way. Although he was incarcerated for the majority of my life, he has been essential in molding me into the man I am today. Through the years, he counseled me on many things. One of the most important being my decision on becoming a New York City Police Officer, which he fully supported. I had this teacher guide me to a beautiful career in law enforcement, and life of protecting and serving the public. My Dad Robert Panton is a role model I'm proud of today. He is a changed man and I hope you will consider him for  presidential pardon.

Everyday I look at my father's progress, I think of a life without him by my side, and tears would come out of my eyes. If my father was not in this country, the loss won't only be to my first child in my wife's pregnant stomach, it would be to all the youth that are benefitting from him every day. My sister Shamecca Panton just had her first child, Mecca Panton, 4 month ago. This family needs the role model of rehabilitated man in our life forever.

My father was released from prison after serving 30 years for a nonviolent drug charge offense, on one count of conspiracy. It is his only felony conviction. My father's sentence was unconstitutional. He was given enhanced penalties for conduct he was not charged with, nor indicted for, or convicted of. In 2020, he was released by Senior Judge Preska of the Southern District of New York. Judge Preska, in granting my father his freedom, talked about the extraordinary things my father accomplished in prison, and further commented on the work my father could do in society to help youngsters from falling into the justice system of long prison sentences.

Redemption is one of the things prisons are supposed to give a person an incentive to do, in the rehabilitation process. My father has done that and more, but now he is going to be punished again with deportation after he already paid his debt to society. My father actions since his release show that he is an asset to our family (including his children and grandchildren) and the community at large.

Since his release from ICE detention, my father partnered with poet laureate Mahdi Salaam to create an organization called "ingeniousiam.com"; and started the "Too Young To Die Campaign", which is aimed at preventing destructive youth actions that are causing them to take their lives too early. This organization's mission statement is "to encourage young people to accept guidance and have the courage to ask for help". My father has been going to schools to speak to young people about alternative choices that can give the youth a hopeful future outside of the prison walls. This work is invaluable to our Harlem community. He has also set up two paramount services to the community: 1) a suicide prevention for the youth; 2) an Amber alert for your and old people when they are perceived missing by their loved ones.

In the time, my father has been out in the community, he has shown that he can make a positive contribution. Simply put, we need more men like my father exiting the prison system, not exiting the country.

Please analyze his life and actions to be one worthy of being here with his family and teaching the youths to make the mistakes he did. Judge Preska heard my plea and released my father from a sentence of life in prison. I hope you will now hear by plea and allow my father to stay in the United States, his home since he was four years old by granting him a presidential pardon.


Sincerely,

Dajon Panton
222 E. 111 Street #6F
New York, NY 10029
(347) 279-0420

T

November 14, 2023

U.S. Department of Justice
Office of the Pardon Attorney
950 Pennsylvania Ave. NW
Washington, DC 20530

Dear President Biden,

My name is Shamecca Panton, the only daughter of Robert Panton. I am writing this letter asking you to please grant my father a presidential pardon.

My father went to jail when I was 2 years old. I am 33 years old now and I feel that I still need my father in my life. It was very difficult growing up without my father in my life. When I was younger I had dropped out of high school at 16. I suffered from Depression, I was in and out of rehabs and went to jail. I was lost in the world but going to jail and rehab change my life. When I was released from jail I had went to a half way house, an sober house then I got a job saved some money up and moved to Decatur, Georgia. I moved to Decatur, Ga because I needed a change and to be in a different environment. I got a job here as a dietary aide. I am waiting for my apartment to come in. I tell you all of this to show you I have change for the better. I know my father have changed for the better also.

My father has been there for me in so many ways, I could write for days telling you about it. I am a single parent and when I'm pressed financially due to a shortage of cash my dad's wallet is opened immediately. My dad does not know the word "no" to me and others also. But this is the beginning of his generosity. My dad started Ingenious I AM that serves the youth with guidance to stay away from a criminal life style and drugs. It has a suicide prevention hotline that goes directly to my father's phone 24/7. The difference he makes with his advice and willingness to listen to others' complaints is remarkable.

To remove my dad from these children's life and me and my daughters for a mistake 33 years ago, that he has paid his debt to society by serving 30 years for a nonviolent first time drug conviction 1 count of conspiracy, doesn't make sense. My dad is a credible messenger. The youth are listening to him, it would be an injustice to the youth, my new born daughter Mecca, my brothers, and my whole family if my dad was not in our life here in the United States.

I just came back from visiting my dad in New York. It was a beautiful visit with my daughter. My dad got to be a grandfather and help take care of my daughter. If I knew he was going to be able to stay in the United States I could move to New York and live with him, so that he could spend more time with her. It would be so nice to have his help in raising her.

Please give him a second chance at live. I love my dad with all my heart and I know that he is a different person today. As he watched me grow from a distance as I have watch him grow.

Please consider granting him a pardon and may God be with you.

Thank you for hearing my cry and concerns for my father.

Sincerely

Shamecca Panton



U

Date: November 13, 2023
From: Aaron Hariss Jenkins
Re: In support of Pardon for my father Robert PANTON.

Dear President Biden,

My father was sentenced to life in prison for a non-violent offense. He went to prison when I was five years old, so my dad couldn't raise me. My heart was broken when I realized that he might never come home. But my dad was not despondent. He had faith that God would release him when he was ready. So this taught me that a person has to make choices wisely, or blame no one but himself.

 I'm glad that he didn't waste his time in jail, and assisted some other young men to live productive lives in prison. Now my dad is free and helping raise 8 grandchildren in North Carolina and youngsters in New York through the Too Young To Die Campaign. Please let my dad continue this positive journey in The United States. Where he learned everything he knows; and is now using it for good!

Please grant my dad a Pardon Mr. President. My dad will make you proud of this decision, just as the judge said when when she released him.


Thank you for your time.

Aaron H. Jenkins,

The son of a good man!
Robert PANTON

Tel: 704-670-6399





# U.H.O. MANAGEMENT CORP.

### 494 Eighth Avenue, 19th Floor, New York, NY 10001
### (212) 563-0310 ♦ Fax (212)268-1068

U.S. Department of Justice

Office of the Pardon Attorney

950 Pennsylvania Avenue NW

Washington DC 20530

To whom it may concern:

I write today on behalf of Robert Panton, a beloved member of our community, to emphatically support his request for a Presidential Pardon.

My name is Sheila E. Dotson, I am the Site Manager for Urban Home Ownership Corp.. My office is located at 105 West 127 Street, New York, NY 10027. We are a nonprofit organization that provides housing to underserved people in Central Harlem. Robert Panton was recommended by me for the Job as a Maintenance Supervisor for the 19 buildings owned by U.H.O Corporation in Central Harlem. In the Community Robert has been nicknamed "good doer". Due to going out of his way to help anyone in need. We provide a better quality of life for the people of Harlem, with the hire of Robert.

Robert is on call 24 hours a day to solve problems for tenants, by connecting them with the Superintendent that he believes can solve the problem in the most reasonable and respectable manner.

I am not ashamed to point out that Robert has at times gone against company policy of having to fix something that is not required or the responsibility of U.H.O Corp.. Robert will state unapologetically, "if it were your mother, sister or grandmother living here, would you have it fixed." Of course the answer to him is, yes. Then Robert comes with his famous reply, "Well we're all family in one way or another, so let's fix it." This is the compassion I've seen from Robert in his work ethics at U.H.O. Corp..

Outside of that Robert has a youth organization called "Ingenious I Am LLC", at ingeniousiam.com. His efforts with the youth has garnished him a "community warrior" award. Most recently he came to work tired and I asked him, sarcastically; long night. Robert explained to me that a 19 year old named Jordan was in the rehabilitation clinic in Nantucket New York, and was put out of the program for violating policy. At 11:00 p.m. Robert went with the young man, Jordan's friend Ben, to go pick up Jordan's mother Emily in the Bronx , drive them to go get Jordan from the rehabilitation clinic. Robert lives on 123 Street in Harlem, and a trip to Nantucket New York brought him home at 1:45 a.m., but not after Robert stopped at a restaurant to buy Ben, Jordan and his mom dinner at a restaurant that opened late.

**Page 136**

I accepted this story at face value knowing Robert. An hour after he arrived a phone call came to the office from a young man named Jordan. It was transferred to the office I share with Robert. The young man, Jordan, spoke to me first and I told him that Robert was on another call. Jordan Quickly told me he just wanted to thank Robert for "leaving his bed to come rescue me". I looked over to Robert and smiled. I told Jordan that I would have Robert call him back. I asked him, how did you get this number?" Jordan responded that Robert gave him my business card and told him "if he can't get me, call the office and tell Sheila what you need".

These are the types of unselfish actions that are needed in my community to help the youth realize that they matter.

I can tell you about the two of many interns that Robert mentored at U.H.O. Corp., and upon completion of this internship, the two young men Louis and Saul, stated to me they didn't want to go anywhere else and wanted to fill out an application to work for Urban Home Ownership Corporation. Those two young men are now employed by us, working directly under Robert's supervision.

To lose this type of person, with this level of commitment to help our youth, would be a disaster.  By Robert being deported for a nonviolent drug crime,  he served a draconia sentence  for, and fully rehabilitated himself in prison; earning a paralegal diploma and specialty diploma in civil litigation, while creating a "slow down program" for youth, family court is sending to the United States Penitentiary to speak with incarcerated inmates like Robert, to get guidance they are not accepting from others.  This is extraordinary.

Please do not deport Mr. Robert Panton; you would disarm the community with the strongest weapon I've seen so far, for getting to the minds and hearts of our misguided youth.  A second chance is what this country was built on.  America made mistakes with slavery and Jim Crow laws that does not exist today, and have been forgiven by the world.  Give Robert the second chance he deserves.

Thank you for your time and consideration.

Sincerely,

Sheila E. Davis Dotson





8 W 126th St, New York, NY 10037  TEL: 718-671-2322

Date: June 20, 2023

My name is Antonio Hendrickson, CEO of "Lead by Example" organization. I have known Robert Panton, aka, Bob Lemon since public school. His organization, that he is the cofounder of, "Ingenious I am LLC" partnered with my company to organize and be Director of a summer Youth Program for 8 weeks in the Summer of 2022.  Robert has been trying diligently to reach the hearts and minds of young people for decades.  Robert and Mahdi Salaam started a "To Young To Die Campaign" for youths lives.

We won the Vibe Grant last year and conducted the program with efficiency and professionalism that Won Robert an Award for activities in the Community.  The "Community Warrior Award" given under his boxing name (respected in the community) was one that made me proud.  I subcontracted the Vibe Grant with Roberts Ingenious I Am LLC, because I personally know of his passion to make sure youth have the information about the streets and the consequences that leads to bad decisions, that the price is too much to pay.

Robert Panton aka Bob Lemon is the ideal person to speak truth to the youngsters about drugs, crime, prison, and growing up without father or a mother; which can be an appropriate excuse.  But unacceptable, when it comes to "reversing the trend".  Myself and Bob have spent decades in prison for a nonviolent drug offense charge of conspiracy.  When Robert speak to the youth in the streets, they get it from him 'raw and uncut'.  The truth does not have to be dressed up, because the war to win the hearts and minds of these youth today is a struggle that is a marathon.

Robert has been where they are at now, and understands the life lessons they need to hear.  Robert being in this country shows what redemption is all about, and how a second chance in any circumstance is supposed benefit himself and his community.  Bob Lemon does this automatically and this is someone our community needs.

Thank you for your time and consideration in this matter.

Sincerely,
Antonio Hendrickson



November 1, 2023

U.S. Department of Justice

Office of the Pardon Attorney

950 Pennsylvania Ave. NW

Washington, DC 20530

Dear President Biden,

My name is Kandel Cornwall, I'm writing to you today on behalf of my brother Robert Panton. My parents had four children, three girls and one boy(Robert). They did not have much, but were able to put all of us through school, so we could make a difference in society. Robert is loving, kind and smart. He has always supported me throughout my life. He is always the one I turned to growing up.

Robert was always my biggest fan and cheerleader. During my junior high school days when I had after-school volleyball competitions it was my brother Robert who showed up to cheer me on. During my middle school days, I would be the host for talent shows and Robert would always help me rehearse. Robert was always my biggest supporter.

Unfortunately, he made some terrible choices along the way that led him to being incarcerated. When Robert was in prison, I visited Robert as often as I possible could, and during those visits we had long conversations about those choices, and how Robert wished he would have stayed on the same path that my sisters and I had continued on. I have seen the growth in Robert and feel he has been rehabilitated. He demonstrates that just because you fall down you can always pick yourself up with the support of your family and community when given a second chance.

When Robert was released from prison it was a dream come true. We were not told in advance by his attorney that he was being released so it was a huge surprise. Once Robert confirmed his release all we could do as a family Is cry, pray and thank God for giving us a second chance to be in his presence again. The happiness that I felt was short lived. The next day when we called the prison to find out how he would be getting home, or could we meet him at the prison? We were told they could not give us any information. The happiness I felt turned to grief quickly. It was like someone was playing a joke on me.

I'm raising a smart but curious 12 year old girl, and Robert serves as a male role model to her. We are proud of all the accomplishments that Robert has made. He offers guidance, information and mentorship for our city youths. He has also supervised summer youth workers learning a trade in

**Page 164**

building maintenance. If he can stay in the United States, he could continue to make a great impact on another young boy's life.

When Robert came home it was just like the good old days with lots of Love, Laughs and family time. Growing up he never really cooked much, but now he is a master chef (smile). He cooked most of our daily meals to contribute to the daily function of my home. Robert is now in New York because it's closer to his son. My 12-year-old daughter and I visited Robert this summer and we had a great time. We went to see a play in central park and Visited the Empire State Building. My daughter was so happy to spend time with her uncle and my big brother as I affectionately call him. I don't call him Robert I refer to him always as big brother because he has always been a big brother to me (protecting and providing).

If Robert was to be deported back to Jamaica it would be devastating because we have no family in Jamaica, and he supports me mentally as well. How would he live and support himself in Jamaica? I will not be able to support him while he is in Jamaica because financial it's hard for me due to the extreme rise in Living expenses and as a single mother. He knows absolutely nothing about Jamaica. He is working and providing for himself, and he is a repented man. I hope you would give Robert a second chance and allow him to live in the United States of America the land of opportunity. The Greatest country in the world. We love Robert and we need him to be here for our growing family.

I thank you for giving me the opportunity to express myself regarding my brother Robert Panton.


Sincerely,

Kandel Cornwall
Tel: 954-646-9789

Page 165



Dear, sir/madam:

I hope this note finds you well.

I want to express my heartfelt support for my brother to remain in the United States. His country, the only country he has ever known.

I would like to tell you about his kindness and his ability to impact so many people.

Particularly the youth.

It is so important that he remains in this country so he can continue to impact and care for more of them.

He is in fact an American. In his, heart and  thoughts. I think the work he does now through his nonprofit reflects that.

The services he provides is truly valuable to the community.

Particularly the suicide prevention program. Evident by all the support that he has received so far. He has truly made a difference in the lives of so many. But there is so many more that he has the potential to help. I think our country is enriched by having people like my brother here. I pray that this is recognized by all the individuals that get it to make this decision.

He has already had two generations of Americans, his three children and his grandchild. I believe their lives will be enriched by having their father and grandfather here to continue to guide them through. I pray that every consideration is made, and justice is served by having Robert stay here with us, his family. After all,that is the American way.

Always in Prayer,

Grace Carrington
e4committeewoman@gmail.com


Date: November 10, 2023

Z

November 30, 2023

U.S. Department of Justice
Office of the Pardon Attorney
950 Pennsylvania Avenue NW
Washington DC 20530

To whom it may concern,

I am writing to support Robert Panton's application for a presidential pardon. My name is Swann Streety, Ordained Deacon at Chambers Memorial Baptist Church located in Spanish Harlem where Robert and I grew up. Presently I am the Public Relations Representative, Events Planner and Administrator, Liaison for Feed the Children, Department of Youth and Community Development, United Way, Federation of Protestant Welfare Agency, American Baptist Churches of Metro New York, Driscoll Foods as well as The Foodbank of NYC. I am responsible for ordering pantry food to distribute to the community as well as grants administrator.

My relationship with Robert is that of a childhood friend and a big brother. Robert and I have known each other for over 50 years as we grew up in the same housing complex, attended the same JHS. We also attended Chambers Memorial Baptist Church together where we also went to Fresh Air Fund sleep away camps during the summer. Robert has always been a dedicated brother to his siblings, a big brother and a great friend. He has always been an advocator of positive activities in the community, even during our youthful years at JHS 45 community center.

Though I did not have a relationship with Robert during his incarceration, Robert and I's relationship has flourished since his release in the sense that we are both passionate about our work for the community. Just as Robert is in pursuit of positive outlets for the youth, we at Chambers are on the same path. There is a great need for afterschool programs, community centers and outlets for the youth so that they remain off the streets and not inducted into gangs. Robert and I had access to these outlets when we grew up. Since Roberts return he has been pursuing these avenues and have received awards for doing so.

I have seen Robert change over the years as he has a refusal in his spirit to return to any of his past activities or associates. He remains positive, creative, passionate and committed to the Youth and community at large.

A presidential pardon will allow Robert to stay in the United States with his family and community. We need him here and we very much hope that he will have the opportunity to continue giving back to his community.

For these reasons, I respectfully ask you to consider his application and recommend him for a pardon.

Thank you very much,

Swann Streety
50 Paladino Avenue – 15F
New York, NY  10035



November 14, 2023

U.S. Department of Justice

Office of the Pardon Attorney

950 Pennsylvania Avenue NW

Washington DC 20530

To whom it may concern,

It gives me great pleasure to write this letter of support for Robert S. Panton's application for a presidential pardon. Robert and I grew up together in New York City and became friends. When I think back to when we were teens, we would have deep conversations regarding life and what we planned to do with our lives. We both had dreams of going to college and making something of ourselves.

Robert is, unfortunately, an example of the effects that the inner city environment can have on many of the young people who dwell there. He was a young boy from the inner city who got lost and made several decisions that found him on the wrong side of the law. What impresses me about Robert is his taking full responsibility for his actions, blaming no one or anything for his past decisions or actions, an attribute you don't always find in many incarcerated individuals. He realizes that he has another chance to make a difference. So he is now committed to working with young people to ensure they don't find themselves making the same mistakes he made while growing up. Helping them identify what life can look like when they stay focused, find purpose, and achieve higher learning.

We have so many young people growing up in the inner city struggling to make good decisions, the same way Robert did growing up as a youth. However, he had many years to ponder his life and where his decisions landed him. During his incarceration, he discovered what he wanted to do, and found peace in his purpose. His purpose is to guide and mentor young boys and girls to grow up to be the best men and women they can be—working with them to be positive contributors to society. Upon his release from prison, he went to work on Ingenious I Am, the Too Young to Die Campaign, and successfully supervised a City Summer Youth Program. All three programs offer mentorship and experiences that many inner-city youth may not typically have. His positive attitude, demeanor, and message draw in people, young and old to listen to what he has to say, and he has a lot of knowledge to share.

It is important to note the humanistic side of Robert. He gives, has a good heart, and helps others when and where possible. He gives when he has very little himself. Several months ago, he told me about an incident that melted my heart: He was riding the bus and started a conversation with a man sitting with his daughter; it was obvious they were celebrating something. I am not sure how the conversation started, but the result was that Robert gave the man the last few dollars he had in his pocket. The gesture allowed the man to buy ice cream to celebrate his young daughter's graduation achievement. The young man was so grateful because he had nothing to give his daughter on this special day. She was so excited that her dad was buying her ice cream. Not many people would befriend a stranger on the bus and later become impactful in that individual's life. The encounter moved Robert to help the young man by connecting him to others that could connect him to services.

**Page 167**

Despite his past, Robert is a good person with a loving heart. He is smart, committed, focused, and hard-working. He is a true example of getting a second chance and making the best of the opportunity. A cohort of individuals is supporting and helping him realize his plight as a positive contributor to society. His impact has only touched the surface; he has more work planned. Deporting him would be a disservice to Robert, the young people he serves, and those working with him to effect positive change in the inner city.

I have and will continue to support him in his efforts to be his best self as he is lifting as he climbs.

I truly hope that you will see the value Robert brings to our community and grant him a pardon, so that he may continue to support his family and community for many years to come.

Sincerely,

Wendy J. Thornton

Wthorton928@gmail.com



# BB

November 29, 2023

Dear President Biden & the U.S. Department of Justice:

My name is Tyrone Ward and I am writing in support of Robert Panton who I met during my time inside federal prison from 2018 to 2019 on a probation violation from a passport misuse case. I am from Flint, Michigan, but currently live in Belleville, Illinois. I am married and I have four children with my current partner. My life today is very different from what it was before I met Robert. I credit many of my recent decisions and this new beautiful chapter in my life to a handful of people who supported me and served as role models. Robert is one of those people.

I first met Robert in a transfer federal prison facility in Atlanta where I was placed into his cell to be his roommate. One of the things I remember right away thinking when I met Robert was that he was very different than many others inside. He moved in a noticeably thoughtful way with more wisdom and intention. I gravitated to him for this reason.

Like me, Robert is Muslim so that meant we could pray together and talk about religion and God. He almost always led us in the prayers because he was so wise. We also ate together, watched TV together, worked out together and sometimes Robert encouraged me to study with him too. He was always so thoughtful in how he talked about religion and also the law. We talked a lot about God and our faith and what it meant to our lives. Sometimes Robert would talk about his childhood and the things he wanted to do when he got home. About how he wanted to get involved in his community.

Robert was the person I spent the most time with during my time inside. After Atlanta, we were together in a Kentucky facility. I remember one incident when we were there together where I realized how respected Robert was not just by me, but by so many others. In prison, sometimes the guys segregate based on the regions they are from, like New York or California. But Robert was not someone who moved in these circles. He was matter-of-fact and he didn't play around in groupings that often led to conflict. He kept to himself and focused on religion and studying.

But one day the New York guys, I remember, were having a problem between themselves. Even though Robert did not really spend time with this New York group, those guys came to Robert to ask for his help mediating the problem before it got worse. I could see in how they approached him that they had a lot of respect for him. They sought his advice when something needed to be solved.

Since I was inside for only about a year the other thing that was so striking to me was that I was with someone who had done almost thirty years. It felt so concerning to me and didn't make any sense. He didn't even seem like the type of person who I could even imagine in a life or world of drugs that would lead to a life sentence. I never really understood it. I just remember feeling bad for him. He was already older—maybe 20 years more than me—and he had a lot of family and grandkids he loved.

1

Page 127

Robert and I did spend some time looking at his case paper work together. He shared with me how a co-defendant in his case who had been much more involved in the drug case had come home much earlier. And he talked about how much he wanted to get home to his family. He talked about the possibility of getting in front of a judge, but I remember feeling sorry for him because I had just never seen those kinds of remedies work. Even for someone like him where it seemed to me like an obvious overkill, I knew it was so rare for anyone to get released. I honestly didn't think it would happen.

That's why when I heard a judge had given him release I knew it was a big deal. I couldn't believe or expect it even though I knew he deserved it more than anyone I had met. I learned he had been released because I started doing google searches once I was on the outside. Robert was someone I cared about and he was someone I wanted to reach out to make sure he was taken care of no matter where he was in his sentence or life. I didn't expect to hear he was already out and I was so relieved for him when I searched for him online.

Again, I would describe Robert as an uncle or father-figure in terms of the role he played for me during my time inside. He was a natural mentor to many, including me. Just seeing his zeal— being an older man and not giving up at an older age—it inspired me to take life more seriously when I came home.

When I met Robert I did not have a job or any degrees. Today I have a master's degree—a MBA with a focus on finance. I also joined volunteer groups. One of the groups I joined was from International Open University called the Prison Initiative. This is an outreach program for Muslim prisoners. We help them get education—religious and non-religious—so that they can get diplomas, certificates and degrees of that nature. Robert had a lot of influence on me in wanting to do more outreach and be more involved.

A lot of people who are in prison are victims of themselves or their circumstances. They aren't on the right path, but all they need is a voice of reason from someone they can trust and who will encourage them. Robert was that guy for me.

He deserves his well-earned peace and time with his grandkids and family. I hope you will consider granting him a pardon so he is not forced to leave the country.


Sincerely,

Tyrone Ward
ibntyrone@gmail.com
618-691-1706

2

**Page 128**